UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY
-------------------------------------------------------------------------X

DR. TERRY RAMNANAN,                                    Dkt. No.: 20 Civ. 12747

                        Plaintiff,

            -against-                                   **COMPLAINT**

COLIN KEIFFER, ESQ., Individually and in his Official
Capacity, DETECTIVE WENDY BERG, Individually and      **JURY TRIAL DEMAND**
in her Official Capacity, DETECTIVE GRACE PROETTA,
Individually and in her Official Capacity, DETECTIVE
JOHN CAMPANELLA, Individually and in his Official     **ECF CASE**
Capacity, GURBIR S. GREWAL, Individually and in his
Official Capacity, RONALD HAYEK, D.C., Individually,
UNION WELLNESS CENTER P.A. LLC, ADAM
AWARI, D.C., Individually, and ADVANCED CHIRO
SPINE CENTER, P.C.,

                        Defendants.
-------------------------------------------------------------------------X

        Plaintiff DR. TERRY RAMNANAN ("Plaintiff"), by his attorneys JON L. NORINSBERG,

ESQ., PLLC, complaining of Defendants, respectfully alleges the following, based upon his own

personal knowledge and/or upon information and belief:

### PRELIMINARY STATEMENT

        1.      This case arises from a manufactured and utterly baseless criminal prosecution that

destroyed a prominent doctor's career, and left his practice and reputation in ruins. The Defendants

here engaged in grossly improper and highly unethical conduct to attain their unlawful ends.   They

manufactured evidence, altered documents and coerced witnesses to give false, misleading and

dishonest testimony, for the purpose of generating a "high profile" case that could advance their careers

and promote their own political agendas.  As a result, Dr. Terry Ramnanan, a highly successful pain

management doctor who had enjoyed a stellar career for 39 years, and who had an excellent reputation

amongst his peers and patients, lost everything that he had worked his entire life to build.

2.      Plaintiff now brings this action to seek redress for Defendants' grossly improper conduct and their flagrant violations of his constitutional rights.  Plaintiff seeks compensatory damages, punitive damages and attorney's fees pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1988 for violations of his civil rights, as said rights are secured by said statutes and the Constitutions of the State of New Jersey and the United States.

## JURISDICTION

3.      This action is brought pursuant 42 U.S.C. §1983 and the Fourth and Fourteenth Amendments to the United States Constitution. The Court has subject matter jurisdiction 28 U.S.C. §§ 1331.

4.      Supplemental jurisdiction over any state law claims asserted herein is founded upon 28 U.S.C. §§ 1367.

## VENUE

5.      Venue is properly laid in the District of New Jersey under 28 U.S.C. § 1391(b)(3), in that this is the District where the incident arose and where all Defendants are employed.

## JURY DEMAND

6.      Plaintiff respectfully demands a trial by jury of all issues in this matter pursuant to Fed. R. Civ. P. 38(b).

## PARTIES

7.      Plaintiff DR. TERRY RAMNANAN is a physician duly licensed to practice medicine in the State of New Jersey, and a resident of the State of New Jersey, residing presently in Upper Saddle River, New Jersey.

8.      At all times hereinafter mentioned, defendant COLIN KEIFFER, ESQ. ("KEIFFER") was a Deputy Attorney General in the Office of the Insurance Fraud Prosecutor of the State of New

Jersey, located at 25 Market Street, in Trenton, New Jersey.

9.      At all times hereinafter mentioned, defendant DETECTIVE WENDY BERG ("DET. BERG") was a detective working in the New Jersey Office of the Attorney General, Division of Criminal Justice, Office of the Insurance Fraud Prosecutor located at 25 Market Street, in Trenton, New Jersey.

10.     At all times hereinafter mentioned, defendant DETECTIVE GRACE PROETTA ("DET. PROETTA") was a detective working at the Union County Prosecutor's Office, located at 32 Rahway Ave, Elizabeth, New Jersey.

11.     At all times hereinafter mentioned, defendant DETECTIVE JOHN CAMPANELLA ("DET. CAMPANELLA") was a detective  working in the Office of the Insurance Fraud Prosecutor of the State of New Jersey,  located at 25 Market Street, Trenton, New Jersey.

12.     At all times hereinafter mentioned, Defendants  KEIFFER, BERG, PROETTA, CAMPANELLA (collectively, the "State Defendants"), were acting within the scope of their employment at the New Jersey Attorney General's Office, and in furtherance of their duties and responsibilities as employees of the New Jersey Attorney General's Office.

13.     At all times hereinafter mentioned, defendant GURBIR S. GREWAL ("GREWAL") was the Attorney General of the State of New Jersey working in the New Jersey Office of the Attorney General located at 25 Market Street, Trenton, New Jersey.

14.     At all times hereinafter mentioned, defendant RONALD HAYEK, D.C. ("HAYEK"), was a chiropractor and the owner of UNION WELLNESS CENTER P.A. LLC, located at 169 Union Blvd Ste. 2C, Totowa, New Jersey.

15.     At all times hereinafter mentioned, defendant the UNION WELLNESS CENTER P.A. LLC, was a chiropractic practice duly organized and existing under and by virtue of the laws of

the State of New Jersey, with its principal place of business, 169 Union Blvd Ste. 2C, Totowa, New Jersey, and was owned, operated, maintained and controlled by defendant Ronald Hayek, D.C.

16.     At all times hereinafter mentioned, defendant ADAM AWARI, D.C. ("AWARI"), was a chiropractor, and the owner of Advanced Chiro Spine Center, located at 1555 Main Avenue, Clifton, New Jersey.

17.     At all times hereinafter mentioned, defendant the ADVANCED CHIRO SPINE CENTER, P.C., was a chiropractic practice duly organized and existing under and by virtue of the laws of the State of New Jersey, with its principal place of business, 1555 Main Avenue, Clifton, New Jersey, and was owned, operated, maintained and controlled by defendant Adam Awari, D.C.

## FACTS

**Dr. Ramnanan's Stellar Career and Exemplary Reputation as a Physician.**

18.     Plaintiff, Dr. Terry Ramnanan, was and is a physician duly licensed to practice medicine in the State of New Jersey.

19.     Dr. Ramnanan is a double Board-Certified Physician who completed two Fellowships, one being at the prestigious and highly competitive University of California, San Francisco, where he was retained as an Assistant Clinical Professor in Pain Management.

20.     For over 38 years, Dr. Ramnanan was a highly respected medical doctor who operated his practice in Paramus, New Jersey.

21.     During his lengthy career, Dr. Ramnanan enjoyed a stellar reputation among the larger medical community and with his patients.

22.     After a very successful medical career in California, spanning over 15 years, including serving as a Department Chairman at a large hospital in California, Dr. Ramnanan was

recruited in 2003 by Hackensack University Medical Center, in Hackensack New Jersey, to help initiate the Pain and Palliative Department.

23.     Dr. Ramnanan had never been sued for malpractice,  and had never been the subject of any complaints by his patients.

24.     Dr. Ramnanan had built a strong and vibrant practice over the course of his career. Many of his patients came to him by word of mouth from other patients, or by referrals from other doctors.

**The State Defendants Engage in Willful and Intentional Misconduct, and Destroy Dr. Ramnanan's Career.**

25.     On August 2, 2017, Dr. Ramnanan was charged in a "kickback scheme" involving "illegally paying for patients."

26.     As set forth in detail below, the alleged "kickback scheme" was based on completely manufactured evidence by the State Defendants.

27.     There was no evidence that Dr. Ramnanan had engaged in any kickback scheme whatsoever. In fact, Dr. Ramnanan never paid for *any* referrals from any medical professional, at any time, *ever*.

28.     Unable to establish Dr. Ramnanan's guilt by **actual evidence**, the State Defendants resorted to lying, cheating and manufacturing evidence to fill in the gaps in their misguided and utterly baseless prosecution.

29.     Further, the State Defendants engaged in blatantly vindictive and retaliatory conduct against Dr. Ramnanan when he refused to cooperate with them.  Once they realized that Dr. Ramnanan would not "name names" -- since he had no information whatsoever to give them -- the State Defendants retaliated against him by filing a plethora of new, equally baseless charges against him.

5

30.     On May 23, 2019, all criminal charges against Dr. Ramnanan were dismissed by the Honorable Robert Vinci.

31.     In dismissing the criminal charges, Judge Vinci concluded that, as a matter of law, Dr. Ramnanan had not engaged in any act of healthcare claims fraud. Specifically, Judge Vinci found as follows:  "*As a matter of law, the State cannot establish the defendant made any false, fictitious, fraudulent, or misleading statement of fact in any document submitted for payment or reimbursement for health services*…" (Ex. A Transcript of Dismissal, dated May 23, 2019, ("Order"), at  21).

32.     Moreover, Judge Vinci concluded that the State Defendants, in their zeal to secure an indictment against Dr. Ramnanan, had crossed the ethical line and engaged in gross prosecutorial misconduct: "[T]his Court concludes that the State *intentionally subverted the grand jury process* resulting in a grand jury presentation that was *fundamentally unfair*." (Order  at 32) (emphasis supplied).

33.     Notwithstanding the dismissal of all criminal charges, Dr. Ramnanan has suffered, and continues to suffer, severe, permanent, and irreparable harm to his professional and personal reputation.

34.     As a result of the State Defendants' manufactured claims against him, Dr. Ramnanan's entire practice has been destroyed, and all of his sources of income have been completely eviscerated.

**The Origins of this Manufactured Prosecution:  The State Defendants Coerce Defendant Ronald Hayek, D.C., to "Name Names" in Order to Avoid a Lengthy Prison Sentence.**

35. The origins of this baseless prosecution can be traced back to July 2016, when Defendant Hayek pleaded guilty to two criminal accusations.  The first accusation charged him with second-degree conspiracy, second-degree money laundering, six counts of commercial

bribery, and one count of third-degree failure to pay taxes. The second accusation charged him with one count of third-degree conspiracy.

36.   In connection with his plea agreement, Hayek agreed to fully cooperate with the State Defendants in their "kickback scheme" investigation.

37.   In exchange for this cooperation, the State Defendants permitted Hayek to enter into a plea agreement which provided for the possibility of a probationary sentence with *no* jail sentence imposed, instead of facing a potential prison sentence of more than *20 years*.

38.   Furthermore, the State Defendants agreed to write a letter to the Chiropractic Licensing Board advising the Board of the cooperation given by Hayek to the State as a possible means of keeping his chiropractic license to practice medicine.

39.   In short, the State Defendants induced Hayek to name as many doctors as possible in the "kickback scheme"  -- whether supported by evidence or not --  by dangling the possibility of no jail sentence, and the opportunity to keep his license.

40.   With an offer he could not refuse, Hayek joined the State Defendants' prosecution team, and became fully invested in their shared goal of manufacturing a case against as many doctors as possible, including Dr. Ramnanan, so as to avoid prison time and preserve his license as a chiropractor.

41.   On March 17, 2016, as part of his cooperation agreement with the State, Hayek participated in a proffer session with members of the Office of the Insurance Fraud Prosecutor.

42.   During this proffer session, Hayek *never once* mentioned that he was involved in a referral relationship with Dr. Ramnanan at any time.

43.   In fact, during the entire proffer session, Hayek never even mentioned Dr. Ramnanan's name, even though he had the opportunity to do so multiple times.

44. On April 1, 2016, Hayek participated in a second proffer session with members of the Office of the Insurance Prosecutor, including Defendant Keiffer.

45. During the course of the lengthy interview, Hayek admitted to participating in multiple conspiracies, identifying many other medical providers and other professionals.

46. It was only at the end of this long proffer session, after being relentlessly pressured to name additional doctors by the State Defendants, that Hayek finally made allegations against Dr. Ramnanan.

47. In response to the State Defendants' relentless leading questions, Hayek stated that he referred to Dr. Ramnanan approximately 30 patients for EMG and NCV tests, in exchange for referral fees.

48. As set forth in detail below, Hayek's allegations were patently false. In fact, Dr. Ramanan never once -- *ever* -- paid Hayek for the referral of any patients.

49. To the contrary, the only payments that Dr. Ramnanan ever made to Hayek were for rent.

50. The State Defendants were well aware of this fact. In fact, during this proffer session, Hayek acknowledged -- as reflected in the State Defendants' own reports, and by Dr. Ramnanan's cancelled checks -- that Dr. Ramnanan "pays Hayek for rent when using Hayek's office space," and that "the rent payment to Hayek from Ramnanan is by check."

51. As set forth in more detail below, the State Defendants willfully, deliberately and knowingly attempted to conceal this material fact – i.e., that the payments made to Hayek were for rent -- during the course of their investigation, hiding it from both the Judge and from the Grand Jury throughout the criminal proceedings.

**The Truth About Plaintiff's Work Relationship with Hayek.**

52.    At all times alleged herein, Defendant Ronald Hayek was a Chiropractor whose practice was located on 169 Union Avenue, Totowa New Jersey.

53.    Plaintiff first met Hayek sometime around 2010 at one of the surgery centers (Endosurgery center) where he was doing Pain procedures.

54.    At that time, Hayek was doing Manipulation Under Anesthesia ("MUA") procedures, and the two met when they were doing medical procedures at the same time.

55.    At some point thereafter, Dr. Ramnanan met Hayek and asked him if he has a pain management physician to whom he is referring his patients.

56.    Defendant Hayek stated that he was already referring patients to a specific pain physician but that he did, in fact, need a physician to do electrodiagnostic studies (EMG/NCV), because he had a backlog of patients who needed these procedures.

57.    Dr. Ramnanan responded that he could explore the possibility. Thereafter, he contacted a few physicians who were willing to perform EMG/NCV procedures on Hayek's patients, as needed.

58.    Thereafter, Dr. Ramnanan and a few other physicians started doing the consultations and testing (EMG/NCV procedures) in early 2012, in a space that Hayek was renting next door to his main facility.

59.    Hayek told Plaintiff that the space that he was renting was an extension of his main facility, which he was using mainly to do physical therapy and acupuncture on his patients.

60.    Initially, it was not clear whether this would be a long-term arrangement, so there was no discussion of any rental agreement at that time.

61.     Toward the end of 2012, Dr. Ramnanan realized that for the convenience of some of his patients, especially while his then current North Haledon Office was in the process of being relocated to Paramus, New Jersey, it would be much better if he could see some of his patients from nearby areas, in Hayek's Totowa office.

**Dr. Ramnanan Starts Renting Office Space from Hayek in 2013, Paying $600.00 By Check Every Month.**

62.     Thereafter, Dr. Ramnanan broached the topic with Hayek of using his Totowa office space. In response, Hayek said that, in order for Dr. Ramnanan to use the Totowa office, he would have to pay monthly rent to Hayek.

63.     Hayek initially wanted $1,200.00 per month in rent, which Dr. Ramnanan thought was too high, since the facility would only be used 2 to 3 times a month, and not more than 2 to 4 hours per session. At maximum, Dr. Ramnanan would be utilizing this office for 12 hours or less per month.

64.     Hayek eventually agreed to $600.00 per month, which, again, was *paid by check*. The checks were made out to Hayek's business entity – "Union Wellness Center" – and the memo section of the checks clearly stated that the payments were for "Union Office Totowa Rent." (Ex. B, Sample Checks).  The first such rent payment was made in January 2013.

65.     All payments made to Hayek, from 2012 to 2016, were solely for rent.  The amount paid to Hayek was exactly the same --  $600.00 -- every month, and never varied.

66.     This agreement continued until March 2016, when Dr. Ramnanan learned that Hayek was under criminal investigation.

67.     Once Dr. Ramnanan learned that Hayek was under investigation, he did not want to have any type of involvement with Hayek whatsoever, and therefore, terminated the rental arrangement.

68.    These rent payments were the only payments ever made by Dr. Ramnanan to Hayek. Dr. Ramnanan never once -- *ever* -- paid Hayek for a "referral" of any patients whatsoever.

**The State Defendants Hide the Truth About the Rent Payments from the Court and Grand Jury.**

69.    The State Defendants knew that the only payments made to Hayek were for rent, and not for referral fees.

70.    Notwithstanding their knowledge of the fact that Dr. Ramnanan's payments to Hayek were solely for rent, and not for alleged "kickbacks," the State Defendants willfully and deliberately concealed this fact when presenting this case to the Court and to the Grand Jury, thereby ensuring that this baseless prosecution against Dr. Ramnanan would continue.

71.    By willfully and deliberately omitting any reference to the rent payments, the State Defendants materially altered the meaning of the payments made to Hayek, and created a false, misleading and dishonest portrait of the work relationship between Hayek and Dr. Ramnanan.

**The Complete Absence of Evidence to Support the First Indictment.**

72.    Based entirely on the manufactured claims of Hayek, Dr. Ramnanan was indicted on August 1, 2017 in a three-count indictment charging Conspiracy in the Third Degree (N.J.S.A. 2C:5-2; Count 1); Commercial Bribery in the Third Degree (N.J.S.A. 21-9; Count 2); and Criminal Running in the Third Degree (N.J.S.A. 2C:21-4.3a; Count 3).

73.    In this three-count indictment, filed on August 1, 2017, the State Defendants accused Dr. Ramnanan of conspiring with Hayek, a licensed chiropractor, to engage in a medical fraud kickback scheme wherein it was alleged that Dr. Ramnanan paid Hayek $100.00 cash for conducting an EMG/NCV test in either the upper or lower extremity, or $200.00 in cash if both extremities were performed on patients referred by Hayek.

74.     There was *no evidence* whatsoever to support these charges.

75.     Dr. Ramnanan never paid a single dollar to Hayek for patient referrals.  This claim was a complete and utter fabrication, invented by the State Defendants to build a case where otherwise existed.

76.     As the State Defendants well knew, the only money that Dr. Ramnanan ever paid to Hayek was for monthly *rent,* as Dr. Ramnanan leased office space from Hayek to conduct EMG/NCV tests on patients who were referred to Dr. Ramnanan by multiple providers.  Thus, each and every month, Dr. Ramnanan would pay Hayek $600.00 in rent for use of his Totowa facilities.

77.     There was nothing illegal or improper about these rent payments.  To the contrary, the rent payments were paid by *check* -- which left a clear and transparent paper trail -- and there was nothing secretive or illicit whatsoever about this rental agreement.   (Ex B, sample monthly payment checks paid by Dr. Ramnanan to Hayek).

78.     Throughout their investigation, and throughout all phases of the criminal proceedings, the State Defendants willfully, knowingly, and intentionally concealed the fact that the payments made by Dr. Ramnanan were solely for *rent.*

79.     The State Defendants concealed the fact of rent payments from the presiding Judge, as well as from the Grand Jury, because they knew that disclosing this evidence would eviscerate their preposterous "kickback" charges against Dr. Ramnanan.

80.     Apart from Hayek's claims -- which were patently incredible on their face, and were fraught with blatant lies, material inconsistencies and gross exaggerations -- there was literally not one *scintilla* of evidence to support the State Defendants charges of an illegal kickback scheme between Plaintiff and Hayek.

81.    There were no witnesses to support any claims of any type of referral payments -- much less an "illegal kickback scheme" -- from Dr. Ramnanan to Hayek.

82.    There were no text messages between Dr. Ramnanan and Hayek.

83.    There were no emails between Dr. Ramnanan and Hayek.

84.    There were no letters between Dr. Ramnanan and Hayek.

85.    There were no faxes between Dr. Ramnanan and Hayek.

86.    There were no incriminating recorded conversations between Dr. Ramnanan and Hayek.

87.    In short, there was no evidence whatsoever, of any kind, to support the State Defendants' claims that there had been illegal payments from Dr. Ramnanan for referral of patients.

**In the absence of actual evidence, the State Defendants Manufacture Evidence Against Dr. Ramnanan to Establish Probable Cause.**

88.    In the absence of *actual* evidence showing any wrongdoing by Dr. Ramnanan, the State Defendants decided to fill in the gaps of their (non-existent) case by literally making up evidence in order to establish probable cause.

89.    As detailed below, the State Defendants manufactured evidence in multiple and significant ways, including but not limited to, doing the following unlawful acts: i) creating a false and misleading transcript of a recording a conversation between Dr. Ramnanan and Hayek, so as to materially alter the meaning of the actual words spoken between the two of them;  ii) creating false and misleading "summary" charts which improperly aggregated the insurance claims submitted by Dr. Ramnanan, thereby vastly increasing the alleged amount of "fraud" committed by him;  iii) commingling the claims submitted by Dr. Ramnanan with the claims submitted by Hayek, thereby creating a "shared" claims chart that was completely fictitious;  iv) commingling

the referrals submitted by other medical practitioners to Dr. Ramnanan with those of Hayek, thereby vastly overstating the amount of patients that Hayek had actually referred to Dr. Ramnanan for EMG/NCV tests; and v) creating summary charts which improperly aggregated *all* of the insurance payments made to *all* of the alleged referral fee patients, for purposes of establishing a completely fictitious sum of $682,000.00 in "fraudulent billing." Each form of false evidence is discussed further below.

**<u>Fabricated Evidence Item No. 1 – The Altered Transcript</u>**

90.     Since the State Defendants had no independent evidence to corroborate Dr. Ramnanan's involvement in any criminal enterprise, they were desperate to find some evidence to prove that a criminal conspiracy did, in fact, exist between Dr. Ramnanan and Hayek.

91.     The State Defendants attempted to create such evidence by having Hayek make a surreptitious recording of a conversation with Dr. Ramnanan. The State Defendants' goal was to record Dr. Ramnanan making self-incriminating statements that could be used against him as independent corroborating evidence to prove the existence of the charged conspiracy.

92.     Towards this end, on April 8, 2016, the State Defendants provided Hayek with a recording device and secreted it on Hayek's person under his clothing.

93.     The objective was to record a conversation between Dr. Ramnanan and Hayek in which, the State Defendants believed, the two would discuss aspects of the criminal conspiracy between them.

94.     Without independent evidence to corroborate Hayek's claims, the State Defendants knew that they would not be able to indict Dr. Ramnanan solely on the testimony of a cooperating government witness.

95.     The need for independent corroboration was particularly compelling in this case, where the State's "star witness" was Hayek, whose credibility was suspect from the outset given his own criminal activities, and his highly incentivized plea deal.

96.     The conversation between Dr. Ramnanan and Hayek, however, did not go as the State Defendants had planned.

97.     Notwithstanding the State Defendants' plan to trap Dr. Ramnanan and have him make damning admissions during this conversation, Dr. Ramnanan did not, in fact, make *any* such incriminating statements during this conversation.

98.     The full, unredacted audio recording of this conversation confirms that Dr. Ramnanan did not make any incriminating statements whatsoever during this conversation.

99.     In the absence of any incriminating statements, the State Defendants attempted to create inculpatory evidence by materially altering the transcript of the actual conversation which took place between Dr. Ramnanan and Hayek.

100.    This altered transcript was created by Detective Grace Proetta during the course of the State Defendants' investigation, when they were still trying to build a case against Dr. Ramnanan and long before they had probable cause to charge Dr. Ramnanan with *any* criminal offenses, much less the commercial bribery and health care fraud charges that they eventually filed against him.

101.    The altered transcript became a lynchpin of the State Defendants' entire case against Dr. Ramnanan.  Without this piece of manufactured evidence, the State Defendants' case could not have moved forward, much less have been presented to a grand jury and used to secure an indictment.

102.    The State Defendants' sleight of hand occurred by altering a critical portion of the transcript, where Hayek had asked Dr. Ramnanan whether he had spoken about their rental arrangement to anyone else.

103.    Specifically,  Hayek started to asked Dr. Ramnanan about whether he (Dr. Ramnanan) had mentioned to anyone their monthly rental arrangement -- which, again, was documented by payments of monthly *checks*, was not hidden in any manner and was perfectly legal -- Dr. Ramnanan interrupted Hayek and answered "Nah, nah, nah, nah …" in mid-sentence, before Hayek could finish his question.

104.    Listening to the actual recording of the conversation makes it clear that Dr. Ramnanan's answer takes place *before* Hayek finishes his question, as the two are speaking over each other at the same time, with a loud television blaring in the background.

105.    However, in order to make the conversation sound incriminating -- and create the inculpatory "evidence" that was otherwise completely lacking on the actual recording --  the State Defendants, and in particular, Detective Grace Proetta, willfully, deliberately and knowingly altered the sequence of the questions and answers between Dr. Ramnanan and Hayek.

106.    Specifically, the State Defendants, and in particular, Defendant Proetta,  created a transcript of the conversation which made it appear as if Hayek had *fully finished* his question first, and then Dr. Ramnanan had answered in response, as follows:

> RH:    You didn't tell, you didn't' tell anybody that you … that *you
> pay me for doing EMG and NCV* and all of that.  Did you?
> Did you mention that to anybody?
> TR:    Nah, nah, nah, nah, nah.
> RH:    No? Right, right?

107.    Thus, on the transcript created by the State Defendants, the questions and answers are presented as a single, fluid exchange.

108.    In other words, as a result of the State Defendants' deliberate and willful alteration of the transcripts, it appears as if Dr. Ramnanan is directly answering the question of whether or not he, Dr. Ramnanan, told anyone that he "pay[s] [Hayek] for doing EMG and NCV" referrals.

109.    On the actual recording, however, Dr. Ramnanan, interrupts Hayek and starts saying "nah, nah, nah" *before* Hayek completes his question, and *before* Hayek makes it clear that he is not asking about rent, but rather, about "EMG and NCV" procedures.

110.    Thus, the transcript that was created by the State Defendants during their investigation, and ultimately presented to the Grand jury, was materially different than the actual audio recording between Hayek and Dr. Ramnanan.

111.    The State Defendants were well aware of the fact that the transcript was false, misleading and inaccurate.  In fact, Defendant Keiffer would later acknowledge that: "There may and are portions of the recording that are omitted and *may be transcribed incorrectly*."

112.    Notwithstanding the fact that the State Defendants *knew* that the audio recording had been "transcribed incorrectly," they nonetheless used this false and misleading "evidence" to secure an indictment against Dr. Ramnanan.

113.    Not only was the audio recording "transcribed incorrectly," but also, the transcript itself with fraught with significant gaps and material omissions.

114.    The State Defendants were well aware of the fact that the transcript contained multiple and significant gaps in the conversation between Dr. Ramnanan and Hayek.  In fact, Defendant Keiffer would later acknowledge that there were "*portions of the recording that are omitted*."

115.    Indeed, throughout the transcript, there are many instances where portions of the conversation are deliberately omitted.

116. For example, in multiple places, Dr. Ramnanan's portion of the conversation is completely deleted, even though his words are clearly audible on the recording itself.

117. Notwithstanding the fact that the State Defendants *knew* that "portions of the recording [] are omitted," they nonetheless used this false and misleading "evidence" to secure an indictment against Dr. Ramnanan.

118. The removal of Dr. Ramnanan's words in this manner materially altered the impression created by the actual recording, destroying the natural ebb-and-flow of the conversation, and changing it from appearing innocuous to appearing inculpatory.

*i.    The State Defendants Conceal the Truth About the Altered Transcript.*

119. The State Defendants' alteration of this transcript was willful, deliberate and intentional. In fact, the State Defendants deliberately tried to conceal the truth about who had created this transcript.

120. During the course of the criminal proceedings, Dr. Ramnanan's defense counsel, William Wong, Esq. -- a former federal prosecutor with over 40 years of experience, who had handled thousands of cases in his career -- repeatedly asked for the State Defendants to disclose the identity of the person who had created this transcript.

121. Notwithstanding these repeated requests, the State Defendants repeatedly refused to disclose the identity of the person who had transcribed, and materially altered, the recording between Dr. Ramnanan and Hayek.

122. In fact, Detective Wendy Berg -- when asked directly by Mr. Wong who had created the transcript -- affirmatively lied to him by stating that it was some "transcription company."

123.    When Mr. Wong asked Detective Berg to name the "transcription company," Detective Berg lied again and told him that she "didn't know" the name of the company that had created the transcript, when in fact, she knew full well that there was no transcription company at all involved with the creation of this transcript.

124.    Detective Berg deliberately lied to Mr. Wong in order to hide from the defense the fact that her own colleague, Detective Proetta, had in fact created this misleading and altered transcript.

125.    In lying to Mr. Wong in this manner, Detective Berg was deliberately attempting to conceal the wrongdoing of her colleague, Detective Proetta, and prevent Mr. Wong from exposing this misconduct during his eventual cross-examination of Detective Proetta.

126.    In fact, the State Defendants were so worried about the truth coming out that they did not allow Detective Proetta to testify at the second grand jury proceeding, hoping to avoid creating any further sworn testimony from her about this transcript.

127.    Instead, the State Defendants elected to put Detective Berg on the stand to explain to the grand jury -- in response to a series of highly improper leading questions by Keiffer, who became an unsworn witness and essentially "testified" by putting words into Detective Proetta's mouth -- what was actually said between Hayek and Dr. Ramnanan during the conversation.

128.    Another red flag regarding this transcript is the complete absence of a report signed by a supervisor from the State Defendants' office.

129.    The normal custom and practice of the New Jersey Attorney General's Office is to have all investigative reports reviewed and signed by a supervisor.  This is a mandatory rule, with no exceptions.  However, that rule was not followed in this case.

130.    The false transcript created by the State Defendants was critical to securing both the first and second indictments.

131.    Without this piece of manufactured evidence, Dr. Ramnanan would never have been indicted in the first place, much less prosecuted for almost two years.

**Fabricated Evidence Item No. 2 – The False "Shared Claims" Chart**

132.    Apart from the altered transcript of the conversation between Dr. Ramnanan and Hayek, there were several other forms of evidence that were manufactured by the State Defendants.

133.    One such form of fabricated evidence was the "Shared Claims" Chart created by the State Defendants.

134.    The "Shared Claims chart" purportedly shows instances where Dr. Ramnanan and Hayek collectively billed multiple insurance companies for medical procedures.

135.    In fact, there were no such "Shared Claims" that were collectively billed by Dr. Ramnanan and Hayek.  This was a complete and utter fabrication.

136.    The "Shared Claims" also shows instances where Dr. Ramnanan and Hayek were both paid by insurance claims based on their "Shared Claims."

137.    In fact, there were no such "Shared Claims" that were paid by insurance companies to Dr. Ramnanan and Hayek.  This too was a complete and utter fabrication.

138.    The State Defendants also took everything that Dr. Ramnanan billed and unlawfully combined and commingled such billings with every sum that Hayek's practice billed.

139.    In fact, according to the State Defendants' Chart, Hayek was still billing and collecting money in 2017, which is impossible, since his practice was shut down in the spring of 2016.

140.    The chart is further flawed in that it contains multiple entries from providers that Dr. Ramnanan had never heard of, and with whom he had no business dealings with whatsoever.

141.    For example, many items included in the "Billing Provider" column of the "Billed on Shared Claims" tab included providers such as "Chong Lee," "Kevin Shea," "Mu Chong."

142.    Dr. Ramnanan never had any interactions with any of these providers, much less a referral relationship.

143.    The inclusion of the names of these other providers was not done by accident. Rather, the State Defendants willfully, deliberately, and knowingly included the names of other providers.

144.    The "Shared Claims" exhibit is further misleading because it deletes material information, namely, the name of the patients who received these procedures, making it impossible to determine which patients the State Defendants were referring to.

145.    The willful and deliberate omission allowed the State Defendants to show a random, large number to persuade the Grand Jury to indict Dr. Ramnanan.

146.    In short, the "Shared Claims" chart was a completely fictitious document. There was no factual basis whatsoever to support the "evidence" that appeared on this chart.

147.    The State Defendants created the "Shared Claims" Chart during the course of their investigation, when they were still trying to establish probable cause to charge Dr. Ramnanan.

148.    The State Defendants then used this "Shared Claims" Chart during the grand jury proceedings.

149.    Specifically, during the course of the second grand jury proceeding, the tabs in Exhibit 8 included the labels "Billed on Shared Claims" and "Paid on Shared Claims".

21

150.    The inclusion of such labels was materially false and misleading. In fact, there were *no* "shared claims" of any nature between Dr. Ramnanan and Hayek, *ever*.

151.    Since there were no shared claims between Dr. Ramnanan and Hayek, *ipso facto*, there could not have been any "Billed on Shared Claims files" between the two practitioners.

152.    The State Defendant's creation of a "Shared Claims" chart was willful, deliberate and knowing fabrication, made up out of whole cloth and intended to help establish probable cause -- where none otherwise existed -- and deceive the grand jury.

153.    Likewise, since there were no shared claims between Dr. Ramnan and Hayek, then, *ipso facto*, there could not have been any "Paid on Shared Claims files" between the two practitioners.

154.    This, too, was a complete and utter fabrication, invented out of whole cloth by the State Defendants, in order to establish probable cause and deceive the grand jury.

**Fabricated Evidence Item No. 3: The False "Summary Chart" of Dr. Ramnanan's Records**

155.    Another flagrant example of manufactured evidence came in the form of a "Summary Chart" that the State Defendants created during the course of their investigation.

156.    This "Summary Chart" purportedly summarized information found in Dr. Ramnanan's medical records relating to procedures that he performed, bills that he submitted, and the doctors who referred the patients to him.

157.    The problem with this "summary," however, is that it contained information that was false and misleading, and was riddled with wildly inaccurate information and errors.

158.    This Summary Chart was created during the course of the State Defendants' investigation, and was used by them to manufacture probable cause to file charges against Dr. Ramnanan.

159.    This Summary Chart was thereafter used by the State Defendants during the second grand jury proceeding -- and introduced as "Exhibit 9" -- to secure an indictment against Dr. Ramnanan.

160.    The Summary Chart was false and misleading in every possible respect.

161.    For example, the Summary Chart repeatedly and consistently included erroneous information about the source of patient referrals to Dr. Ramnanan.

162.    Specifically, the Summary Chart repeatedly and consistently included the names of patients who were allegedly referred by Hayek, when in fact, these patients were referred by *other* medical providers, and *not* by Hayek.

163.    Further, the Summary Chart contains the names of multiple patients who were allegedly referred by Hayek to Dr. Ramnanan, even though such patients were *not* referred by Hayek.

164.    An example of some of the patients who were referred by other doctors, and not Hayek, include but are not limited to the following individuals: i) patient Andrzej Burdzy was referred by Joseph Salamone, D.C., *not* Ronald Hayek, D.C.; ii) patient Gabriela Burdzy was referred by Joseph Salamone, D.C., *not* Ronald Hayek, D.C.; iii) Sonia Perez was referred by Stuart Levin, D.C., not Ronald Hayek, D.C.; and iv) Michael Massenzio was referred by Dr. Michael Loreti, *not* Ronald Hayek, D.C.

165.    The State Defendants willfully and deliberately included the names of the above patients, as well as many others, in order to artificially increase the total number of referrals from Hayek to Dr. Ramnanan.

166.    The State Defendants created this false and misleading chart during the course of their investigation, when they were still trying to establish probable cause to charge Dr. Ramnanan.

23

167.    The State Defendants then used this same misleading chart during the course of the grand jury proceedings to help secure an indictment.

*i.*    ***Additional Falsehoods in the Summary Chart***

168.    The Summary Chart was flawed and misleading in many other respects as well. For example, the Summary Chart repeatedly and consistently included erroneous information regarding the procedures performed on the various patients by Dr. Ramnanan.

169.    While the State Defendants claimed that Dr. Ramnanan had "paid Hayek for EMG/NCV tests," in fact, many of the services listed on Exhibit 9 were for *different* procedures, and not for an EMG /NCV.

170.    The inclusion of these other procedures was not done by accident.   The State Defendants willfully, deliberately and knowingly included such other procedures in order to artificially inflate the number of procedures that Dr. Ramnanan had allegedly submitted to the insurance companies as part of the "kickback scheme".

171.    In fact, many of the patients who were referred by Hayek were referred for other medical procedures – procedures which were *not* included in the alleged "kickback scheme" – and therefore, were clearly outside of the scope of the information that should have been presented to the grand jury.

172.    Worse still, the Summary Chart also contained certain patients listed who were not even seen by Dr. Ramnanan, but instead, were seen by other providers.

173.    For example, patients Marjorie Diez-Neyra, Tomas Batista and Mirla Rosario -- to name just a few patients -- were seen by a Dr. "J.D.", *not* by Dr. Ramnanan.  The State Defendants deliberately included the names of patients seen by other providers, and not Dr. Ramnanan, to artificially inflate the amount of "fraudulent" bills that Dr. Ramnanan had allegedly submitted.

174.    The Summary Chart was further flawed in that it contained multiple entries relating to patients who were merely presenting to Dr. Ramnanan's office for a *follow-up* visit, not for an EMG/NCV procedure.  The State Defendants deliberately commingled and merged these visits -- and the bills arising from same -- so as to create a distorted and grossly inflated number as to the amount of bills submitted by Dr. Ramnanan to the various insurance companies.

**Fabricated Evidence Item No. 4: The False "Insurance Billing" Chart**

175.    The evidence that the State introduced at the grand jury hearing was factually insufficient to meet the threshold amount of $75,000.00 or more as charged in Count 2 of the indictment, which was the lynchpin of the more serious charges against Dr. Ramnanan.

176.    Even if the State Defendants' "kickback scheme" calculations were accepted as valid -- which they were not -- the total sum of kickback "fees" would only equal $28,900.00, *not* $75,000.00.

177.    The State Defendants were well aware of this shortfall.  In fact, in a spreadsheet created by Defendant Detective Campanella -- which was purportedly based on an interview of Ronald Hayek -- Defendant Hayek is shown to receive a total sum of $25,900.00 in "kickbacks" from Dr. Ramnanan for performing EMG/NCV medical procedures, at the rate of $100.00 per test, on patients referred to Dr. Ramnanan by Hayek.

178.    The State Defendants also presented testimony through Detective Berg, which was purportedly based on an interview of chiropractor Adam Awari -- that he received approximately $3,000.00 in cash from Dr. Ramnanan for the referral of patients.

179.    Thus, even accepting the State Defendants' allegations as true, the combined *total* amount of "kickback" fees would be $28,900.00, which falls far short of establishing that Dr. Ramnanan derived a benefit of $75,000.00 or more.

180.    To make up this shortfall of $46,100.00, the State Defendants created a false and misleading "Insurance Billing" chart during the course of their investigation.

181.    This false chart, which was later presented to the Grand Jury as Exhibit 15-B, purports to be a chart listing all of the insurance companies that Dr. Ramnanan billed for over <u>639</u> medical procedures in the amount of $<u>682,000.00</u>, for which the insurance companies actually paid him approximately $230,000.00 for the total amount billed.

182.    This "Insurance Billing" summary was false and misleading in every possible respect.  It was created for the sole purpose of overcoming a critical flaw in the State's theory of the case -- namely, that the amount of "kickbacks" fell far short of the mandatory $75,000.00 threshold --  by presenting a grossly distorted, and wildly inflated, number as to the amount of bills submitted by Dr. Ramnanan to the various insurance companies.

183.    This Insurance Billing summary was further misleading because Dr. Ramnanan did *not* bill for 639 procedures on Hayek's patients, did *not* submit $682,000.00 in bills to insurance companies in connection with Hayek's patients, and did *not* receive $230,000.00 in fees from the insurance companies for work performed on Hayek's patients.

184.    Moreover, the Insurance Billing summary was materially misleading for another reason: it deliberately conveyed, falsely, the impression that Dr. Ramnanan had fraudulently overbilled the insurance companies for large amounts of money.  Nothing, however, could have been further from the truth.

185.    As Judge Vinci expressly found -- and as the State Defendants were eventually forced to concede -- "[t]here were *no fraudulent claims, there was no over-billing or overcharging*. All of the amounts paid by the insurers were for medical procedures needed by – needed by and

performed on their insureds, amounts that the insurance companies were obligated to pay pursuant to their respective insurance contracts." (Order at 7) (emphasis supplied).

186.    Indeed, as Judge Vinci further noted, "the State *concedes that the procedures were medically necessary, and they were actually performed by qualified medical professionals on legitimate patients*." (Id).  Thus, there was no evidence of fraudulent billing whatsoever.

  i.    **The State Defendants Use False and Inaccurate Assumptions to Combine all Insurance Claims Together and Create a Grossly Inflated Total.**

187.    The State Defendants' Insurance Billing Summary was false and deceptive for still another reason:  it relied upon the aggregation of insurance claims that could not, as a matter of law -- much less fundamental fairness --  be grouped together in such a manner.

188.    The State Defendants' aggregation of these claims was based on an erroneous and wildly inaccurate assumption, namely: that *all* insurance companies would  have concluded that the referral payments allegedly paid by Dr. Ramnanan -- which he never actually paid -- would have been considered "material" by each and every insurance company, for *all* claims submitted.

189.    The State Defendants' theory was based on wild speculation.  There was simply *no evidence* that Dr. Ramnanan's alleged failure to advise on the insurance forms that he submitted the existence of a referral fee was a "material" omission, so as to establish fraud within the definition of the Health Care claims fraud statue.

190.    Indeed, Defendant Keiffer's questioning of Detective Berg before the Grand Jury confirms the complete and utter lack of evidence to support the State Defendants' claims.

191.    In a series of improper leading questions to the State Defendants' sole witness, Detective Berg,  Defendant Keiffer attempted -- but failed miserably -- to establish the fact that the omission to disclose the existence of a "kickback" scheme was material to each of the payments of the specific insurance claim:

> Q:  You've reached out to multiple insurance companies about whether the existence of a kickback relationship may affect their decision to pay, correct?
> A:  Yes
> Q:  And some of the questions that were asked of whether or not the existence of a kickback scheme *could potentially* affect the payment of the resolution of the claim?
> A:  Yes.
> Q:  And *some of them* said that a kickback scheme would definitely affect their investigation and payment of the claim, correct?
> A:  Yes.

(GJ. Tr. at 71) (emphasis supplied).

192.    Thus, "<u>some</u>" of the insurance companies contacted by Detective Berg said that failure to disclose a referral relationship on a claim form "<u>could potentially</u>" affect their payment of claims.    This "evidence" (if one can call it that) fell markedly far short of establishing the element of materiality.

193.    As Judge Vinci pointedly noted, the "State's effort to establish materiality before the Grand Jury was based on *vague and ambiguous hearsay testimony*" (Ex. A, at P. 22:2-23) (emphasis supplied).

194.    Indeed, the State Defendants did not present any evidence as to: i) how many insurance companies were actually contacted by Detective Berg;  ii) the names of the  insurance companies whom Detective Berg actually spoke with;   iii) the names and positions of the individuals whom  Detective Berg actually spoke with;  iv) the specific questions that Detective Berg actually posed to those individuals;  and v) the specific answers that they actually provided to Detective Berg.

195.    Notably, there is not a *shred* of evidence that exists -- not a single contemporaneous note, email, text, memorandum, and/or recording  --  to support the State Defendants' claims that *any* insurance companies actually believed that referral fees paid for EMG/NCV tests would be

"material" information in reviewing a claim form submitted, much less that *all* such insurance companies would so.

196.    Notwithstanding the absence of any such evidence, the State Defendants improperly -- as Judge Vinci would later conclude -- "aggregated all of the insurance payments made to all of the alleged referral fee patients for purposes of establishing the second degree grading of the offense." (Ex. A, at 29).

197.    Simply put, "it was *improper for the State to present the aggregate amount of the insurance payments* without reducing the amount for the insurers who would not even say that they might have denied the claims." (Id.) (emphasis supplied).

198.    As Judge Vinci further concluded: "The State *knew* that it could not establish that all of the insurers would have denied the claims … yet the State went ahead and told the grand jurors … that all of the insurers would have denied all of the claims when it … aggregated all of the amounts paid to Hayek and Awari in ... its presentation to the grand jury." (Ex. A, 30).

199.    Indeed, given the State Defendants penchant for manufacturing evidence and making up claims out of whole cloth, as detailed above, Detective Berg likely made very few, if *any,* actual calls to insurance companies to support her specious claims before the Grand Jury.

200.    The fact that Defendant Keiffer felt compelled to use only leading questions with Detective Berg -- rather than ask a single open ended question -- combined with the complete absence of any contemporaneous records documenting these alleged interviews, supports the conclusion that such calls were either never made by Detective Berg, or were made to only a very small number of insurance companies.

   *ii.*  ***The State Defendants Use the False "Aggregate Claims" Numbers to Create Several Other Highly Inaccurate and Prejudicial Charts.***

  201. Having created  false and misleading "evidence" of the total amounts paid by the insurance companies, the State Defendants sought to exploit the impact of this fabricated evidence by creating other false charts which shamelessly repeated -- in bold caps and with inflammatory, misleading  charts that made Dr. Ramnanan appear to be more like a drug kingpin than a doctor charged with paying referral fees  --- by including the same "evidence" in these charts as well.

  202. These other charts repeated the same trifecta of lies that were contained in the Insurance Billing summary (later used as Grand Jury Exhibit 15(b)) – namely, that Dr. Ramnanan had performed <u>639</u> medical procedures in the amount of <u>$682,000.00</u>., for which the insurance companies paid him approximately <u>$230,000.00</u> --- despite the fact that, as demonstrated above, these claims were categorically false in every respect.

  203. In sum, the State Defendants knowingly, intentionally and deliberately created the Insurance Billing summary to fill a major gap in their case, and to manufacture probable cause -- where  none  otherwise existed --  and then repeatedly used this same false "evidence" throughout the criminal proceedings, and in particular, during presentation to the Grand Jury, to secure an indictment against Dr. Ramnanan.

**The False Evidence Created by the State Defendants is Used to Manufacture Probable Cause to Charge Plaintiff and Secure Two Indictments Against Him.**

  204. There were eventually two separate indictments filed against Dr. Ramnanan.  Both indictments were based upon the false, misleading and dishonest evidence that had literally been made up by the State Defendants -- as summarized above -- in order to create probable cause and ensure that the criminal prosecution against Dr. Ramnanan would go forward.

205.    The original indictment included a third-degree conspiracy and commercial bribery for allegedly paying a Totowa chiropractor, Ronald Hayek, D.C., for patient referrals to his pain-management facility in Paramus between 2012 and 2016.

206.    In this first indictment, there was no allegation that Dr. Ramnanan submitted false health care claims for reimbursement.

207.    There was no allegation that Dr. Ramnanan exaggerated the health care services that he performed for patients.

208.    There was no allegation that Dr. Ramnanan improperly provided unnecessary services.

209.    The State's first indictment was based entirely on the word of one witness, Ronald Hayek. However, as discussed above, Hayek's claims were patently incredible and demonstrably false.  There was literally *no evidence* to support his outlandish claims.

210.    As noted above, in 2016, Ronald Hayek had plead guilty to a number of charges in multiple cases for his involvement in medical kickback schemes. As a convicted felon, and at that, one who had pled guilty to crimes involving theft and dishonesty, Hayek was a particularly weak foundation upon which to build an entire criminal case.

211.    Hayek's patent unreliability of a witness became even more clear when he gave deposition testimony in a subsequent civil matter. In a July 2019 dismissal of a different medical practitioner's case brought forward by the Attorney General's Commercial Bribery Task Force ("CBTF"), a civil deposition of Ronald Hayek, D.C. was cited, where Ronald Hayek, D.C. backtracked previous statements that were originally made in a proffer regarding his involvement in the kickback schemes that led to many medical doctors being indicted, including Terry Ramnanan, M.D.

212.    At his deposition, Hayek essentially acknowledged that he had been pressured into making up false claims at the behest of the State Defendants: "A lot of that stuff – now that I'm thinking of it, it wasn't like this when we talked, when I testified and we gave my plea agreement and all that, and they interrogated me. They said they weren't believing when I – my answers, [they kept] *pushing, pushing. I was extremely stressed out. I don't even remember what I told them.*"

**Unable to Coerce Dr. Ramnanan to Cooperate, the State Defendants Retaliate Against Him by Filing A Completely Baseless Second Indictment.**

213.    Realizing that their case against Dr. Ramnanan was extremely weak -- depending entirely upon Hayek's word, without any independent evidence to corroborate his specious claims -- the State Defendants sought to extract incriminating information from Dr. Ramnanan relating to other doctors.

214.    Specifically, in late 2017 and early 2018, the State Defendants sought to explore the possibility of Dr. Ramnanan cooperating with them and identifying other medical practitioners -- in particular, Todd Koppel, M.D., who was the main target of their investigation – who were involved in the alleged "kickback scheme."

215.    However, Dr. Ramnanan refused to cooperate with the State Defendants, since he was not a participant in any "kickback scheme" and therefore, he had no information to give to the State Defendants about Dr. Koppel, or any other doctor for that matter.

216.    Once it became clear that Dr. Ramnanan would not cooperate, however, the State Defendants decided to punish him for his failure to "name names," even though he had no such information to give.

217.    In a blatantly petty, vindictive and retaliatory move, the State Defendants filed a second indictment that was insufficient as a matter of law.   As the State Defendants well *knew* --

and as Judge Vinci later confirmed in his scathing dismissal -- there was no legal or factual basis whatsoever for bringing any of these charges in the second indictment.

218.    By bringing the second indictment, State Defendants wrongfully tried to make a public example out of Dr. Ramnanan in order to further their own political agenda.  In essence, the State Defendants wanted to "teach a lesson" to Dr. Ramnanan -- and to any other doctors who refused to cooperate – that there would be severe consequences for failing to "play ball" and cooperate with the State Defendants.

219.    Thus, when Dr. Ramnanan refused to provide a proffer to the State Defendants -- since he had *zero knowledge* and *zero involvement* in any schemes, and therefore had no knowledge of any other healthcare professionals' involvement -- the State Defendants superseded the original indictment, with more false, baseless charges in order to punish him and force him to make a proffer.

220.    In connection with this retaliatory prosecution, the State Defendants grossly overcharged Dr. Ramnanan and charged him with offenses that were intended solely to "send a message" to him, not to achieve justice.

221.    A superseding indictment was returned on May 31, 2018 against Dr. Ramnanan, charging him with multiple additional crimes, including: i) Conspiracy in the Second Degree (N.J.S.A. 2C:5-2; Count 1); ii) Misconduct by a Corporate Official-Second Degree (N.J.S.A. 21-9; Count 2); iii) Health Care Claims Fraud – Second Degree (N.J.S.A. 2C:21- 4.3a; Count 3); Theft by Deception – Second Degree (N.J.S.A. 2C:20-4; Count 4); v) Commercial Bribery and Breach of Duty to Act Disinterestedly – Third Degree (N.J.S.A. @C:21-10a(2) and 21-10c; Count 5);  vi) Criminal Running – Third Degree (N.J.S.A. 2C:21-22.1; Count 6); vii) Conspiracy – Second Degree (N.J.S.A. 2C:5-2, Count 7); viii) Health Care Claims Fraud – Second Degree

33

(N.J.S.A. 2C:21-4a, Count 8); ix) Commercial Bribery and Breach of Duty to Act Disinterestedly – Third Degree (N.J.S.A. 2C:21-10a(3) and 21-10c; Count 9); and Criminal Running – Third Degree (N.J.S.A. 2C:21-22.1; Count 10).

222.    In the superseding indictment, the charged conspiracy – which was the basis for charging Counts 1 through 6, is the same conspiracy charged in the original indictment and alleged to have been committed by Dr. Ramnanan and Ronald Hayek. Additionally, the superseding indictment added Counts 7 through 10, which were based on a second different conspiracy, alleged to have been committed by Dr. Ramnanan and Adam Awari, a licensed chiropractor.

**The Fictitious "Kickback" Claims Regarding Adam Awari, D.C.**

223.    In furtherance of their improper scheme to manufacture evidence against Dr. Ramnanan -- and ensure that the baseless criminal charges against him would stick -- the State Defendants attempted to bolster their (non-existent) case by claiming that Dr. Ramnanan had *also* paid Awari -- who, like Hayek, had already pled guilty to criminal charges and was trying to avoid jail time and preserve his license -- referral fees.

224.    This claim, however, was another complete and outright fabrication.

225.    Dr. Ramnanan had never paid any referral fees to Awari, period.  Not once, *ever*.

226.    To the contrary, over the years, Dr. Ramnanan had referred many of his own patients to Awari for chiropractic treatment.

227.    Awari, in turn, had referred many patients to Dr. Ramnanan for pain management.

228.    Awari referred patients to Dr. Ramnanan because he thought that Dr. Ramnanan was an excellent pain management physician.

229.    In fact, Awari thought so highly of Dr. Ramnanan that he actually sought treatment from Dr. Ramnanan for his own back pain on two separate occasions.

230.     There was nothing illegal, unethical or improper about the referral arrangement between Dr. Ramnanan and Awari.

231.     In fact, referrals of this nature are expressly permitted under New Jersey law.

232.     In fact, Dr. Ramnanan had a similar referral relationship with many other doctors and chiropractors. These relationships were mutually beneficial, completely above board, and in all respects lawful and proper.

**The Complete Absence of Any Evidence of "Kickbacks" Between Dr. Ramnanan and Adam Awari, D.C.**

233.     The State Defendants' claim of a "kickback scheme" between Dr. Ramnanan and Awari was literally made up out of whole cloth.

234.     There was no evidence whatsoever to corroborate any of the State Defendants' claims regarding Awari.

235.     There was no documentary evidence to support this claim.

236.     There were no checks ever paid by Dr. Ramnanan to Awari.

237.     There was no cash ever paid by Dr. Ramnanan to Awari.

238.     There were no emails between Dr. Ramnanan and Awari.

239.     There were no text messages between Dr. Ramnanan and Awari.

240.     There were no faxes between Dr. Ramnanan and Awari.

241.     There were no phone records to show contact between Dr. Ramnanan and Awari.

242.     There were no recordings of any conversations between Dr. Ramnanan and Awari.

243.     There were no witnesses to support any claims of any type of referral payments -- much less an "illegal kickback scheme" --  from Dr. Ramnanan to Awari.

244.     In short, there was no evidence whatsoever, of any kind, to support the State Defendants' claims that there had been illegal payments from Dr. Ramnanan for referrals.

**The State Defendants Literally Put Words into Awari's Mouth to Manufacture Another "Kickback" Claim against Dr. Ramnanan.**

245.    In the absence of actual evidence, the State Defendants literally made up evidence to pursue their claims against Dr. Ramnanan.

246.    The State Defendants knew that there were never any payments made by Dr. Ramnanan to Awari. However, blinded by their "win at all costs" approach -- and still angered by Dr. Ramnanan's refusal to cooperate with them -- they attempted to fill in the missing gaps in their case by manufacturing evidence against Dr. Ramnanan.

247.    Specifically, during their proffer session with Awari, which took place on February 6, 2018, the State Defendants repeatedly and deliberately put words in his mouth regarding the alleged "kickback" scheme between him and Dr. Ramnanan.

248.    During their proffer session with Awari, the State Defendants were the first ones to mention "Dr. Ramnanan" by name. Awari never mentioned Dr. Ramnanan on his own.

249.    During their proffer session with Awari, the State Defendants were the first ones to suggest that the amount of referral fees that Dr. Ramnanan had paid was actually "$3,000.00." Awari never mentioned this specific sum on his own.

250.    During their proffer session with Awari the State Defendants were the first ones to suggest that the amount paid Dr. Ramnanan for each referral was "$500.00." Awari never mentioned this sum on his own.

251.    During their proffer session with Awari, the State Defendants invented the "fact" that the cash payments were delivered by Dr. Ramnanan in "envelopes." Awari never mentioned this "fact" on his own.

252.    As the State Defendants well knew, there were no cash payments, period. Further, Dr. Ramnanan never delivered *anything* to Awari in an envelope.

36

253.    There was no evidence that Dr. Ramnanan ever made any "cash payments", or any payments whatsoever, to Awari.

**The State Defendants Recognize that Awari is a Patently Incredible Witness.**

254.    During the proffer session, it soon became clear that Awari was completely worthless as a witness.

255.    When interviewed by the State Defendants, Awari gave long, rambling and incoherent responses, often contradicting himself and providing materially inconsistent answers.

256.    Awari also had frequent memory lapses and could not recall critical events, such as when the meetings took place, where the meetings took place, how the meetings were arranged, how much money was paid, when the money was paid, how the alleged kickback scheme ended.

257.    It was obvious from the outset that Awari had massive credibility problems, and could not possibly be trusted to provide even the most basic information, much less to serve as a foundation for any criminal charges against Dr. Ramnanan.

258.    Unable to get the answers that they wanted from Awari the State Defendants instead chose to give him the answers that they wanted.

259.    In particular, Defendant Keiffer took over the questioning and started asking a series of grossly improper leading questions, essentially testifying as an unsworn witness.

260.    Rather than seeking to elicit evidence from Awari, Keiffer spoon fed the answers to Awari so that he would know what to say.   The other State Defendants likewise continuously provided him with the "right" answers to their questions.

261.    The reason why the State Defendants had to continuously feed the answers to Awari, D.C. was because they *knew* that he was a patently incredible witness.

262. Desperate to avoid prison time and keep his license, Awari was literally willing to say *anything* that the State Defendants wanted him to say, a fact which the State Defendants knew and exploited in every way possible.

263. As a result, the only "evidence" of a referral scheme between Awari and Dr. Ramnanan came from the State Defendants themselves, in the form of leading, coercive and improperly suggestive questions to Awari.

264. With addition of the false charges relating to Awari, the State Defendants' specious criminal prosecution had now ballooned up to ten separate criminal charges.

**The State Defendants Attempt to Conceal the Truth About the Plea Deals with Hayek and Awari.**

265. Apart from manufacturing evidence and inducing false testimony, the State Defendants flagrantly violated their constitutional duties under <u>Brady v. Maryland</u>, 373 U.S. 83 (1963) and <u>Giglio v. United States</u>, 405 U.S. 150 (1972).

266. Specifically, throughout the criminal proceedings, the State Defendants willfully attempted to conceal the true nature and extent of the plea deals reached with Hayek and Awari.

267. While the State Defendants disclosed some of the details of these plea details, they deliberately omitted the fact that several other criminal charges had been dropped in exchange for Hayek and Awari's cooperation.

268. For example, upon learning that he was the subject of an investigation, Hayek committed the crime of obstruction of justice by willfully and intentionally destroying critical evidence.

269. Specifically, after he was initially approached by detectives, Hayek told his office manager, Edwin Bermudez, that "we have a problem." Thereafter, Hayek ordered Bermudez to

destroy a gray binder kept in his office that specified, in detail, all of the referrals that Hayek had made to other doctors in exchange for cash payments.

270.    This gray binder would have proven conclusively that Dr. Ramnanan was *not* one of the doctors who was paying Hayek for referrals.  Hayek thus destroyed critical exculpatory evidence that would have exonerated Dr. Ramnanan.

271.    Apart from ordering the destruction of the gray binder, Hayek also willfully, intentionally and deliberately destroyed a video camera in his office.  Hayek physically destroyed this camera himself by using a hammer and repeatedly striking the camera, until it was no longer operational.

272.    This camera recorded all of the doctors who had visited Hayek in person to make cash payments for referrals.  These recordings would have proven conclusively that Dr. Ramnanan was *not* one of these doctors, and would have directly contradicted Hayek's claims about how many times Dr. Ramnanan had visited his office to make cash payments.   Thus, Hayek destroyed exculpatory evidence that was critical to establishing Dr. Ramnanan's innocence.

273.    Notwithstanding Hayek's willful and deliberate destruction of material and exculpatory evidence, the State Defendants, inexplicably, never charged Hayek with obstruction of justice. Nor, for that matter, did the State Defendants charge Hayek with tax fraud, despite the fact that he had never reported any of the illegal income that he had earned from his many referrals of patients to other doctors.

274.    To the contrary, as part of the plea deal with Hayek, the State Defendants voluntarily *dropped* these criminal charges before they were even filed.

275.    The State Defendants' decision to not pursue criminal charges for obstruction of justice and tax fraud was another substantial benefit that Hayek received by entering into the plea

deal, and one which the State Defendants were *obligated* to disclose under <u>Brady v. Maryland</u>, 373 U.S. 83 (1963) and <u>Giglio v. United States</u>, 405 U.S. 150 (1972). Yet, the State Defendants never disclosed this exculpatory information to Dr. Ramnanan's defense counsel, William Wong, Esq., thereby flouting their constitutional obligations under <u>Brady</u> and <u>Giglio</u>

276.    Likewise, the State Defendants never charged Awari with tax fraud, despite the fact that he had failed to report any of the illegal income that he had earned from the many referral fees that he had earned from at least 7 (seven) other doctors with whom he had conspired.

277.    Pursuant to the Supreme Court's decisions in <u>Brady</u> and <u>Giglio</u>, the State Defendants were *required* to disclose the true nature and extent of the plea deals reached with Hayek and Awari. This was mandatory, not optional.

278.    However, throughout the criminal proceedings, the State Defendants deliberately flouted their obligations under <u>Brady</u> and <u>Giglio</u>, as well as many of their other discovery obligations -- including violating Judge Vinci's order to give the defense Open File Discovery, which the State Defendants disregarded up until the end of the case --  and willfully concealed the full scope of the plea deals that they had entered into with Hayek and Awari.

279.    In fact, throughout the criminal proceedings, until the moment when all charges were dismissed, the State Defendants willfully and deliberately hid from Dr. Ramnanan's legal team the true benefits that both Hayek and Awari were receiving under their respective plea deals.

**Judge Vinci Issues a Scathing Decision Against the State Defendants and Dismisses all Charges Against Dr. Ramnanan.**

280.    No matter how many false charges the State Defendants added to the original indictment, in the end, it did not matter. Once Judge Vinci had an opportunity to carefully review the evidence presented to the Grand Jury, the State Defendants' manufactured case came to a crashing halt.

281. Specifically, after forcing Dr. Ramnanan to defend himself against fabricated charges for nearly two years -- and completely destroying his reputation and career in the process -- the State Defendants' sham case finally ended on May 23, 2019, when the Honorable Robert M. Vinci dismissed the entire ten count superseding indictment against Dr. Ramnanan.

282. In doing so, Judge Vinci left no doubt that the State Defendants had engaged in grave misconduct in presenting their case to the grand jury. Specifically, in his dismissal decision, Judge Vinci described the State Defendants' deceptive conduct before the grand jury as, inter alia: "improper[]," "intentional[]," "extremely misleading," "flat-out wrong," "incorrect[] and misleading[]," and "patently false." See generally Ex. A.

283. In short, "the State [had] *intentionally subverted the grand jury process* resulting in a grand jury presentation that was *fundamentally unfair*." (Id. at 32) (emphasis supplied)

284. By engaging in such misconduct, "[t]he State *lost sight of its obligation to do justice* and instead sought to indict the defendant on the most serious charges it could present. Had the State not *misled the grand jurors regarding the law applicable* to the charges and had the State not *charged [the] defendant improperly*...and had the State not and misled the grand jury...the Court is not convinced the grand jury would have indicted the defendant." (Id. at 36) (emphasis supplied).

285. In short, Judge Vinci found that the State Defendants completely "deceived" the grand jury, which resulted in an unlawful and impermissible criminal indictment against Dr. Ramnanan. (Id. at 33-34) (emphasis supplied).

286. In dismissing all charges, Judge Vinci made it clear that Dr. Ramnanan did not commit *any* healthcare claim fraud whatsoever: "*As a matter of law, the State cannot establish the defendant made any false, fictitious, fraudulent, or misleading statement of fact in any*

*document submitted for payment or reimbursement for health services*… Defendant, therefore, has met its burden to demonstrate the evidence is clearly lacking support in the charges…"

287.    Even viewing "the facts in the light most favorable to the State", the indictment had to be dismissed because it was "palpably defective." (<u>Id</u>. at 11).

288.    In reaching this conclusion, the Court expressly rejected the State Defendants' theory of the case, i.e., that Dr. Ramnanan had violated a criminal statute by omitting information on claim forms submitted to insurance carriers as to whether he was paying referral fees to other referring medical practitioners.

289.    The Court reasoned that the forms did not actually *ask* for this information, and that therefore, a doctor "cannot omit information from a claim form, if that information is not sought in the first instance. (<u>Id</u>, at 16).

290.    Since the forms never sought referral information from Dr. Ramnanan, the State Defendants had failed to identify any representation made in any claim form that was rendered misleading by the failure to disclose the payment of referral fees. Accordingly, the evidence presented by the State Defendants was "clearly lacking support in the charges." (<u>Id</u>. at 20-21).

291.    The Court further found that the State Defendants had failed to satisfy the required element of materiality. The Court stated that the "State's effort to establish materiality before the Grand Jury was based on vague and ambiguous hearsay testimony" (<u>Id</u>. at 22-23).

292.    The Court further criticized the State for telling the Grand Jurors that there was substantial case law in the civil context upon which many insurers rely, in which the United States Supreme Court held that there is an implied certification contained in claim forms that the medical provider has complied with all significant statutory requirements.

293.    The Court stated that this was "at best, a *gross overstatement* of the Supreme Court's decision" and that it "was *extremely misleading* to tell the Grand Jury that the United States Supreme Court issued a decision supporting the State's legal theory when that simply is not true. (Id. at 23-24) (emphasis supplied).

294.    After reviewing the entire grand jury transcript, Judge Vinci concluded that "the State [had] intentionally subverted the Grand jury process resulting in a Grand Jury presentation that was fundamentally unfair …."  (Id. at 32-33).

295.    In particular, "it was improper to suggest to the grand Jurors that …. they should consider some ambiguously described body of law, including the alleged Supreme Court decision that allegedly supported the State's request for an indictment on the charges.  This left the Grand Jurors … with the [false] impression … that the State's legal position was supported by substantial case law and Supreme Court law."  (Id. at 32-33).

296.    "By incorrectly and misleadingly … advising the Grand Jury regarding the applicable law, the State left the Grand Jurors with the *patently false impression* that the law was in its favor.  In fact, the State should have told the Grand Jury that there's absolutely no law that supported … these charges.  The State *deceived* the Grand Jury when it told them otherwise." (Id. at 33-34).

297.    The Court further found that the "runner" charges against Dr. Ramnanan failed as a matter of law.  As Judge Vinci explained,  "the statute specifically provides that a runner shall *not* include a person who refers patients to a provider as otherwise authorized by law." (Id. at 30) (emphasis supplied). Thus, "as chiropractors, Hayek and Awari were *authorized by law* to refer patients to the Defendant. (Id. at 31).  "Because Hayek and Awari cannot qualify as 'runners' under

the Statue, Counts 6 and 10 of the superseding indictment fail to charge a viable offense and must also must be dismissed." (Id. at 32).

298.    In sum, based on his review of the entire grand jury proceedings, Judge Vinci had "*grave doubts that the determination ultimately reached was arrived at fairly and impartially.*" (Id. 37) (emphasis supplied).    Accordingly, Judge Vinci dismissed all 10 charges of the superseding indictment.

**Despite Having All Charges Dismissed, Dr. Ramnanan's Career is Permanently Destroyed as a Result of the State Defendants' False, Defamatory and Prejudicial Press Releases.**

299.    While Dr. Ramnanan felt vindicated by Judge Vinci's dismissal of the criminal charges, it had come too late: Dr. Ramnanan's entire career had been destroyed.

300.    Everything that Dr. Ramnanan had worked for so hard for 39 years had been eviscerated.    His reputation, both personally and professionally, was in tatters.    His medical practice, which he had spent his lifetime building up, was in complete ruins, his patients having abandoned him in droves and new patients unwilling to be treated by such a "corrupt" doctor.

301.    The reason why Dr. Ramnanan's career was thoroughly destroyed was not, simply because of the sham indictments, but rather, because of the State Defendants' shameless attempt to *publicize* these indictments for their own political agenda by issuing false, defamatory and highly sensationalized press releases regarding Dr. Ramnanan.

302.    There was no legal justification for issuing the press releases. Simply put, publicizing indictments is *not* part of the Prosecutors' duties in the New Jersey Attorney General's Office.

303.    However, the State Defendants saw an opportunity to promote and publicize the work of the Commercial Bribery Task Force ("CBTF") -- which was still relatively new, having just been created in 2016 -- so they deliberately and knowingly attempted to sensationalize the

criminal charges against Dr. Ramnanan, so as to enhance the prestige and stature of the CBTF, and make it appear as this unit was highly successful in exposing massive fraud in the medical industry.

304.    The first press release, issued by the New Jersey Office of Attorney General on August 2, 2017, stated, in bold initial caps, as follows: "**Bergen County Neurologist Charged with Paying Kickbacks to a Passaic County Chiropractor in Exchange for Patient Referrals to his Pain Management Facility**." (Ex. C). The press release also contained an unflattering photo of Dr. Ramnanan.

305.    The press release went on to state that "Kickback schemes like this one undermine the entire medical profession and violate the doctor-patient relationship that serves as its sacred bedrock," quoting Acting Insurance Fraud Prosecutor Christopher Iu. "Patients must be able to trust their healthcare treatments are based on sound medicine, not the *greed and corruption* of their doctors." (Id.) (emphasis supplied).

306.    The press release continued: "As this investigation shows, medical professionals who *exploit that trust for personal gain* will be held accountable." (Id.) (emphasis supplied).

307.    Thus, according to the State Defendants' press release, Dr. Ramnanan was a doctor who allowed his "greed and corruption" to trump the doctor-patient relationship and who "exploit[ed] his patients for personal gain."

308.    Even more damaging, the press release suggested that, as result of this bribery scheme, Dr. Ramnanan's patients may have been "*misdiagnosed patients or receive[d] unnecessary treatments.*" (Id.).

309.    This press release was false and defamatory in every respect, as the State Defendants well knew based on their own investigation.

310.    The first press release was drafted, edited, reviewed and/or approved by each of the State Defendants and/or was based upon the same lies -- and the same manufactured evidence -- that the State Defendants had used to support their specious claim that Dr. Ramnanan was engaged in a "kickback scheme."

311.    The story was picked up by many news outlets, and was repeated on social media and all over the Internet.    The news was picked up locally, nationally and internationally throughout the world.

312.    The story caused great damage to Dr. Ramnanan. He lost many patients as a result, and it caused him severe humiliation and embarrassment amongst his friends, family and professional colleagues.

313.    Nonetheless, despite the damage caused by the first press release, Dr. Ramnanan was still able to maintain some resemblance of his patient base and his medical practice.  However, this all came to an abrupt end with the second press release.

314.    On June 1, 2018, the State Defendants issued another press release regarding Dr. Ramnanan.  (Ex.  D). This press release, which contained new, highly sensationalized and truly scandalous information -- which was demonstrably false in every respect -- was far more damaging than the original press release.

315.    This second press release contained, in bold lettering, the following headline: *"Bergen County Neurologist Faces New Charges in Superseding Indictment Alleging He Fraudulently Billed Insurance Companies for $682,000 in Statewide Medical Kickback scheme."*

316.    Thus, the press release repeated the same lies -- and relied upon the same false evidence -- that the State Defendants had manufactured during their investigation in order to

support their specious claim that Dr. Ramnanan had "fraudulently billed insurance companies for $682,000."

317. This "fraudulent billing" claim was patently false in every respect. As Judge Vinci later concluded, the State Defendants had arrived at this number by improperly "aggregate[ing] all of the insurance payments made to all of the alleged referral fee patients for purposes of establishing the second degree grading of the offense." (Ex. A. at 29).

318. The press release went on to allege that "Dr. Terry Ramnanan, 65, who operates the Interventional Spine and Pain Treatment Center facility in Paramus, used his medical facility to *fraudulently bill insurance carriers for more than 637 medical procedures totaling $682,000* related to patients involved in the kickback scheme."

319. Thus, this press release suggested, falsely, that Dr. Ramnanan had: i) fraudulently billed insurance carriers; ii) fraudulently submitted claims for over 637 procedures; and iii) fraudulently billed the insurance companies for a total of $682,000.00. Each one of these claims was categorically false.

320. In fact, as Judge Vinci later found -- and as the State Defendants were eventually forced to concede -- "[t]here were *no fraudulent claims, there was no over-billing or overcharging*. All of the amounts paid by the insurers were for medical procedures needed by – needed by and performed on their insureds, amounts that the insurance companies were obligated to pay pursuant to their respective insurance contracts. (Ex. A at 7) (emphasis supplied).

321. In fact, as Judge Vinci noted, "the State *concedes that the procedures were medically necessary, and they were actually performed by qualified medical professionals on legitimate patients*." (Id). Thus, there was no evidence of fraudulent billing whatsoever. The press release's suggestion to the contrary was a stunningly false statement, made complete and

utter disregard for the truth.   Simply put, there was no legal or factual basis whatsoever for making such a claim.

322.   While the press release suggested that there was false billing in the amount of $682,000.00 in actuality, this "fraud" amount was also shockingly overstated and patently false, as discussed above.

323.   The press release continued: "The deeper our investigators dig, the more dirt they uncover on the doctors who conspired to *buy and sell patients for profit* in this statewide kickback scheme," said Attorney General Grewal. (Ex. D) (emphasis supplied).

324.   Thus, the press release conveyed the (completely false) impression that the State Defendants Investigators had dug "deeper"  and  had now, as a result,  uncovered "more dirt" on Dr. Ramnanan, confirming that he was indeed one of the doctors who "buy and sell patients for profit."

325.   The press release continued: "Upon further information and review, additional, *upgraded charges against Dr. Ramnanan are appropriate*, give his alleged role in this conspiracy to corrupt New Jersey's health care industry."

326.   Specifically, "Dr. Ramnanan's alleged crimes are *greater in number* and *more serious* in nature than we originally believed.  The charges contained in the superseding indictment reflect the true nature of his involvement in this scheme," said Acting Insurance Fraud Prosecutor Tracy M. Thompson.

327.   As a result of the State Defendants' attempt to publicize the second indictment of Dr. Ramnanan, the story was picked up by many news outlets, and was repeated on social media and all over the Internet.   The news was picked up locally, nationally and internationally throughout the world.

328.    Moreover, Dr. Ramnanan's photograph was posted in multiple news outlets, and even on Attorney General Gurbir Grewal's Twitter page, where Defendant Grewal boasted as follows: "Dr. Terry Ramnanan, a Bergen County neurologist, faces new charges in a superseding indictment alleging he fraudulently billed insurance companies for $682,000.00 in a statewide kickback scheme."  (Ex. E). This Twitter post resulted in even further damage and humiliation to Dr. Ramnanan and his family.

329.    Defendant Grewal further attempted to publicize the false charges against Dr. Ramnanan by making similar postings about his "fraudulently billing insurance companies for 682,000" on  Facebook, Instagram and other forms of social media.  These stories were picked up by other news outlets and caused further substantial harm to Dr. Ramnanan's reputation and practice.

330.    While the first press release was damaging to Dr. Ramnanan, the second press release -- when combined with Defendant Grewal's boastful postings on Twitter, Facebook and Instagram -- proved to be a devastating blow to Dr. Ramnanan, the *coup de grace* that effectively destroyed Dr. Ramnanan's practice for good.

331.    Following the second press release, Dr. Ramnanan started losing his patients in droves, and new patients were impossible to bring in.   The damage to his reputation was severe and irreparable, and continues to this date.

332.    The negative press has fundamentally destroyed Dr. Ramnanan's medical practice. It is extremely difficult for him to attract both new, and retain existing, patients when there is only negative press about him out in the public forum.

333.    To this day, anyone who looks up Dr. Ramnanan will find page after page of stories on the Internet talking about his alleged "fraudulent billing" of insurance companies for

"$682,000," and his status as a doctor who "buy and sell patients for profit." (Ex. E, Sample Negative Internet Stories).

334.    There is not *one* article on the Internet, or anywhere else for that matter, that mentions the fact that all charges against Dr. Ramnanan were dismissed by Judge Vinci.

335.    In sum, Dr. Ramnanan's pristine reputation as a medical doctor for over 38 years, and his leadership of a previously very successful medical practice, has been thoroughly destroyed by the State Defendants' false accusations and manufactured evidence, which they shamelessly publicized to promote their own political agenda.

## COUNT I
### Violation of Civil Rights Pursuant to 42 U.S.C. § 1983
### Fabrication of Evidence (All Defendants)

336.    Dr. Ramnanan hereby incorporates all of the preceding allegations and makes them part of this Count as if fully set forth herein.

337.    The State Defendants at all times acted under color of state law.

338.    As described above, the State Defendants, in their individual and official capacities, acting alone and in concert with Defendants Hayek and Awari, agreed to engage in and engaged in the fabrication of evidence in violation of Dr. Ramnanan's rights under the Fourth, Fifth and Fourteenth Amendments to the United States Constitution.

339.    As described above, Dr. Ramnanan was charged in two separate indictments based on completely fabricated evidence.

340.    The State Defendants created manufactured such fabricated evidence knowingly, intentionally, willfully during the course of their investigation, and did so for the improper purpose of manufacturing probable cause to charge Dr. Ramnanan, knowing full well that probable cause did not exist.

341.    The fabricated evidence that was manufactured by the State Defendants included, but was not limited to,  the following evidence: i) the doctored transcript of the conversation between Dr. Ramnanan and Hayek, which materially altered the  sequence and meaning of the words spoken by Dr. Ramnanan; ii)  the completely fictitious "Shared Claims" chart, which purportedly shows instances where Dr. Ramnanan and Hayek collectively billed multiple insurance companies for medical procedures, when in fact there were no such claims; iii) a completely false "Summary Chart" of Dr. Ramnanan's Records, which repeatedly and improperly included the names of patients who were allegedly referred by Hayek, when in fact, these patients were referred by *other* medical providers, and *not* by Hayek, and also contains the names of multiple patients who were allegedly referred by Hayek to Dr. Ramnanan, even though such patients were *not* referred by Hayek nor by Ronald Hayek, D.C.; iv) the false and misleading spreadsheet regarding Hayek's referrals; v)  the false and misleading "Insurance Billing" chart -- which improperly and unlawfully aggregated *all* insurance claims submitted to *all* insurance companies, even though there was no evidence of same – in order to arrive at an utterly fictitious sum of "$682,000.00" from "fraudulent billing";  and vi) a completely fabricated "corroborating" statement from Awari, D.C., in which the State Defendants literally *put words in his mouth* regarding: the amount of referral payments ("$3,000.00"), the amount of each payment ("$500.00"), the means of each payment ("cash"), the manner of referral ("envelopes"), and other false statements, as set forth in detail above.

342.    Dr. Ramnanan suffered a deprivation of liberty as a result the State Defendants' fabricated evidence. Based on such false evidence, he was arrested and booked, and thereafter he was required to make multiple court appearances to defend himself against the baseless charges brought by defendants.

343.    Dr. Ramnanan would not have been charged with any criminal offenses had the State Defendants not fabricated evidence against him in the first instance. In fact, Dr. Ramnanan could not have been charged with *any* crimes without the above described fabricated evidence.

344.    As a direct result of the State Defendants' fabrication of evidence, Dr. Ramnanan has suffered loss of liberty, damage to his personal and professional reputation, mental anguish, severe emotional distress, embarrassment, humiliation, loss of his career,  past lost earnings and future lost earnings.

345.    Since the State Defendants acted maliciously, willfully, and want only in violating Dr. Ramnanan's federally protected rights, the imposition of punitive damages is warranted.

## <u>COUNT II</u>
### Violation of Civil Rights Pursuant to 42 U.S.C. § 1983
### <u>Malicious Prosecution – All Non-Prosecutorial Defendants</u>

346.    Dr. Ramnanan hereby incorporates all of the preceding allegations and make them part of this Count as if fully set forth herein

347.    The State Defendants, in their individual and official capacities, initiated criminal proceedings against Dr. Ramnanan, intentionally engaged in conduct that influenced the initiation of criminal proceedings against Dr. Ramnanan, and intentionally engaged and agreed to engage in conduct that gave rise to the continuation of criminal proceedings against Dr. Ramnanan.

348.    The State Defendants, in their individual and official capacities, acting alone and in concert with Defendants Hayek and Awari, agreed to engage in and be engaged in misconduct in initiating a malicious prosecution depriving Dr. Ramnanan of his rights as a citizen of the United States under the Fourth and Fourteenth Amendments to the Constitution of the United States.

349.    The State Defendants suborned and solicited perjury, offered illegal immunity deals in order to solicit perjured testimony, protected the perjurers from criminal charges, conspired to

knowingly create false and fabricated evidence during their investigation.

350.    The State Defendants, acting in concert with Defendants Hayek and Awari, used the fabricated evidence to initiate and continue baseless criminal charges against Dr. Ramnanan, and to deceive the Grand Jury and the Court.

351.    The State Defendants then presented such false evidence to the Court in an attempt to prevent the Court from granting Dr. Ramnanan's meritorious motion for dismissal, and further destroyed exculpatory evidence, knowingly pursued baseless claims against Dr. Ramnanan, and engaged in egregious misconduct, as detailed above.

352.    The State Defendants knowingly and intentionally presented false and fabricated evidence to the Grand Jury, and conspired with Defendants Hayek and Awari to do so.

353.    The criminal proceedings against Dr. Ramnanan terminated in Dr. Ramnanan's favor on May 23, 2019, when the Honorable Robert Vinci dismissed all charges against Dr. Ramnanan.

354.    The State Defendants, and Hayek and Awari, acted maliciously and for purpose other than bringing Dr. Ramnanan to justice.

355.    As a result of the State Defendants' misconduct, Dr. Ramnanan suffered a deprivation of his liberty, in that he was detained against his will and was required to defend himself against baseless and fabricated charges for almost two years, before all charges were dismissed.

356.    As a direct result of the State Defendants' violation of Dr. Ramnanan's constitutional rights, acting in concert with Defendants Hayek and Awari, Dr. Ramnanan has suffered loss of liberty, damage to his personal and professional reputation, mental anguish, emotional distress, embarrassment, humiliation, the destruction of his medical practice, past lost

earnings and future lost earnings.

357.    The State Defendants, acting in concert with Hayek and Awari, acted maliciously, willfully, and wantonly in violating Dr. Ramnanan's federally protected rights, thereby warranting the imposition of punitive damages.

### COUNT III
### Violation of Civil Rights Pursuant to 42 U.S.C. § 1983
### Malicious Abuse of Process
(The State Defendants)

358.    Dr. Ramnanan hereby incorporates all of the preceding allegations and makes them part of this Count as if fully set forth herein.

359.    The State Defendants issued legal process by filing false criminal charges against Dr. Ramnanan.

360.    The State Defendants filed these false charges for the collateral purpose of generating artificial (and completely undeserved) publicity for their newly formed Commercial Bribery Task Force, so that they could show the public that they were handling "high profile" cases and ensnaring high-level doctors and medical professionals.

361.    The State Defendants also filed these false charges for the collateral purpose of threatening, harassing and intimidating Dr. Ramnanan into "cooperating" with them so that he would name other medical professionals whom they could also falsely charge – just as they had falsely charged him -- and thereby artificially enhance their (false) public image of being a top-level law enforcement unit that goes after the "big guys" in the medical field and other white collar professions.

362.    The State Defendants acted with intent to do harm to without any excuse or justification for doing so.

363.    As a result of the foregoing, Dr. Ramnanan was deprived of his liberty, was denied

fundamental constitutional rights, was publicly embarrassed and humiliated, was caused to suffer severe emotional distress, was forced to incur substantial legal expenses, had his personal and professional reputation destroyed,  lost his livelihood as  a medical doctor and has incurred substantial lost earnings.

**COUNT IV**
**Inducement of False Testimony In Violation of 42 U.S.C. § 1983**
(The State Defendants)

364.    Dr. Ramnanan hereby incorporates all of the preceding allegations and makes them part of this Count as if fully set forth herein.

365.    The State Defendants met with and interviewed several witnesses during the course of their investigation into Dr. Ramnanan, including Defendants Hayek and Awari.

366.    At these meetings, and continuing thereafter, the State Defendants, at the direction of defendant Keiffer and/or with his express  approval,  harassed, threatened, pressured, intimidated, manipulated and coerced  these witnesses to make up false claims against Dr. Ramnanan.

367.    Neither Hayek nor Awari, had identified Dr. Ramnanan, much less alleged that he was involved with a "kickback scheme." It was only after the State Defendants threatened, harassed, intimidated, bribed and coerced them that they finally identified Dr. Ramnanan as a participant in the "kickback scheme."

368.    Even then, however, Hayek's and Awari's stories were demonstrably false and completely irreconcilable with other evidence that the State Defendants had learned regarding the alleged "kickback scheme" involving Dr. Ramnanan.

369.    Notwithstanding this fact, the State Defendants -- in their overriding zeal to reel in a "big fish" and make an example out of Dr. Ramnanan -- glossed over material discrepancies, ignored glaring omissions and affirmatively induced Hayek and Awari to make false statements so as to manufacture a basis for filing criminal charges against Dr. Ramnanan, when none otherwise would

exist.

370.    As a result of the foregoing, Dr. Ramnanan was deprived of his liberty, was denied fundamental constitutional rights, was publicly embarrassed and humiliated, was caused to suffer severe emotional distress, was forced to incur substantial legal expenses, had his personal and professional reputation destroyed, lost his medical practice, and incurred substantial lost earnings.

### COUNT V
### Conspiracy To Violate Plaintiff's Civil Rights – All Defendants

371.     Dr. Ramnanan hereby incorporates all of the preceding allegations and makes them a part of this Count as if fully set forth herein.

372.    The State Defendants, acting in concert with Defendants Hayek and Awari, conspired and agreed to engage in conduct that deprived Dr. Ramnanan of his rights under the Fourth, Fifth, Sixth, and Fourteenth Amendments. The State Defendants each engaged in a series of actions and omissions in furtherance of this conspiracy and agreement.

373.    The State Defendants, acting in concert with Defendants Hayek and Awari, falsified evidence and manipulated the truth during their pre-trial investigation, suborned perjury, protected witnesses who they knew, with absolutely certainty, were providing false testimony, and denied Dr. Ramnanan his constitutional rights.

374.    Throughout the period of the conspiracy, the Defendants pursued their objectives with actual malice toward plaintiff, with utter and deliberate indifference to and disregard for plaintiff's rights under the Constitution and laws of  the United States, without probable or reasonable cause to believe plaintiff was guilty of any crime.

375.    Pursuant to the conspiracy, the conspirators, and their employees, agents and servants, intentionally, recklessly, negligently, and/or with complete indifference to the rights of Dr. Ramnanan: (a) manufactured false evidence; (b) pressured, intimidated,  threatened, coerced and induced witnesses to  give untruthful, erroneous, incomplete and/or misleading statements and

testimony; (c) failed to correct such false statements and testimony; and (d) withheld from the Grand Jury and trial judge evidence favorable to the accused on the issue of guilt or innocence.

376.    The aforesaid conduct of defendants operated to deprive Dr. Ramnanan of important and well-established rights under the Constitution and the laws of the United States including, but not limited to, his rights:

(a)    Not to be deprived of his liberty or to be arrested, detained or imprisoned except upon probable cause to believe him guilty of a crime, under the Fourth, Fifth and Fourteenth Amendments to the United States Constitution;

(b)    Not to be deprived of his liberty or to be arrested, indicted, prosecuted or imprisoned based upon evidence fabricated by a government official;

(c)    Not to be deprived of his liberty or to be arrested, indicted, prosecuted or imprisoned based upon the testimony of witnesses who had been illegally bribed or influenced for their testimony; and

(d)    To timely disclosure of all evidence favorable to the defense on the issues of guilt or innocence and/or punishment, pursuant to the due process clauses of the Fifth and Fourteenth Amendments to the United States Constitution, and to Brady v. Maryland, 373 U.S. 83 (1963), and its progeny.

377.    As a result of the foregoing, Dr. Ramnanan was deprived of his liberty, was denied fundamental constitutional rights, was publicly embarrassed and humiliated, was caused to suffer severe emotional distress, was forced to incur substantial legal expenses, had his personal and professional reputation destroyed,  lost his livelihood as  a medical doctor and has incurred substantial lost earnings.

**COUNT VI**
**"Stigma Plus" Claim Under 42 U.S.C. §  1983**
**Defendant Grewal and the State Defendants**

378.    Dr. Ramnanan hereby incorporates all of the preceding allegations and makes them a part of this Count as if fully set forth herein.

379.    The information contained in both press releases by State Defendants was based on false evidence that the State Defendants had manufactured during their investigation into Dr. Ramnanan.

380.    All of the State Defendants were involved in creating, reviewing, revising, editing and/or approving the contents of the first press release.

381.    The first press release was false, misleading and defamatory in nature, and caused substantial harm to Dr. Ramnanan's reputation and career as a medical doctor.

382.    All of the State Defendants were involved in creating, reviewing, revising, editing and/or approving the contents of the second press release.

383.    The second press release was false, misleading and defamatory in nature, and caused substantial harm to Dr. Ramnanan's reputation and career as a medical doctor.

384.    Defendant Grewal greatly exacerbated the harm caused by the second press releases by publicizing, for his own personal gain and political agenda, as well as the political agenda of the New Jersey State Attorney General's Office, the false and defamatory claims against Dr. Ramnanan on all different forms of social media, including but not limited to, Twitter, Facebook, and Instagram.

385.    As a result of the false and defamatory press releases, as well as the social media posts by Defendant Grewal, Dr. Ramnanan was the subject of extensive and highly prejudicial news coverage in local media publications and all over the Internet.  The false charges against Dr.

Ramnanan became national and international stories.

386.    The false and defamatory press releases, as well as the social media posts by Defendant Grewal, caused severe, permanent and irreparable harm to Dr. Ramnanan's reputation, and destroyed his career as a medical doctor.

387.    As a result of the State Defendants' manufactured claims -- which were repeated and publicized in the press releases issued by the New Jersey Attorney General's Office, as well as Defendant Grewal's own highly prejudicial social media posts -- Dr. Ramnanan's reputation was severely and permanently damaged.

388.    To this day, the story of Dr. Ramnanan's second indictment is *still* the first story that appears when doing a Google search of his name on the Internet.  Yet, there is *no* mention of the fact that the charges against Dr. Ramnanan were completely dismissed by Judge Robert Vinci.

389.    Dr. Ramnanan was never afforded an opportunity for a name-clearing hearing at any time before, during or after his criminal prosecution.

390.    As a result of the State Defendants' false and defamatory statements, Dr. Ramnanan was deprived of his liberty, was denied fundamental constitutional rights, was publicly embarrassed and humiliated, was caused to suffer severe emotional distress, was deprived of his right to a name-clearing hearing, was forced to incur substantial legal expenses, had his personal and professional reputation destroyed, and lost his career and chosen occupation as a medical doctor.

## COUNT VII
### Municipal Liability Under Section 42 U.S.C. § 1983

**(State of New Jersey/Attorney General's Office  – Deliberate Indifference to Training)**

391.    Dr. Ramnanan hereby incorporates all of the preceding allegations and makes them a part of this Count as if fully set forth herein.

392.    Defendants initiated and continued criminal proceedings against Dr. Ramnanan, despite a lack of credible evidence against him, and notwithstanding their knowledge that said proceedings would jeopardize plaintiff's liberty, well-being, safety and constitutional rights.

## I.    Failure to Train Prosecutors Regarding Impermissible Conduct.

393.    Defendant, the State of New Jersey Attorney General's Office (the "NJAG") exhibited a deliberate indifference toward the training and supervision of assistant district attorneys of in the New Jersey State Attorney General's Office, and more specifically, the newly created Commercial Bribery Task Force, regarding the ethical boundaries of presenting evidence against the accused.

394.    Specifically, defendant NJAG exhibited a deliberate indifference by failing to give prosecutors in its office, such as defendant Colin Keiffer, proper training on the following subject matters: i) the need to refrain from issuing false, misleading and erroneous instructions to the grand jury regarding the applicable law and/or regarding the evidence introduced during the grand jury proceedings; ii) the need to avoid eliciting false, misleading and erroneous testimony during the grand jury proceedings;  iii) the need to avoid making material alterations to evidence that is presented to the grand jury, so as to create a false and misleading impression as to the contents of that evidence;  iv) the need to avoid creating "summary" charts that are false, misleading and dishonest, and which grossly misrepresent the actual evidence against the accused;  v) the need to refrain from repeatedly and consistently asking leading questions during direct examination, so as to elicit "testimony" from the witness that is, in fact, the prosecutor's own statement of evidence, and that is false, misleading and inaccurate; vi) the need to avoid testifying as an unsworn witness by putting words in the witnesses' mouths throughout their grand jury testimony;  vii) the need to avoid vouching for the credibility of witnesses who testify on behalf of the prosecution;  viii) the

need to avoid threatening witnesses with perjury charges if they do not give the desired testimony during the pretrial investigating; and ix) the need to avoid becoming a fact witness and/or interjecting one's own personal beliefs into criminal proceedings.

395.    Further, as evidenced from the prosecutorial misconduct of Defendant Keiffer in the grand jury proceedings in this matter, as confirmed in Judge Vinci's opinion, Defendant NJAG exhibited a deliberate indifference toward the training and supervision of assistant district attorneys in the NJAG Office, including those working for the Commercial Bribery Task Force, regarding prosecutorial misconduct during the grand jury presentation, in that Defendant NJAG:

a)    Intentionally and/or recklessly failed to properly instruct, train and/or supervise assistant district attorneys with regard to their obligations to avoid prosecutorial misconduct in the grand jury as required by law;

b)    Intentionally and/or recklessly failed to properly instruct, train and/or supervise assistant district attorneys with regard to their obligations to act as an officer of the public, and of the duty of fair dealing owed to the accused; and

c)    Intentionally and/or recklessly failed to properly instruct, train and/or supervise assistant district attorneys with regard to their obligations to not vouch for the evidence by substituting their own testimony for the testimony of the witnesses in the grand jury; and

d)    Intentionally and/or recklessly failed to properly instruct, train and/or supervise assistant district attorneys with regard to their obligations to properly and correctly instruct grand jurors regarding the law that is applicable;

396.    The aforesaid deliberate indifference to the training and supervision of assistant district attorneys by defendant NJGA may be inferred from the fact that the prosecutorial misconduct in this case was *not* an isolated incident, but rather, occurred on *multiple* occasions throughout the grand jury proceedings.

**II.    Failure to Discipline Prosecutors Who Engage in Misconduct**.

397.    The aforesaid deliberate indifference to the training and supervision of assistant district attorneys by defendant NJAG  may further be inferred from  the fact that, upon information and belief: 1) AAG Keiffer was *not*  punished or disciplined in any way for his acts of prosecutorial misconduct, despite the Court's finding that these acts had been done "intentionally"; 2) no official actions were taken against AAG Keiffer by the NJAG's Office; 3) no record of prosecutorial misconduct was ever placed in the personnel files of AAG Keiffer; 4) no notification was ever made to the State of New Jersey Disciplinary Committee, despite Judge Vinci's finding that the misconduct committed by AAG Keiffer was intentional; 5) no additional training was given by the NJAG's Office to AAG Keiffer to avoid future instances of prosecutorial misconduct by this prosecutor; and 6) no additional training was given by the NJAG to other prosecutors to avoid future instances of prosecutorial misconduct of the nature identified by Judge Vinci.

398.    In light of the Court's finding that Keiffer had engaged in intentional misconduct, defendants NJAG's failure to punish or discipline AAG Keiffer in any way -- and their failure to implement any remedial training sessions to prevent similar instances of prosecutorial misconduct from occurring again in the future -- is proof of constructive acquiescence by the policy makers at the NJAG of the unconstitutional conduct and practices alleged herein.

399.    The aforesaid deliberate indifference to the training and supervision of assistant attorney generals  by Defendant NJAG  may further be inferred from  the fact that, upon information and belief: 1) numerous other Assistant Attorney Generals in the NJAG's Office have engaged in similar  misconduct as engaged in by Defendant Keiffer, but have not been  punished or disciplined for their acts of prosecutorial misconduct; 2) no official actions were taken against the other prosecutors who engaged in similar acts of prosecutorial misconduct, just as no official

actions were taken against AAG Keiffer; 3) no record of prosecutorial misconduct was ever placed in the personnel files of the other prosecutors who engaged in similar acts of prosecutorial misconduct, just as no such record was ever placed in the personnel files of AAG Keiffer; 4) no notification was ever made to the State of New Jersey Disciplinary Committee regarding the prosecutorial misconduct of any Assistant Attorney General working in the New NJAG's Office even where the Court has found that such misconduct was intentional – just as no such notification was made regarding the misconduct of AAG ; and 5) no additional training was given by the NJAG's Office to other prosecutors who engaged in similar misconduct, just as no such additional training was given to AAG Keiffer, to avoid future instances of prosecutorial misconduct.

400. The aforesaid deliberate indifference to the training and supervision of Assistant Attorney Generals by defendant NJAG may further be inferred from an analysis of other reported decisions which have documented similar instances of prosecutorial misconduct by other prosecutors in the NJAG's Office.

401. Such prior instances of misconduct is further evidence of Defendant NJAG's deliberate indifference toward the training of its prosecutors regarding the scope and limits which must be adhered to when questioning witnesses and instructing grand juries on the law, and are also proof of defendant NJAG's longstanding, *de facto* policy of *never* punishing or disciplining prosecutors who engage in prosecutorial misconduct, even when such actions are found to have been done intentionally and/or repeatedly by the same prosecutors.

402. Defendant NJAG's policy of "lax discipline," has created an atmosphere which encourages Assistant Attorney Generals to engage prosecutorial misconduct, as such prosecutors know that they will *not* be punished and/or disciplined in any way, no matter how egregious their acts of prosecutorial misconduct might be.

403.    The foregoing unlawful policy of defendant NJAG's Office is the direct and moving force behind the constitutional violations suffered by Dr. Ramnanan, and is substantially certain to result in the violation of the constitutional rights of other citizens in the future.

404.    The acts complained of were carried out by Defendant Keiffer in his capacity as an Assistant Attorney General pursuant to the customs, policies, usages, practices, procedures, and rules of the NJAG's Office, all under the supervision of ranking officers of said department.

405.    As a direct and proximate result of the foregoing practices and policies of the NJAG's Office, Dr. Ramnanan was denied fundamental constitutional rights, was subjected to grossly improper and repeated instances of prosecutorial misconduct, was deprived of his liberty, was forced to incur substantial legal expenses, had his reputation destroyed, and was otherwise deprived of his constitutional rights under the Fourth, Fifth and Fourteenth Amendments to the United States Constitution.

406.    The aforesaid deliberate indifference to the training and supervision of Assistant Attorney General's was done by policymaking officials for defendant NJAG's Office,  who knew that:

(a)    to a moral certainty that such policies, procedures, regulations, practices and/or customs concern issues that regularly arise in the investigation and prosecution of criminal cases;

(b)    that such issues either present assistant district attorneys  with difficult choices of the sort that instruction, training and/or supervision will make less difficult, or that the need for further instruction, training and/or supervision was demonstrated by a history of assistant district attorneys mishandling such situations; and

(c)    Despite their knowledge of said policies, procedures, regulations, practices and/or customs, the supervisory and policymaking officers and officials of the defendant NJAG's Office as a matter of policy, perpetuated, or failed to take steps to terminate, said policies, procedures,

regulations, practices and/or customs, did not discipline or otherwise properly supervise the employees engaged in them, did not effectively instruct, train and/or supervise such personnel with regard to the proper constitutional and statutory requirements in the exercise of their authority, but instead sanctioned the policies, procedures, regulations, practices and/or customs described above, with a deliberate indifference to the effect of said policies, procedures, regulations, practices and/or customs upon the constitutional rights of residents and citizens of the State of New Jersey.

407.    All of foregoing customs, policies, usages, practices, procedures and deficiencies in training by the NJAG's Office, constituted a deliberate indifference to the safety, well-being and constitutional rights of all defendants, including but not limited to, Dr. Ramnanan.

408.    The foregoing customs, policies, usages, practices, procedures and deficiencies in training by the NJAG's Office, were the direct and proximate cause of the constitutional violations suffered by Dr. Ramnanan.

409.    The foregoing customs, policies, usages, practices, procedures and rules of the NJAG's Office, were the moving force behind the constitutional violations suffered by Dr. Ramnanan as alleged herein.

410.    As a direct and proximate result of the foregoing practices and policies of the NJAG's Office, Dr. Ramnanan was denied fundamental constitutional rights, was subjected to an utterly baseless and selective criminal prosecution, was forced to incur substantial legal expenses, had his reputation and career destroyed, and was otherwise deprived of his constitutional rights under the Fourth, Fifth and Fourteenth Amendments to the United States Constitution.

## III.    Additional Deficiencies in The Training of Prosecutors.

411.    Apart from the foregoing deficiencies, defendant NJAG further exhibited a deliberate indifference toward the training and supervision of Assistant Attorney Generals in the NJAG's Office, in that defendant NJAG:

a)   Intentionally and/or recklessly failed to properly instruct, train and/or supervise prosecutors with regard to their obligations to discontinue a criminal prosecution when evidence is discovered which negates probable cause and exonerates the accused;

b)   Intentionally and/or recklessly failed to properly instruct, train and/or supervise prosecutors with regard to their obligations to discontinue a criminal prosecution when it becomes apparent that a criminal complaint is not valid;

c)   Intentionally and/or recklessly failed to properly instruct, train and/or supervise prosecutors with regard to their obligations to timely disclose all evidence favorable to the defense on the issues of guilt or innocence and punishment, pursuant to the due process clause of the Fifth and Fourteenth Amendments to the United States Constitution, and to Brady v. Maryland, 373 U.S. 83 (1963), and its progeny, and Giglio v. United States, 405 U.S. 150 (1972);

d)   Intentionally and/or recklessly failed to properly instruct, train and/or supervise prosecutors with regard to their obligations to avoid threatening, intimidating and/or coercing potential defense witnesses and prevent them from testifying on behalf of the accused;

e)   Intentionally and/or recklessly failed to properly instruct, train and/or supervise prosecutors with regard to their obligations to avoid interfering with a defendant's constitutional right to a fair trial by giving false, erroneous and misleading instructions to the grand jury;

f)   Intentionally and/or recklessly failed to properly instruct, train and/or supervise prosecutors with regard to their obligations to avoid pressuring potential witnesses to give untruthful, erroneous, incomplete and/or misleading statements; and

g)   Intentionally and/or recklessly failed to properly instruct, train and/or supervise prosecutors with regard to their obligations to avoid pursuing a criminal prosecution as a "vendetta" against a witness who is believed to holding back material information from prosecutors.

412.   The aforesaid deliberate indifference to the training and supervision of assistant district attorneys by defendant NJAG's Office  may also be inferred from an analysis of convictions obtained from said office which have been reversed on appeal based upon:  (1) the prosecution's failure to disclose evidence favorable to the defense, pursuant to its obligations under Brady v. Maryland, 373 U.S. 83 (1963) and Giglio v. United States, 405 U.S. 150 (1972); (2) the prosecution's

failure to comply with well-established constitutional obligations; (3) the prosecution's use of improper and/or misleading questions during cross-examination of witnesses; 4) the prosecution's misstatement of evidence during grand jury proceedings; and 5) the prosecution's use of improper, inflammatory and prejudicial evidence to secure an indictment and/or conviction.

413.    The acts complained of were carried out by the aforementioned individual defendants in their capacities as assistant district attorneys and officials pursuant to the customs, policies, usages, practices, procedures, and rules of the NJAG's Office, all under the supervision of ranking officers of said department.

414.    As a direct and proximate result of the foregoing practices and policies of the NJAG's Office, Dr. Ramnanan was denied fundamental constitutional rights, was subjected to an utterly baseless and selective criminal prosecution, was forced to incur substantial legal expenses, had his reputation and career destroyed, and was otherwise deprived of his constitutional rights under the Fourth, Fifth and Fourteenth Amendments to the United States Constitution.

415.    The aforesaid deliberate indifference to the training and supervision of prosecutors district attorneys was done by policymaking officials for defendant NJAG's Office including, who knew that:

(a)    to a moral certainty that such policies, procedures, regulations, practices and/or customs concern issues that regularly arise in the investigation and prosecution of criminal cases;

(b)    that such issues either present Assistant Attorney Generals with difficult choices of the sort that instruction, training and/or supervision will make less difficult, or that the need for further instruction, training and/or supervision was demonstrated by a history of assistant district attorneys mishandling such situations; and

(c)    Despite their knowledge of said policies, procedures, regulations, practices and/or customs, the supervisory and policymaking officers and officials of the defendant NJAG, as a matter

of policy, perpetuated, or failed to take steps to terminate, said policies, procedures, regulations, practices and/or customs, did not discipline or otherwise properly supervise the employees engaged in them, did not effectively instruct, train and/or supervise such personnel with regard to the proper constitutional and statutory requirements in the exercise of their authority, but instead sanctioned the policies, procedures, regulations, practices and/or customs described above, with a deliberate indifference to the effect of said policies, procedures, regulations, practices and/or customs upon the constitutional rights of residents and citizens of the State of New Jersey.

416.    All of foregoing customs, policies, usages, practices, procedures and deficiencies in training by the NJAG's Office, constituted a deliberate indifference to the safety, well-being and constitutional rights of all defendants, including but not limited to, Dr. Ramnanan.

417.    The foregoing customs, policies, usages, practices, procedures and deficiencies in training by the NJAG's Office, was the direct and proximate cause of the constitutional violations suffered by Dr. Ramnanan as alleged herein.

418.    The foregoing customs, policies, usages, practices, procedures and rules of the NJAG's Office, were the moving force behind the constitutional violations suffered by Dr. Ramnanan.

419.    As a direct and proximate result of the foregoing practices and policies of the NJAG's Office,  Dr. Ramnanan was denied fundamental constitutional rights, was subjected to an utterly baseless and selective criminal prosecution, was forced to incur substantial legal expenses, had his reputation and career destroyed, and was otherwise deprived of his constitutional rights under the Fourth, Fifth and Fourteenth Amendments to the United States Constitution.

## PENDENT STATE LAW CLAIMS

420.    Dr. Ramnanan hereby incorporates all of the preceding allegations and makes them a part of this Count as if fully set forth herein.

421.   In addition to the claims set forth above under federal law, pursuant to 42 U.S.C. § 1983, plaintiff also alleges multiple claims under New Jersey State law and the New Jersey Constitution in this action, as set forth below.

**COUNT VIII**
**Violation of Civil Rights Pursuant to N.J.S.A. § 6:10-1** *et seq.*
**Fabrication of Evidence – The State**
**Defendants,   Hayek and Awari**

422.   Dr. Ramnanan hereby incorporates all of the preceding allegations and makes them a part of this Count as if fully set forth herein.

423.   The State Defendants at all times acted under color of state law.

424.   As described above, The State Defendants, in their individual and official capacities, acting alone and in concert, agreed to engage in and engaged in the fabrication of evidence in violation of Dr. Ramnanan's rights and due process afforded under the New Jersey Constitution.

425.   As described above, Dr. Ramnanan was charged with two separate indictments, and was forced to defend himself for almost two years, based on completely fabricated evidence.

426.   Dr. Ramnanan would never  have been charged with first indictment, much less the second one, had the State Defendants not fabricated evidence during their investigation and then presented such evidence to the grand jury.

427.    Dr. Ramnanan's rights under the New Jersey Constitution were clearly established such that any reasonable person would be aware of them. It was not reasonable for the State Defendants to believe that their unlawful actions did not violate Dr. Ramnanan's rights under the New Jersey Constitution.

428.    As a direct result of the State Defendants' violation of Dr. Ramnanan's constitutional rights, Dr. Ramnanan has suffered loss of liberty, damage to his personal and professional reputation, loss of his career, mental anguish, emotional distress, embarrassment, humiliation and substantial financial losses, and is entitled to relief under N.J.S.A. § 10:6-2.

## COUNT IX

### Violation of Civil Rights Pursuant to N.J.S.A. § 10:6-1 *et seq.*
### Malicious Prosecution – All Non-Prosecutorial Defendants

429.    Dr. Ramnanan hereby incorporates all of the preceding allegations and makes them a part of this Count as if fully set forth herein.

430.    The State Defendants at all times acted under color of state law.

431.    The State Defendants, in their individual and official capacities,  and acting in concert with Defendants Hayek and Awari, initiated criminal proceedings against Dr. Ramnanan, intentionally engaged and agreed to engage in conduct that influenced the initiation and continuation of  baseless criminal proceedings against Dr. Ramnanan, and intentionally engaged and agreed to engage in conduct that gave rise to the initiation and continuation of criminal proceedings.

432.    The State Defendants, in their individual and official capacities, acting alone and in concert, agreed to engage in and engaged in misconduct amounting to a malicious prosecution depriving Dr. Ramnanan of his rights under the New Jersey Constitution, including but not limited to Article I.

433.    The State Defendants suborned and solicited perjury, offered illegal immunity deals in order to solicit perjured testimony, protected the perjurers from criminal charges, conspired to knowingly present false and fabricated evidence to the Grand Jury and to the court before, presented false evidence in order to prevent the court from granting Dr. Ramnanan's meritorious motion for dismissal, destroyed exculpatory evidence, knowingly pursued baseless claims against Dr. Ramnanan, and engaged in other egregious misconduct, as set forth above.

434.    The State Defendants manipulated the truth during the pre-trial investigation, suborned perjury, protected witnesses who were providing false testimony, and denied Dr. Ramnanan his civil rights under the New Jersey State Constitution.

435.    The State Defendants knowingly and intentionally presented false and fabricated

evidence to investigators, and conspired with the other State Defendants to do so.

436.    The State Defendants acted maliciously, willfully, and wantonly in violating Dr. Ramnanan's rights.

437.    The criminal proceedings against Dr. Ramnanan terminated in Dr. Ramnanan's favor on May 23, 2019, when all charges against him were dismissed.

438.    The State Defendants acted maliciously and for purposes other than bringing Dr. Ramnanan to justice.

439.    As a result of the State Defendants' misconduct, Dr. Ramnanan suffered a severe deprivation of his liberty.

440.    Dr. Ramnanan's rights under the New Jersey Constitution were clearly established such that any reasonable person would be aware of them. It was not reasonable for The State Defendants to believe that their actions did not violate Dr. Ramnanan's rights under the New Jersey Constitution, including but not limited to Article I.

441.    As a direct result of the State Defendants' violation of Dr. Ramnanan's rights, Dr. Ramnanan has suffered loss of liberty, damage to his reputation, mental anguish, emotional distress, embarrassment, humiliation and financial loss and is entitled to relief under N.J.S.A. § 10:6-2.

### COUNT X
**Violation of Civil Rights Pursuant to N.J.S.A. § 6:10-1 *et seq.*
Deprivation of Substantive Due Process – The State Defendants**

442.    Dr. Ramnanan hereby incorporates all of the preceding allegations and makes them a part of this Count as if fully set forth herein.

443.    The State Defendants at all times acted under color of state law.

444.    The State Defendants, in their individual and official capacities, acting alone and in concert, agreed to engage in and engaged in conduct that shocks the conscience and deprived Dr. Ramnanan of fundamental interests protected by the New Jersey Constitution, including: his rights

to intrastate and interstate travel, his right to pursue a career and profession of his choosing, his right to be free from involuntary confinement, resulting in the violation of Dr. Ramnanan's rights to substantive due process.

445.    The State Defendants knowingly disregarded a substantial and real risk of serious injury, resulting in the deprivation of Dr. Ramnanan's life, liberty, and property interests.

446.    The State Defendants manipulated the truth during the pre-trial investigation, suborn perjury, protect witnesses providing false testimony, further the conspiracy, and denied Dr. Ramnanan his constitutional rights. By furthering the conspiracy through their administrative role, they were not engaged in law enforcement and are not entitled to sovereign immunity.

447.    Dr. Ramnanan's right to substantive due process under the New Jersey Constitution was clearly established such that any reasonable person would be aware of them. It was not reasonable for the State Defendants to believe that their actions and omissions did not violate Dr. Ramnanan's right to substantive due process under the New Jersey Constitution.

448.    As a direct result of the State Defendants' violation of Dr. Ramnanan's rights, Dr. Ramnanan has suffered numerous losses, including but not limited to loss of liberty, damage to his reputation, permanent negative stigma, mental anguish, emotional distress, embarrassment, loss of his ability to work in his chosen field, loss of his ability to travel, humiliation and substantial financial losses and is entitled to relief under N.J.S.A. § 10:6-2.

## COUNT XI
### Violation of Civil Rights Pursuant to N.J.S.A. § 6:10-1 *et seq.*
### Conspiracy – All Defendants

449.    Dr. Ramnanan hereby incorporates all of the preceding allegations and makes them a part of this Count as if fully set forth herein.

450.    The State Defendants at all times acted under color of state law.

451.    The State Defendants conspired and agreed to engage in conduct that deprived Dr.

Ramnanan of his rights under the New Jersey Constitution. The State Defendants each engaged in a series of actions and omissions in furtherance of this conspiracy and agreement.

452.    The State Defendants manipulated the truth during the pre-trial investigation, suborned perjury, protected witnesses who were providing false testimony, and violated Dr. Ramnanan's constitutional rights.

453.    As a direct result of the State Defendants' violation of Dr. Ramnanan's rights, Dr. Ramnanan suffered loss of liberty, damage to his personal and professional reputation, loss of his career, mental anguish, emotional distress, embarrassment, humiliation and substantial financial losses, and is entitled to relief under N.J.S.A. § 10:6-2.

**COUNT XII**
**Intentional Infliction of Emotional Distress – All Defendants**

454.    Dr. Ramnanan hereby incorporates all of the preceding allegations and makes them a part of this Count as if fully set forth herein.

455.    The Defendants acted intentionally or recklessly at all times.

456.    The Defendants manipulated the truth during the pre-trial investigation, suborned perjury, protected witnesses providing false testimony, and flagrantly violated Dr. Ramnanan's constitutional rights.

457.    The conduct of the Defendants was extreme and outrageous.

458.    The extreme and outrageous conduct of the State Defendants caused Dr. Ramnanan to suffer severe emotional distress.

459.    The emotional distress incurred by Dr. Ramnanan was so severe that no reasonable person could be expected to endure it.

460.    The emotional distress incurred by Dr. Ramnanan was so severe that it resulted in serious psychological sequelae. It also caused his family to suffer severe emotional distress, which Dr. Ramnanan saw with his own eyes every day, and which greatly compounded his own suffering.

461.    As a direct result of the conduct of the Defendants, Dr. Ramnanan suffered loss of liberty, damage to his reputation, loss of his career, mental anguish, severe emotional distress, embarrassment, humiliation and substantial financial losses and is entitled to relief under New Jersey common law.

## DEMAND FOR RELIEF

**WHEREFORE**,  Plaintiff Terry Ramnanan, M.D., demands judgment against all defendants:

(1)    On all causes of action, compensatory damages in the amount of $50,000,000.00;

(2)    On all causes of action, punitive damages in the amount of $50,000,000.00; and

(3)    Costs and disbursements of this action, including attorney's fees, and for such other and further relief as to this Court may deem just and proper.

Dated: New York, New York
          September 16, 2020

**JON L. NORINSBERG, ESQ., PLLC**

Diego O. Barros, Esq.
*Attorney for Plaintiff*
110 E. 59th Street, Suite 3200
New York, New York 10022
Tel. No.: (212) 791-5396

# EXHIBIT A

                              SUPERIOR COURT OF NEW JERSEY
                              LAW DIVISION, CRIMINAL PART
                              BERGEN COUNTY, NEW JERSEY
                              INDICTMENT NO. 18-05-00083-S
                              APP. DIV. NO.

STATE OF NEW JERSEY,         )
                             )          TRANSCRIPT
    vs.                      )             of
                             )
TERRY RAMNANAN,              )       MOTIONS DECISIONS
                             )
        Defendant.           )

                      Place: Bergen County Superior Court
                             Justice Center, 10 Main St.
                             Hackensack, N.J. 07601

                      Date:   May 23, 2019

BEFORE:

    HONORABLE ROBERT M. VINCI, J.S.C.

TRANSCRIPT ORDERED BY:

    WILLIAM S. WONG, ESQ. (Attorney at Law)


APPEARANCES:

    CRYSTAL CALLAHAN, ESQ. (Deputy Attorney General,
    Appearing for Robert Grady, Esq., Deputy Attorney
    General)
    Attorney for the State

    WILLIAM S. WONG, ESQ. (Attorney at Law)
    Attorney for the Defendant


                 Transcriber Dolores Hastings, AD/T 417
                 **APPEALING TRANSCRIPTS INC.**
                 8 Victoria Drive
                 Clark, New Jersey 07066
                 (732) 680-1610 / Fax (732) 680-1615
                 Dolores.hastings@appealingtrans.com
                 Digitally Recorded
                 Operator, Bernard Rodrigues

**2**

1                                I N D E X

2                                                            Page(s)

3    Colloquy                                                    3

4    THE COURT:    Decision                                      4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**3**

1    THE COURT:  On the record.  All right, <u>State</u>
2    <u>versus Terry Ramnanan</u>, it's -- it's Indictment 18-05-
3    83-S.
4    Counsel, appearances please?
5    MS. CALLAHAN:   Good afternoon, Your Honor,
6    Deputy Attorney General Crystal Callahan appearing on
7    behalf of Robert Grady on behalf of the State.
8    THE COURT:  Good afternoon.
9    MR. WONG:   Good afternoon, Your Honor,
10   William Wong on behalf of Dr. Terry Ramnanan who's
11   present.
12   THE COURT:  Good afternoon.
13   DR. RAMNANAN:   Good afternoon.
14   THE COURT:  Good to see you and I assume Mr.
15   Grady had a jury duty?
16   MS. CALLAHAN:   Jury duty.
17   THE COURT:  Okay.
18   MS. CALLAHAN:   That's correct.
19   THE COURT:  Okay.  Well, thanks for coming in
20   his place, so that we can --
21   MS. CALLAHAN:  Of course.
22   THE COURT:  -- we can do this.  Everybody can
23   have a seat.  Is any -- is there anything anybody wants
24   to talk to about before --
25   MS. CALLAHAN:  I think there's one

**4**

1    outstanding --
2    THE COURT:  -- before I give you my decision?
3    MS. CALLAHAN:  -- discovery issue per detec -
4    - D.A.G. Grady, and so this is the best efforts of my
5    office to comply with the request from Mr. Wong, so I'm
6    giving these over.  These are the transcripts and the
7    recorded statements with respect to some of the other
8    questions, at least as D.A.G. Grady has relayed them to
9    me, the other items do not exist.
10   MR. WONG:  Well, the other item has --
11   THE COURT:  Let's -- let's -- we'll deal with
12   that after.
13   MS. CALLAHAN:  Okay.
14   THE COURT:  Let's deal with that after.
15   Okay.  So this is -- there are two motions
16   that I'm dealing with right here.  First is the
17   defendant's motion to dismiss.  We also have the
18   defendant's motion to sever.
19   I'm going to stick to the motion to dismiss
20   first.  The -- in terms of the procedural history, I
21   have the defendant's moving brief filed January 25,
22   2019, I have the State's opposition filed on February
23   11, 2019, defendant's reply briefs filed on February
24   19, 2019 and February 20, 2019, the State's re -- reply
25   to those briefs dated -- dated -- dated April 23, 2019,

5

1  and the defendant's reply to that brief, which was
2  filed on May 1, 2019.  I -- I heard oral argument on
3  this case in connection with these motions on May 13,
4  2019 and I -- and I asked you to come back -- asked the
5  parties to come back today so I could give you a
6  decision on the motion.
7          The facts of the case -- around August 1,
8  2017 defendant was initially indicted for conspiracy in
9  the third degree, commercial bribery and breach of duty
10  to act disinterestly -- disinterestedly in the third
11  degree, and criminal use of runners in the third
12  degree.  All of these counts related only to the
13  defendant's allegedly kickback payments to chiropractor
14  Ronald Hayek.
15          On May 31, 2018 defendant was charged a
16  superseding indictment that included 10 counts and the
17  first -- the first six counts relating to chiropractor
18  Hayek, including conspiracy in the second degree,
19  misconduct by a corporate official in the second
20  degree, healthcare claims fraud in the second degree,
21  theft by deception in the second degree, commercial
22  bribery and breach of duty to act disinter --
23  disinterestedly in the third degree, and criminal
24  running in the third degree.  Then he was also indicted
25  with respect to alleged kickback payments to a second

6

1  chiropractor, Dr. Awari, and then -- then those counts
2  included conspiracy in the second degree, healthcare
3  claims fraud in the second degree, commercial bribery
4  and breach of duty to act disinterestedly in the third
5  degree, and commercial running in the third degree.
6          As I said, Counts 1 and 3, 4, 6 -- 5, and 6
7  relate to the alleged kickback payments to Arnold Hayek
8  and Counts 7 through 10 relate to defendant's alleged
9  kickback payments to Adam Awari.  The misconduct by a
10  corporate official charge, Count 2, is the only count
11  that arises out of the defendant's alleged kickback
12  payments to both Hayek and Awari.
13          The facts of the case - on May 31, 2018 the
14  State presented evidence to the State Grand Jury to
15  support the following allegations:  between January 1,
16  2012 and April 8, 2016 the defendant, a neurologist
17  using Interventional Spine and Pain Treatment Center, a
18  New Jersey corporation owned by defendant, submitted
19  insurance claims to at least 15 insurance companies
20  based on referrals from chiropractors Hayek and Awari.
21  The State alleges that the defendant paid kickback --
22  had kickback arrangements with Hayek and Awari under
23  which defendant paid the chiropractors cash bribes for
24  the referral of patients to the Spine and Pain
25  Treatment Center.

7

1    After providing the medical procedures, the
2    spine -- the inter -- the Spine and Pain Treatment
3    Center and/or defendant submitted standardized health
4    insurance claim forms to the various insurance
5    companies using a standard health insurance claim --
6    claim form.
7    The procedures included patient
8    consultations, needle E.M.G. and nerve conduction
9    tests, and, importantly, the State concedes that the
10   procedures were medically necessary and they were
11   actually performed by qualified medical professionals
12   on legitimate patients.  There were no fraudulent
13   claims, there was no over-billing or overcharging.  All
14   of the amounts paid by the insurers were for medical
15   procedures needed by -- needed by and performed on
16   their insureds, amounts that the insurance companies
17   were obligated to pay pursuant to the terms of their
18   respective insurance contracts.
19   The State alleges that the defendant paid Dr.
20   Hayek a total of $25,900 for 196 patients and that
21   defendant paid Dr. Awari approximately $3,000 in
22   referral fees.  The State does not allege defendant
23   made any false, fictitious, fraudulent, or misleading
24   statements in the health insurance claims forms, nor
25   does the State allege that the defendant omitted any

8

1    information that was requested on those claim forms.
2    The sole allegation is that defendant paid referral
3    fees to Hayek and Awari and did -- did not disclose the
4    alleged payments when he submitted the claim forms.
5    Specifically, the State alleges -- alleged before the
6    grand jury that defendant submitted the claim forms,
7    "to the different insurance companies,
8    knowing that he or his staff was making
9    misrepresentations or omissions on those forms by
10   omitting to tell the insurance companies that he was
11   breaking an implied certification that he, as a
12   licensed doctor, was on -- or that as a licensed doctor
13   was honoring his fiduciary duty to his patients to not
14   be paying kickbacks to other referral -- referring
15   medical practitioners, and by committing crimes and
16   breaking regulatory rules in contravention of his
17   medical license."
18   That's on the May 31, 2018 grand jury
19   transcript, pages 5 to 6.
20   In exchange for a plea agreement providing
21   the possibility of a non-custodial probationary
22   sentence, Hayek agreed to cooperate with the State.  On
23   April 1, 2016 Hayek participated in a proffer session
24   with members of the Office of Insurance Prosecutors and
25   during which he admitted that he had been receiving

9

1   cash payments directly from defendant for patient
2   referrals since 2012.  On April 8, 2016 Hayek was
3   outfitted with a recording device while he attempted to
4   discuss the kickback arrangements with defendant.
5           In exchange for being diverted into Pretrial
6   Intervention and avoiding jail -- a jail sentence,
7   Awari also agreed to cooperate with the State.  On
8   January 24, 2018 and February 7, 2018, as part of his
9   cooperation, Awari participated in two proffer sessions
10  with members of the Insurance Fraud Prosecutor's
11  Office.  During these sessions Awari admitted that he
12  received between $2,000 and $3,000 in cash from the
13  defendant for patient referrals between two -- 2012 and
14  2015.
15          On May 31, 2018 Detective Berg (phonetic)
16  testified in front of the grand jury regarding both the
17  statements of Hayek and Awari, as well as the
18  recordings obtained in which defendant allegedly inculp
19  -- inculpated himself by discussing the kickback
20  schemes.
21          Defendant moved to dismiss Counts 2, 3, 4,
22  and 8.  As I explained at oral argument on May 13th,
23  because the motion to dismiss Count 2 implicitly and
24  necessarily includes a motion to dismiss the use of
25  criminal runners' charge -- runners' charges, because

10

1   Count 2 is based, in part, on those charges, I'm also
2   treating the motion to include a request for dismissal
3   of Counts 6 and 10, which allege criminal use of
4   runners.  Because that aspect of the motion was not
5   expressly set forth, the Court allowed the State an
6   opportunity to submit an additional brief on the issue
7   of the criminal use of runners following oral argument.
8   In response to that offer and opportunity, I received
9   nothing from the State.  The State has not provided any
10  authority at all to support the charges of criminal use
11  of -- of runners that were included in the indictment.
12          A grand jury determines whether the State has
13  established a prima facie case that a crime has been
14  committed and that the accused committed it.  That's
15  State versus Francis, 191 N.J. 571 at 586 (2007).  In
16  seeking the indictment, the Prosecutor's sole
17  evidential obligation is to present a prima facie case
18  that the accused has committed a crime.  State versus
19  Hogan, 144 N.J. 216 at 236 (1996).  In order to
20  withstand the motion to dismiss, the State need only to
21  present some -- some evidence as to each element of the
22  charged offense.  State versus Vasky, 218 N.J. Super.
23  487 at 491, Appellate Division (1987).  The test of the
24  sufficiency of an indictment is whether it contains
25  elements of the offense intended to be charged and

**11**

1 gives the accused reasonable notice of the act or acts
2 he's called upon to defend. State versus M.I., 253
3 N.J. Super. 13, at Page 19, Appellate Division (1991).
4 A defendant who challenges an indictment must
5 demonstrate that evidence is clearly lacking to support
6 the charges. State versus Graham, 248 N.J. Super. 413,
7 4 -- at 417, Appellate Division (1995). In reviewing a
8 motion to dismiss, the Court must consider the facts in
9 the light most favorable to the State. State versus
10 Saavedra, 433 N.J. Super. 501 at 514, Appellate
11 Division (2013). An -- an indictment cannot stand,
12 however, if it fails to charge a viable offense. State
13 versus Bennett, 194 N.J. Super. 231, Appellate Division
14 (1984), certification denied, 101 N.J. 224 (1985) State
15 -- and State versus Wein, 80 N.J. 491 at 497 (1979).
16 The trial court's discretion to dismiss an indictment
17 should be exer -- not be exercised except upon the
18 clearest and plainest grounds and unless it's palpably
19 defective. State versus N.J. Trade Waste Association,
20 96 N.J. at 8 -- at 18 and 19 (1984). Accordingly, a
21 trial court may dismiss an indictment only upon a
22 palpable showing of fundamental unfairness --
23 unfairness. State versus Wein, 80 N.J. 5 -- at 501, or
24 where the Prosecutor's conduct amounted to an
25 intentional subversion of the grand jury process.

**12**

1 State versus Murphy, 110 N.J. 20 at 35 (1988).
2 Dismissal of indictment is appropriate if it is
3 established that -- that the violations substantially
4 influence the grand jury's decision to indict or if
5 there's grave doubt that the determination ultimately
6 reached was arrived at fairly and impartially. State
7 versus Hogan, 336 N.J. Super. 319 at 340, Appellate
8 Division (2001).
9 Turning to Counts 3 and 8, healthcare claim
10 fraud, pur -- N.J.S.A. 2C:21-4.2 states that healthcare
11 claims fraud means making or causing to be made a
12 false, fictitious, fraudulent, or misleading statement
13 of material fact in, or omitting a material fact from,
14 or causing a material fact to be omitted from any
15 record, bill, claim, or other document that a person
16 submits for payment or reimbursement for healthcare
17 services.
18 The statute targets false or fraudulent
19 claims. The State concedes that the claims at issue in
20 this case were legitimate claims for necessary services
21 provided by qualified providers to insured patients.
22 There are no allegations of over-billing, over-
23 prescribing, or fraud, or any type of fraud, other than
24 the alleged payment of the referral fees. The claim
25 submissions in this case were accurate and they

**13**

1   provided all of the information that was requested by
2   the insurers on the universal health insurance claim
3   form.  There were -- was no false -- there were no
4   false or fraudulent statements, and no information that
5   was requested or necessary to submit the claim was
6   omitted.  There were no representations one way or the
7   other regarding the payment of referral fees, because
8   the insurers do not request that information on the
9   health insurance claim form.  The insurers didn't ask
10  for a representation that referral fees were not paid
11  as part of the claim submission process and defendant
12  made no representations that could be construed to
13  represent otherwise.
14          As the State told the grand jury, the claim
15  against the defendant is premised on the notion that by
16  submitting a health insurance claim form he omitted to
17  tell the insurance companies that he was breaking an
18  implied certification that he -- he, as a licensed
19  doctor, was honoring his fiduciary duty to his patients
20  not -- to not be paying kickbacks to other referring
21  medical practitioners.
22          Where statutory language is clear and
23  unambiguous, the Court must enforce it as written.
24  Versus Moore, 358 N.J. Super. 241 at 247, Appellate
25  Division (2003).  Under the Rule of Lenity, however,

**14**

1   any ambiguity in criminal laws must be resolved in
2   defendant's favor in order to afford the defendant fair
3   notice that certain behavior is criminal.  Individuals
4   must receive fair warning that certain behavior is
5   criminal.  State versus Riley, 412 N.J. Super. 162,
6   Appellate Division (2009).
7           In Riley, the court rejected the State's
8   interpretation of a computer crime statute on the
9   ground that it criminalized what amounted to a breach
10  of an employment contract.  Riley at 185.  The State
11  argued that criminal -- while incorporated by
12  reference, informal and unclear workplace policies, but
13  the Court found the State's interpretation did not
14  provide sufficient notice to satisfy due process.
15  Riley at 185 to 86.
16          Fair warning is fur -- is -- is -- is
17  furthered by the void for vagueness doctrine in the
18  United States versus Lanier, 520 U.S. 529 (1997).  The
19  void for vagueness doctrine requires that a penal
20  statute define the criminal offense with sufficient
21  definiteness that ordinary people can understand what
22  conduct is prohibited and in a manner that does not
23  encourage arbitrary and discriminatory enforcement,
24  Kolender versus Lawson, 461 U.S. 352 in 1983.  The
25  touchstone is whether the statute, either standing

**15**

1    alone or as -- or as construed, made it reasonably
2    clear at the relevant time that defendant's conduct was
3    criminal.  Lanier, 520 U.S. at 267.  Although the
4    doctrine focuses both on the actual notice to citizens
5    and arbitrary enforcement, the more important aspect of
6    the vagueness doctrine is not actual notice, but the
7    other principal element of the doctrine, that is the
8    requirement that our Legislature establish minimum
9    guidelines to govern law enforcement.  Smith versus
10   Goguen, 415 U.S. 560 -- 66 at 574 (1974).
11           In this case, the  -- the healthcare claims
12   fraud statute criminalizes making a false, fictitious,
13   fraudulent, or misleading statement of material fact
14   and/or omitting a material fact from or causing a
15   material fact to be omitted from any record, bill,
16   claim, or other document that a person submits for
17   payment or reimbursement for healthcare services.
18           As the State -- State explained to the grand
19   jury, the defendant submitted the claims at issue using
20   a universal health insurance claim form.  That form,
21   along with relevant patient records, were the only
22   documents submitted for payment or reimbursement for
23   health services.  Defendant did not make any false,
24   fictitious, fraudulent, or misleading statement of fact
25   in any of those documents, nor did defendant omit any

**16**

1    fact, material or otherwise, from any of those
2    documents.  Defendant provided all of the information
3    requested by the insurers on the health insurance claim
4    forms.  The State's attempting to shoehorn the use of
5    referral fees into the statute by implicitly creating,
6    from whole cloth, the requirement that providers
7    include information regarding the payment of referral
8    fees, a requirement that does not exist and a charge --
9    and then charging the defendant with omitting that
10   information.  One cannot -- cannot omit information
11   from a claim form if that information is not sought in
12   the first instance.
13           The State's contention that the H.C.C.F.
14   statute extends to the defendant's alleged omission to
15   tell the insurance companies that he was breaking an
16   implied certification is a clear violation of the Rules
17   of Lenity and fair warning.  The Legislature did not
18   include the payment of referral fees as an active
19   healthcare claim fraud; of course, the Legislature
20   could have done so, but it didn't.  The State attempts
21   to stretch the reach of the statute to include the
22   payment of referral fees by contending that the failure
23   to report the payment of such fees was an omission, but
24   the insurers didn't ask for that information in the
25   claim submission process and there's no reason why a

17

1    provider would be required to volunteer that
2    information in the claim submission process.  It was
3    not requested or required by any applicable statute or
4    regulation.  The claim submission process focuses on
5    the service provided and the patient who receives that
6    service.  There's no reason why the provider would have
7    been required to provide information regarding the
8    operation of the provider's business when submitting a
9    claim for reimbursement.
10           The inferences set forth in 2C:40 -- 21-
11   4.3(f)(1) and (2) provide context for the intended
12   breach of the statute.  Those inferences apply to
13   failure to perform an assessment necessary to determine
14   the appropriate course of treatment and in -- in other
15   words, an unnecessary procedure, and submission of
16   claims for more treatments or procedures than could
17   have been performed during the time period; in other
18   words, claims for services not actually provided.
19           There's no reason why information relating to
20   referral fees would be required, it has nothing to do
21   with the service provided to the patient for which the
22   payment or reimbursement is being sought and for which
23   the insurer is contractually obligated to pay or
24   reimburse.  At best, it's indirectly related to the
25   service provided, because it relates to the business

18

1    practices of the pro -- provider.  Because the
2    information is not directly relevant or necessary to
3    the claim submission process and because it's not
4    information requested by the insurers as part of the
5    claims submission process, there's no way to know it
6    would be an active healthcare claim fraud to not
7    volunteer that information regarding the payment of --
8    of referral fees in connection with the submission of
9    the health insurance claim form.  Therefore, it would
10   violate the Rules of Lenity and fair warning to hold an
11   individual criminally -- criminally responsible for the
12   failure to volunteer information regarding referral --
13   referral fees in connection with the submission of the
14   health insurance claim form.
15           The Legislature also could have included in
16   the H.C.C.F. of this statute the type of implied
17   certification requirement that the State is attempting
18   to create.  In fact, the Legislature did include such a
19   provision in the New Jersey Insurance Fraud Prevention
20   Act, N.J.S.A. 17:33(a)(1) through -- to (30).  Under
21   the Insurance Fraud Prevention Act it is a violation of
22   the statute if a person,
23           "conceals or knowingly fails to disclose the
24   occurrence of an event which affects person's initial
25   or continued right or entitlement to any insurance

19

1  benefit or payment".
2       That's at 17:33(a)-4(a)(3).
3       The leg -- Legislature did not include any
4  similar provision in the Criminal Healthcare Claims
5  Fraud statute, rather the H.C.C.F. statute is limited
6  to making false, fictitious, fraudulent, or misleading
7  statements of fact in or omitting facts from documents
8  submitted for payment or reimbursement for health
9  services.
10      Based on the language of the Insurance Fraud
11 Prevention Act, the Legislature knew how to include the
12 type of implied certification language the State seek -
13 - seeks to graft onto the H.C.C.F. statute, but have
14 elected not to do so.  The Legislature limited the
15 scope of the H.C.C.F. statute to actual
16 misrepresentations or omissions, it does not extend to
17 the type of implied certification alleged in this case.
18      The State's reliance on Universal Health
19 Services v. Escobar, 136 Supreme Court (1989), 2016
20 U.S. Lexus, 3920 2016 is misplaced.  First, Escobar is
21 a qui tam action under with the -- under the False
22 Claims Act seeking civil penalties.  It's not a
23 criminal case.
24      Second, and more importantly, the Supreme
25 Court did not adopt the extraordinarily broad implied

20

1  certification argument the State advances in this case,
2  rather, the Court held the implied certification theory
3  can be a basis of liability at least where two
4  conditions are satisfied.  First, that the claim does
5  not merely request payment, but also makes specific
6  representations about the goods or services provided
7  and, second, that the defendant's failure to disclose
8  noncompli -- or the defendant's failure to disclose
9  noncompliance with a material statutory, regulatory, or
10 con -- or contractual requirements makes those
11 representations of a -- representations mis --
12 misleading half truths.  That's Escobar at 136 Supreme
13 at 2000.  This would include, for example, using
14 billing codes that in -- that indicated services were
15 provided by qualified providers when those services
16 were actually provided by unlicensed, uncreden --
17 uncredentialed or unqualified staff.  The Court
18 expressly -- the Supreme Court expressly did not
19 resolve whether all claims for payment implicitly
20 represent that a billing party is legally entitled to
21 payment.  Escobar at 136, Supreme Court at 2001.
22      In this case, the State can't point to any
23 representations made in any health insurance claim form
24 that is rendered misleading -- a misleading half truth
25 by the failure to disclose the payment of referral

21

fees.  Therefore, even if the implied certification
theory adopted in Escobar applied to this criminal
prosecution, which it does not, the State cannot
satisfy the Escobar standard under the facts of this
case.  Based on the clear and unambiguous language of
the H.  -- H.C.C.F. statute, defendant did not commit
an act of healthcare claim fraud.  As a matter of law,
the State cannot establish the defendant made any
false, fictitious, fraudulent, or misleading statement
of fact in any document submitted for payment or
reimbursement for health services or that defendant
admitted any fact, material or otherwise, from any such
documents.  Defendant, therefore, has met its burden to
demonstrate the evidence is clearly lacking support in
the charges.  See State versus Graham, 248 N.J. Super.
at 417.  Even if the State could establish an omission
as contemplated by the H.C.C.F. statute, which it
cannot, the State cannot establish that the omission
was material.
     In State versus Goodwin, 224 N.J. 102 (2016)
the Supreme Court held that statement -- a statement of
fact is material if it could have reasonably affected
the decision by an insurance company to provide
insurance coverage to a claimant, or the decision to
provide any benefit pursuant to an insurance policy, or

22

the decision to provide reimbursement, or the decision
to pay a claim.
     The State's effort to establish materiality
before the grand jury was based on vague and ambiguous
hearsay testimony.  On this -- and this is at the -- in
the grand jury transcript at Pages 71 and 72.  The
testimony included things such as the insurers -- the
insurer said "some of them said a kickback scheme would
definitely affect their investigation and payment of
claims."  Also, some were not willing to commit and say
it definitely would and many of the insurer --
insurance companies considered the existence of a kick
-- kickback scheme between providers to be material and
the failure to disclose that scheme when billing is
considered material to them, as well.
     And the State didn't identify which of the
insurers considered the payment of referral fees to be
material or -- or what any of the insurers would have
done if they knew about the payments.  The best the
State could do on materiality, therefore, was to tell
the grand jury that some or many of the insurers would
consider the existence of kickback schemes in their
investigation of payment and payment of a claim.
     The State needed to concede that some of the
insurers would not even say -- they would not even say

23

1   the payment of re -- referral fees would be material to
2   the investigation of payment of a -- on the payment of
3   the claims, and the State didn't offer any testimony to
4   support the claim that any of the insurers would have
5   denied an otherwise legitimate and -- an insured claim
6   based on the payment of a referral fee.  It's not
7   surprising, based on the facts of this case.  Again,
8   the medical procedures in this case were legitimate and
9   necessary procedures performed by qualified
10  professionals on insured patients.  The insurers were
11  obligated to pay the claims pursuant to the terms and
12  conditions of the respective insurance policies with
13  their insureds.
14          The State then took it one step further and
15  told the grand jurors,
16          "Actually, there's substantial case law in
17  civil context upon which many insurance companies re --
18  reply", I believe that's supposed to be rely, "wherein
19  the Supreme Court has held that there is an implied
20  certification whenever they are sending in these
21  healthcare claim forms that medical providers have to
22  comply with all significant statutes, such as the
23  regulation in their -- in -- in their licenses".
24          This is, at best, a gross overstatement of
25  the Supreme Court's decision in Escobar.  In fact, as a

24

1   -- as I already discussed, Escobar says nothing of that
2   sort.  And, in fact, expressly does not adopt the legal
3   analysis suggested by the State to the grand jurors
4   here.  It was extremely misleading to tell the grand
5   jury that the United State Supreme Court issued a
6   decision supporting the State's legal theory when that
7   simply is not true.
8           At best, the evidence presented to the grand
9   jury supports a finding that some of the insurers may
10  have considered the payment of referral fees in their
11  investigation in payment of claims.  As the Supreme
12  Court held in Escobar, it's not sufficient for a
13  finding of materiality if the government would have had
14  the option to decline to pay if it knew of the
15  defendant's noncompliance.  Escobar, 136 Supreme Court
16  at 2003.
17          In the absence of evidence that the insurers
18  or even some of the insurers would have actually
19  declined coverage if they were aware of the referral
20  payments, the State cannot establish the alleged
21  omissions in the claim process were material.
22          Finally, the defendant provided evidence
23  establishing that the insurers paid every claim
24  submitted and continued to pay the claims without
25  objection after the State obtained the superseding

25

1    indictment in this case.  The State doesn't contest
2    defendant's claims and has not provided evi -- any
3    evidence to contradict it.  The fact that the insurers
4    continued to pay these claims after the superseding
5    indictment was -- was -- was issued further undermines
6    the State's claim of materiality.
7            As the Supreme Court noted in <u>Escobar</u>, if the
8    government pays a particular claim in full, despite its
9    actual knowledge that certain requirements were
10   violated, that's very strong evidence that those
11   requirements are not material.  <u>Escobar</u>, 136 Supreme
12   Court at 230 -- 2003 to 2004.
13           The insurers in this case continued to pay
14   the very claims at issue after the defendant was
15   indicted.  This is strong evidence that the insurers
16   did not view the payment of referral fees as material
17   to their decisions to pay legitimate claims for medical
18   services provided to their insureds.
19           In the end, defendant has demonstrated that -
20   - that evidence is clearly lacking to support the
21   charge of healthcare claim fraud alleged in Counts 3
22   and 8 of the superseding indictment.  Because Counts 3
23   and 8 of the superseding indictment fail to charge a
24   viable offense, they must be dismissed.
25           Now I'll move to the theft by deception --

26

1    theft by -- pursuant to 2C:20, and this is Count 4.
2    Pursuant to 2C:20-4 a person is guilty of theft if he
3    purposely obtains property of another by deception.  A
4    person deceives if he purposely a) creates or
5    reinforces a false impression including false
6    impressions as to law, value, intention, or other -- or
7    other state of mind, b) prevent -- prevents another
8    from acquiring information which would affect his
9    judgment of a transaction, or, three -- or -- or c)
10   fails to correct the false impression which the
11   deceiver previously created or reinforced.
12           First, defendant did not obtain property of
13   another as contemplated by 2C:20-4.  The insurers paid
14   and/or reimbursed amounts they were obligated to pay
15   under the terms and conditions of their insurance
16   policies with their insureds.  Payments were made for
17   legitimate claims for necessary medical services
18   actually provided to their insureds.
19           The State claims -- the State's claim that
20   the defendant committed theft because the insurers
21   would have denied the claims if then insurers knew
22   about the referral payments fails miserably.  As
23   discussed previously, the State did not provide any
24   evidence that any of the insurance companies denied the
25   claims on that basis.  The best the insurer -- the

27

1  State could do was offer evidence that some of the
2  insurance companies may have taken that fact into
3  account in their investigation or payment of claims.
4  Even if this -- this evidence established materiality
5  for purposes of the Health Claims Fraud statute, which
6  it does not, it would not support a claim of theft by
7  deception.
8         Second, the State's implicit certification
9  argument doesn't even come to close to establishing
10 deception as contemplated by the theft by deception
11 statute.  In fact, the premises of the State's implicit
12 certification argument is that the defendant did not
13 make any false or misleading statements or omit any
14 information requested by the insurers.
15        To prove theft by deception, the State must
16 prove that defendant purposely created or reinforced a
17 false impression or purposely prevented another from
18 acquire -- acquiring information which would affect his
19 or her judgment of a transaction or purposely failed to
20 correct a false impression which the deceiver
21 previously created or reinforced.
22        In this case, the State contends the
23 defendant omitted information from the health insurance
24 claim form that was not even sought by the insurers on
25 the form.  There's no evidence support a claim that

28

1  defendant purposely created or reinforced a false
2  impression, purposely prevented the insurers from
3  require -- from obtaining required information, or
4  purposely failed to correct the false impression that
5  defendant previously created or reinforced.
6         Third, the claim against the defendant
7  arising out of his alleged taking of property from the
8  insurer sounds in contract, not criminality.  Distilled
9  to its essence, the State contends that the insurers
10 would have denied reimbursement for the claims because
11 defendant violated the -- his various agreements with
12 the insurers.  Even if any of the insurers would
13 actually have denied the claims, a claim that appears
14 to be con -- contradicted by the fact that they did pay
15 the claims, even after the defendant was indicted, the
16 insurers would have based the denial on defendant's
17 failure to comply with their agreements with the
18 defendant.  This type of breach of contract action has
19 consistently been rejected as a basis for criminal
20 charges.  See State versus Bennett, 194 N.J. Super.
21 231, Appellate Division (1984) and State versus Riley,
22 412 N.J. Super. 162, that was Law Division (2009).
23 Defendant's alleged breach -- defendant's alleged
24 violations of his agreements with the various insurers
25 is not a proper basis for a criminal charge of theft by

29

1   deception.
2                Finally, despite the fact that some identify
3   -- some identified subset of the insurers would not
4   even represent to the State that they would consider
5   the payment of referral fees to be material
6   information, much less that they would actually deny
7   any -- any claims, the State aggregated all of the
8   insurance payments made to all of the alleged re --
9   referral fee patients for purposes of establishing the
10  second degree grading of the offense.  There's no way
11  for the grand jurors to determine the amount of the
12  payments made by the insurers who refused to say they -
13  - they would even consider the payments to be -- to be
14  material to the decision to pay.  It was improper for
15  the State to present the aggregate amount of the
16  insurance payments without reducing the amount for the
17  insurers who would not even say that they might have
18  declined the claims.  The State knew that it could not
19  establish that all of the insurers would have denied
20  the claims, because all -- some of the insurers would
21  not even tell them that they would consider this -- the
22  -- the -- the fact in their -- in their investigation
23  in payment of the claims, yet the State went ahead and
24  told the grand jurors that all -- in effect, all of the
25  insurers would have denied all of the claims when it

30

1   aggregated -- aggregated all of the amounts paid to
2   Hayek and Awari in -- in -- in its presentation to the
3   grand jury.
4                Again, the defendant has demonstrated that
5   the evidence is clearly lacking to support the charge
6   of second degree theft by deception alleged in Count 4
7   of the superseding indictment.  Because Count 4 of the
8   superseding indictment fails to charge a viable
9   offense, it also must be dismissed.
10               Now with respect to criminal use of runners.
11  This is 2C:21-22.1(b).  A person is guilty of a crime
12  if that person knowingly uses, solicits, hires, or
13  employs another to act as a runner.
14               2C:21-22.1(c) provides that a runner means a
15  person who, for pecuniary benefit, procures or attempts
16  to procure a patient at the direction of, request, or -
17  - or in cooperation with a provider with the purpose --
18  or in cooperation with a provider was -- whose purpose
19  is to seek to obtain benefits under a contract of
20  insurance.
21               The statute specifically provides runner
22  shall not include a person who refers patients to a pro
23  -- provider as otherwise authorized by law.  In this
24  case, the State concedes that but for the alleged
25  payment of referral fees, Hayek and Awari were

31

1   authorized by law to refer patients to the defendant.
2   In other words, as chiropractors, Hayek and Awari were
3   authorized by law to refer patients to the defendant.
4   The Legislature expressly excludes such persons,
5   persons such as chiropractors, who are authorized by
6   law to refer patients, but -- but to do so -- but who
7   do so for a fee in violation of the applicable
8   regulations and licensure requirements.  For example,
9   from the use of -- from the definition of runners, for
10  purposes of the criminal use of runners statute.  The
11  State has not provided any authority to support its
12  decision to charge the defendant under this statute and
13  the Court's research doesn't reveal any.  Again, I gave
14  the State an opportunity to provide me anything that
15  would support charging the defendant under this statute
16  and the defen -- and the State provided me absolutely
17  nothing, not a single piece of paper, not a single
18  citation to anything that could possibly support
19  charging the defendant under this statute, which by its
20  plain -- plain reading he did not violate.  In the
21  absence of any authority that could possibly explain or
22  justify the State's decision to charge the defendant
23  with a violation of this statute, the State -- the
24  State con -- this Court concludes that the State did so
25  improperly based on a plain reading of the statute.

32

1   Because Hayek and Awari cannot qualify as runners under
2   the statute, Counts 6 and 10 of the superseding
3   indictment fail to charge a viable offense and also
4   must be dismissed.
5            Count 2 of the superseding indictment alleges
6   misconduct by a corporate official, contrary to 2C:21-
7   9.  Count 2 alleges that defendant used, controlled, or
8   operated Interventional Spine Pain for the fur --
9   furtherance or promotion of 1) theft by deception, 2)
10  healthcare claims fraud, and 3) criminal use of
11  runners.  Because all the offenses on which Count 2 is
12  based have been dismissed, Count 2 also must be
13  dismissed.
14           Finally, as I went through all of -- all of
15  this analysis and I -- and I became more familiar with
16  the -- with the legal concepts and -- and -- and fine -
17  - and finer points of exactly what was charged and what
18  was -- what was represented to the grand jury, this
19  Court concludes that the State intentionally subverted
20  the grand jury process resulting in a grand jury
21  presentation that was fundamentally unfair. First, the
22  State suggested to the grand jury that it should rely
23  on or at least assuaged by the fact that there exists,
24           "substantial case law and civil context upon
25  which many insurance companies rely, wherein the

1   Supreme Court has held that there is an implied
2   certification whenever -- whenever they are sending in
3   these healthcare claims forms, that medical providers
4   have to comply with all significant statutes, such as
5   the regulation in their licenses".
6           This was improper for two reasons.  It was
7   improper to suggest to the grand jurors that the --
8   that they should consider some ambiguously described
9   body of law, including the alleged Supreme Court
10  decision that allegedly supported the State's request
11  for an indictment on the charges.  This left the grand
12  jurors not only with the impression that the legal
13  instructions provided at the conclusion of the
14  presentation should be considered in conjunction with
15  some other vaguely defined body of law, but also that
16  the State's legal position was supported by substantial
17  case law and Supreme Court law.
18          In addition, the State's claim was misleading
19  at best.  In fact, the State should have told the grand
20  jury that there is absolutely no law supporting the
21  charges of healthcare claim fraud, use of criminal
22  runners, or theft by deception.  The State deceived the
23  grand jury when it told them otherwise.  Not a single
24  one of the cases cited by the State is a criminal case
25  and not a single one of those cases relates to the --

1   to the H.C.C.F. statute.  Moreover, the State's
2   apparent reference to the Supreme Court's decision in
3   Escobar is flat out wrong.  In addition to the fact
4   that Escobar was a civil qui tam action, not a criminal
5   case, the Supreme Court simply did not adopt the
6   position represented by the State, instead, it adopted
7   a test the State can't meet in this case.  By
8   incorrectly and misleadingly advisingly [sic] the grand
9   -- advising the grand jury regarding the applicable
10  law, the State left the grand jurors with the patently
11  false impression that the law was in its favor.  In
12  fact, the State should have told the grand jury that
13  there's absolutely no law that supported -- supported
14  these charges.  The State deceived the grand jury when
15  it told them otherwise.
16          Second, the State charged the defendant with
17  a violation of criminal use of runner statute even
18  though it knew the claim failed as a matter of law.  As
19  explained previously, the Legislature expressly
20  exempted from the definition of runner a person who
21  refers patients to a provider as otherwise authorized
22  by law.
23          As chiropractors, Hayek and Awari were
24  authorized by law to refer patients to the defendant.
25  The State was well aware that the Legislature expressly

**35**

1    excluded cases such as this from the reach of the
2    criminal runner statute and the State cannot come with
3    any -- come up with any authority to support its
4    decision to charge the defendant in the face of the
5    place language of the statute.  In order to secure an
6    indictment on this charge, the State failed to advise
7    the grand jurors that -- what it plainly knew, that
8    Hayek and Awari were authorized to refer patients to
9    the defendant and could not qualify as runners.
10    Instead, the State selectively -- selectively advised
11    the grand jurors at the outset of the presentation that
12    it would be prof -- professional misconduct for a
13    chiropractor to receive referral -- a referral fee, and
14    that's the transcript at Page 7.  Yet it neglected to
15    tell the grand jurors that they were authorized to
16    refer patients to the defendant.  By hiding the ball
17    from the grand jurors and not advising them of the fact
18    -- of a fact that was critical to the grand jurors'
19    evaluation of the criminal runner statute, the State
20    intentionally subverted the grand jury process.
21         In this case, in addition, as I -- as I
22    mentioned earlier, despite knowing that the -- some --
23    at least some of the insurers, and we -- we have no
24    idea how many of the insurers, told the State that they
25    would not tell -- they would not consider the use of

**36**

1    runners as part of the investigation and -- and claim
2    payment process, the State went ahead and aggregated
3    all of the payments to -- with respect to all of the
4    patients to all of the insurers in presenting the case
5    to the grand jury, and -- and -- and as I said earlier,
6    implicitly represented to the grand jury that all of
7    those claims would have been denied; the State knew
8    that was not true.  The State absolutely knew that at
9    least some of the insurers told them that they wouldn't
10    even commit to considering it as part of the process,
11    yet the State went ahead and -- and implicitly told the
12    grand jurors that every single one of those claims
13    would have been denied.  That was clearly improper and
14    it's simp -- simply cannot -- cannot be tolerated in
15    the context of a presentation of charges like this to a
16    grand jury.
17         In this case, the State lost sight of its
18    obligation to do justice and instead sought to indict
19    the defendant on the most serious charges it could
20    present.  Had the State not misled the grand jurors
21    regarding the law applicable to the charges and had the
22    State not charged defendant improperly with the use of
23    criminal runners, and had the State not over --
24    overstated the materiality and misled the grand jury
25    with respect to how -- how many, if any, of the

37

```
 1    insurers would have actually denied the -- these
 2    claims, the Court is not convinced the grand jury would
 3    have indicted the defendant.  In short, this Court has
 4    grave doubts that the determination ultimately re -- re
 5    -- reached was arrived at fairly and impartially.
 6             Accordingly, Counts 2, 3, 4, 6, 8, and 10 of
 7    the superseding indictment are dismissed with
 8    prejudice.  Counts 1, 5, 7, and 9 of the superseding
 9    indictment are dismissed without prejudice and, of
10    course, the State is free to represent those charges to
11    the grand jury in a fair and -- and appropriate manner,
12    if it chooses to do so.
13             Okay.  Thanks everybody.
14             MS. CALLAHAN:  Thank you.
15             MR. WONG:  Your Honor, is there a chance I
16    can get a copy of that?
17             THE COURT:  No.  You can order a transcript.
18             MR. WONG:  Oh, a transcript from your clerk?
19             THE COURT:  Yes.
20             MR. WONG:  Okay.
21             THE COURT:  Oh, we can go off the record.
22
23                   (END OF PROCEEDINGS)
24
25
```

38

CERTIFICATION

    I, DOLORES S. HASTINGS, the assigned transcriber,
do hereby certify the foregoing transcript of
proceedings of May 23, 2019, digitally recorded, index
number from 1:43:11 to 2:21:56, is prepared to the best
of my ability and in full compliance with the current
Transcript Format for Judicial Proceedings and is a
true and accurate compressed transcript of the
proceedings as recorded.


**/s/ Dolores S. Hastings**          May 30, 2019
Dolores S. Hastings AD/T 417
APPEALING TRANSCRIPTS, INC.
CLARK, NEW JERSEY

# EXHIBIT B





1949

**INTERVENTIONAL SPINE AND
PAIN TREATMENT CENTER, PC**
P.O. BOX 604
SADDLE RIVER, NJ 07458-0602

55-33/212 NJ
60353

DATE 1/3/2013

PAY
TO THE
ORDER OF _Union Wellness Center P.A_ | $ 600 00/100

_Six Hundred_ _____ DOLLARS

**Bank of America**

ACH R/T 021200339

FOR _Union office February Rent_

⑆001949⑆ ⑈021200339⑈ 009505798506⑈

```
Amount:        $600.00              Sequence Number: 8992538982
Account:       9505798506           Capture Date:    02/01/2013
Bank Number: 02120033               Check Number:    1949
```



```
Electronic Endorsements:
Date        Sequence       Bank #      Endrs Type   TRN   RRC   Bank Name
02/01/2013  008992538982   111012822   Pay Bank     N           BANK OF AMERICA, NA
02/01/2013  9290211187     74909962    Rtn Loc/BOFD  Y           JPMORGAN CHASE BANK,
```



**INTERVENTIONAL SPINE AND PAIN TREATMENT CENTER, PC**
P.O. BOX 604
SADDLE RIVER, NJ 07458-0602

1957

55-33/212 NJ
60353

DATE 2/1/2013

PAY TO THE ORDER OF _Union Wellness Center_

$ 600 00/x

_Six Hundred_ DOLLARS

**Bank of America**

ACH R/T 021200339

FOR _Union Potorra Office Rent for Feb'13_

⑈00⑈957⑈ ⑈021200339⑈ 009505798506⑈

Amount:       $600.00                Sequence Number: 9192661850
Account:      9505798506             Capture Date:    02/22/2013
Bank Number:  02120033              Check Number:    1957



Electronic Endorsements:

| Date       | Sequence      | Bank #    | Endrs Type   | TRN | RRC | Bank Name            |
|------------|---------------|-----------|--------------|-----|-----|----------------------|
| 02/22/2013 | 4580596403    | 74909962  | Rtn Loc/BOFD | Y   |     | JPMORGAN CHASE BANK, |
| 02/22/2013 | 009192661850  | 111012822 | Pay Bank     | N   |     | BANK OF AMERICA, NA  |

INTERVENTIONAL SPINE AND
PAIN TREATMENT CENTER, PC
P.O. BOX 604
SADDLE RIVER, NJ 07458-0602

1968

55-33/212 NJ
60353

DATE _3/4/2013_

PAY TO THE ORDER OF _Union Wellness Center_    $ 600.00

_Six Hundred_    DOLLARS

**Bank of America**

ACH R/T 021200339

FOR _Union Totowa Office Rent for 3/2013_

⑈0019681⑈ ⑊021200339⑈ 0095057985061⑈

| Amount: | $600.00 | Sequence Number: | 9592046248 |
|---|---|---|---|
| Account: | 9505798506 | Capture Date: | 03/08/2013 |
| Bank Number: | 02120033 | Check Number: | 1968 |



Electronic Endorsements:

| Date | Sequence | Bank # | Endrs Type | TRN | RRC | Bank Name |
|---|---|---|---|---|---|---|
| 03/08/2013 | 009592046248 | 111012822 | Pay Bank | N | | BANK OF AMERICA, NA |
| 03/08/2013 | 4580076627 | 74909962 | Rtn Loc/BOFD | Y | | JPMORGAN CHASE BANK, |

1976

55-33/212 NJ
60353

**INTERVENTIONAL SPINE AND
PAIN TREATMENT CENTER, PC**
P.O. BOX 604
SADDLE RIVER, NJ 07458-0604

DATE 4/1/2013

PAY
TO THE
ORDER OF  Union Wellness Center    $ 600.00

Six Hundred _____ DOLLARS

**Bank of America**

ACH R/T 021200339

FOR Totowa Rental for April 2013

⑈001976⑈ ⑆021200339⑆ 009505798506⑈

MP

Amount:       $600.00                    Sequence Number: 9992650690

Account:      9505798506                 Capture Date:    04/05/2013

Bank Number: 02120033                    Check Number:    1976



Electronic Endorsements:

| Date | Sequence | Bank # | Endrs Type | TRN | RRC | Bank Name |
|------|----------|--------|------------|-----|-----|-----------|
| 04/05/2013 | 8490415075 | 74909962 | Rtn Loc/BOFD | Y | | JPMORGAN CHASE BANK, |
| 04/05/2013 | 009992650690 | 111012822 | Pay Bank | N | | BANK OF AMERICA, NA |

**INTERVENTIONAL SPINE AND
PAIN TREATMENT CENTER, PC**
P.O. BOX 604
SADDLE RIVER, NJ 07458-0604

2001

55-33/212 NJ
60353

DATE 5/1/13

PAY
TO THE
ORDER OF ___Unim Wellness Center_____ | $600 00/xx

___Six Hundred_____ DOLLARS

**Bank of America**
ACH R/T 021200339

FOR ___Rental for May 13 Totowa office_____

⑆00 200 ⑈ ⑆021200339⑆ 009505798506⑈

Account:        9505798506      Capture Date:    05/15/2013
Bank Number: 02120033           Check Number:    2001

INTERVENTIONAL SPINE AND
PAIN TREATMENT CENTER, PC
P.O. BOX 604
SADDLE RIVER, NJ 07458-0604

2001

55-33/212 NJ
60353

DATE _5/1/13_

PAY TO THE ORDER OF _Union Wellness Center_        $ _600_

_Six Hundred_                                    DOLLARS

**Bank of America**

ACH R/T 021000339

FOR _Rental for May 13 Totowa office_

⑆00 200 ⑆ ⑈021200339⑈ 009505798506⑉

Electronic Endorsements:

| Date | Sequence | Bank # | Endrs Type | TRN | RRC | Bank Name |
|------|----------|--------|-----------|-----|-----|-----------|
| 05/15/2013 | 008992245640 | 111012822 | Pay Bank | N | | BANK OF AMERICA, NA |
| 05/15/2013 | 4580714828 | 74909962 | Rtn Loc/BOFD | Y | | JPMORGAN CHASE BANK, |

FOR DEPOSIT ONLY
UNION WELLNESS CENTER, PA
421295/45081

Amount:     $600.00                Sequence Number: 8992245640

2004

55-33/212 NJ
60353

**INTERVENTIONAL SPINE AND
PAIN TREATMENT CENTER, PC**
P.O. BOX 604
SADDLE RIVER, NJ 07458-0604

DATE _6/1/2013_

PAY
TO THE
ORDER OF _Union Wellness Center_                    $ 600.⁰⁰

_Six Hundred_                                      DOLLARS

Security
Features
Details on
Back.

**Bank of America**

ACH R/T 021200339

FOR _June Rental Union Office_

MP

⑈00 2004⑈ ⑈02 1200339⑈ 009505798506⑈

Amount:        $600.00                Sequence Number: 9892079475

Account:       9505798506             Capture Date:    06/10/2013

Bank Number: 02120033                 Check Number:    2004



Electronic Endorsements:

| Date | Sequence | Bank # | Endrs Type | TRN | RRC | Bank Name |
|------|----------|--------|------------|-----|-----|-----------|
| 06/10/2013 | 9470936904 | 74909962 | Rtn Loc/BOFD | Y | | JPMORGAN CHASE BANK, |
| 06/10/2013 | 009892079475 | 111012822 | Pay Bank | N | | BANK OF AMERICA, NA |

2033

55-33/212 NJ
60353

**INTERVENTIONAL SPINE AND
PAIN TREATMENT CENTER, PC**
P.O. BOX 604
SADDLE RIVER, NJ 07458-0604

DATE 7/01/2013

PAY TO THE
ORDER OF ___Union Wellness Center___ $ 600 00/xx

___Six Hundred___ DOLLARS

Security
Features
Details on
Back

**Bank of America**

ACH R/T 021200339

FOR ___Union Office Rent (Totowa)___

⑈002033⑈ ⑇021200339⑇ 009505798506⑈

| Amount: | $600.00 | Sequence Number: | 9292512388 |
| Account: | 9505798506 | Capture Date: | 07/24/2013 |
| Bank Number: | 02120033 | Check Number: | 2033 |



Electronic Endorsements:

| Date | Sequence | Bank # | Endrs Type | TRN | RRC | Bank Name |
|------|----------|--------|-----------|-----|-----|-----------|
| 07/24/2013 | 009292512388 | 111012822 | Pay Bank | N | | BANK OF AMERICA, NA |
| 07/24/2013 | 9670461169 | 74909962 | Rtn Loc/BOFD | Y | | JPMORGAN CHASE BANK, |

**INTERVENTIONAL SPINE AND PAIN TREATMENT CENTER, PC**
P.O. BOX 604
SADDLE RIVER, NJ 07458-0604

2034

55-33/212 NJ
60353

DATE 8/1/13

PAY TO THE ORDER OF _Union Wellness Center_ $ 600.00

_Six Hundred_ DOLLARS

**Bank of America**
ACH R/T 021200339

FOR _Totowa office rental Aug 2013_

⑈00 2034⑈ ⑆021200339⑆ 0095057985 06⑈

| Amount: | $600.00 | Sequence Number: | 8792664394 |
|---|---|---|---|
| Account: | 9505798506 | Capture Date: | 08/12/2013 |
| Bank Number: | 02120033 | Check Number: | 2034 |



Electronic Endorsements:

| Date | Sequence | Bank # | Endrs Type | TRN | RRC | Bank Name |
|---|---|---|---|---|---|---|
| 08/12/2013 | 3790534429 | 74909962 | Rtn Loc/BOFD | Y | | JPMORGAN CHASE BANK, |
| 08/12/2013 | 008792664394 | 111012822 | Pay Bank | N | | BANK OF AMERICA, NA |

2061

**INTERVENTIONAL SPINE AND
PAIN TREATMENT CENTER, PC**
P.O. BOX 604
SADDLE RIVER, NJ 07458-0604

55-33/212 NJ
60353

DATE 9/6/13

PAY
TO THE
ORDER OF Anima Wellness Center                    $ 600 00

Six Hundred                                          DOLLARS

**Bank of America**

ACH R/T 021200339

FOR Totowa Office Rental

⑈"002061⑈" ⑈:021200339⑈: 009505798506⑈"

```
Amount:        $600.00          Sequence Number: 9092266245
Account:       9505798506       Capture Date:    09/10/2013
Bank Number: 02120033           Check Number:    2061
```

INTERVENTIONAL SPINE AND
PAIN TREATMENT CENTER, PC
P.O. BOX 604
SADDLE RIVER, NJ 07458-0604

2061

50-33212 NJ
60353

DATE 9/6/13

PAY TO THE ORDER OF  Unun Wellness Center    $ 600 00

Six Hundred     DOLLARS

**Bank of America** 

ACH R/T 021200339

FOR  Totowa Office Rental

⑈00 2061⑈ ⑈021200339⑈ 009505798506⑈

UNION WELLNESS CENTER, PA
FOR DEPOSIT ONLY
421294581

Electronic Endorsements:

```
Date        Sequence       Bank #     Endrs Type     TRN  RRC  Bank Name
09/10/2013  4270869547     74909962   Rtn Loc/BOFD   Y         JPMORGAN CHASE BANK,
09/10/2013  009092266245   111012822  Pay Bank       N         BANK OF AMERICA, NA
```

2082

**INTERVENTIONAL SPINE AND PAIN TREATMENT CENTER, PC**
P.O. BOX 604
SADDLE RIVER, NJ 07458-0604

55-33/212 NJ
60353

DATE 10/1/13

PAY TO THE ORDER OF _Union Wellness Center_    $ 600.00

_Six Hundred_    DOLLARS

**Bank of America**

ACH R/T 021200339

FOR _Totowa office rental oct 2013_

⑆00 2082⑆ ⑆021200339⑆ 009505798506⑆

```
Amount:        $600.00            Sequence Number: 8592119945
Account:       9505798506         Capture Date:    10/23/2013
Bank Number: 02120033             Check Number:    2082
```





Electronic Endorsements:

| Date | Sequence | Bank # | Endrs Type | TRN | RRC | Bank Name |
|------|----------|--------|-----------|-----|-----|-----------|
| 10/23/2013 | 9070668246 | 74909962 | Rtn Loc/BOFD | Y | | JPMORGAN CHASE BANK, |
| 10/23/2013 | 008592119945 | 111012822 | Pay Bank | N | | BANK OF AMERICA, NA |

**INTERVENTIONAL SPINE AND PAIN TREATMENT CENTER, PC**
P.O. BOX 604
SADDLE RIVER, NJ 07458-0604

2098

55-33/212 NJ
60353

DATE  1/1/13

PAY TO THE ORDER OF _____ Union Wellness Center _____ | $ 600 00

Six Hundred _____ DOLLARS

**Bank of America**

ACH R/T 021200339

FOR Union Office Rental Nov 2013

⑆002098⑆ ⑈021200339⑈ 009505798506⑆

Amount:        $600.00          Sequence Number: 9692596376
Account:       9505798506       Capture Date:    11/26/2013
Bank Number:   02120033         Check Number:    2098

**INTERVENTIONAL SPINE AND PAIN TREATMENT CENTER, PC**
P.O. BOX 604
SADDLE RIVER, NJ 07458-0604

2098
55-33/012 NJ
68353

DATE _11/1/13_

PAY TO THE ORDER OF ___Union   Wellness   Center___   $ 600.00

___Six   Hundred___ DOLLARS

**Bank of America**
ACH R/T 021200339

FOR ___Union Office Rental Nov 2013___

�串002098�串  ⑆021200339⑆  009505798506⑆

JPMorganChaseBank  12605 747713-941862024559

CREDITED TO ACCOUNT OF
WITHIN NAMED PAYEE
FOR DEPOSIT ONLY
JPMorgan Chase Bank, N.A.

Electronic Endorsements:

| Date | Sequence | Bank # | Endrs Type | TRN | RRC | Bank Name |
|------|----------|--------|------------|-----|-----|-----------|
| 11/26/2013 | 8490073363 | 74909962 | Rtn Loc/BOFD | Y | | JPMORGAN CHASE BANK, |
| 11/26/2013 | 009692596376 | 111012822 | Pay Bank | N | | BANK OF AMERICA, NA |

INTERVENTIONAL SPINE AND
PAIN TREATMENT CENTER, PC
P.O. BOX 604
SADDLE RIVER, NJ 07458-0604

55-33/212 NJ
60353

DATE 12/1/13

PAY
TO THE
ORDER OF   Union Wellness Center

$ 600 ⁰⁰

Six Hundred _____ DOLLARS

**Bank of America**

ACH R/T 021200339

FOR Totowa office Rental Dec 2013

⑈002110⑈ ⑆021200339⑆ 009505798506⑈

Amount:        $600.00              Sequence Number: 8892958112
Account:       9505798506           Capture Date:    12/20/2013
Bank Number: 02120033               Check Number:    2110

---

**INTERVENTIONAL SPINE AND PAIN TREATMENT CENTER, PC**
P.O. BOX 604
SADDLE RIVER, NJ 07458-0604

2110

55-33/212 N.J
83753

DATE 12/1/13

PAY TO THE ORDER OF    Union Wellness Center        $ 600 ⁰⁰

Six  Hundred        DOLLARS

**Bank of America**
ACH R/T 021200339

FOR  Totowa office rental Dec 2012

⑈002110⑈ ⑆021200339⑆ 009505798506⑈

FOR DEPOSIT ONLY
UNION WELLNESS CENTER, PA
4212904581

---

Electronic Endorsements:

| Date       | Sequence     | Bank #    | Endrs Type   | TRN | RRC | Bank Name              |
|------------|--------------|-----------|--------------|-----|-----|------------------------|
| 12/20/2013 | 008892958112 | 111012822 | Pay Bank     | N   |     | BANK OF AMERICA, NA    |
| 12/20/2013 | 4090969451   | 74909962  | Rtn Loc/BOFD | Y   |     | JPMORGAN CHASE BANK,   |

| Amount: | $600.00 | Sequence Number: | 9092707262 |
| Account: | 9505798506 | Capture Date: | 02/28/2014 |
| Bank Number: | 02120033 | Check Number: | 2145 |



INTERVENTIONAL SPINE AND
PAIN TREATMENT CENTER, PC
P.O. BOX 604
SADDLE RIVER, NJ 07458-0604

2145

95-33/212 NJ
60353

DATE JAN 3rd 2014

PAY TO THE ORDER OF_____ UNION WELLNESS CENTER_____ $ 600 00/=

Six HUNDRED_____ DOLLARS

**Bank of America**
ACH R/T 021200339

FOR POTOWA OFFICE RENTAL FOR JAN 2014

⑈002145⑈ ⑆021200339⑇ 009505798506⑈

FOR DEPOSIT ONLY
UNION WELLNESS CENTER, PA
AC 2120405 21



Electronic Endorsements:

| Date | Sequence | Bank # | Endrs Type | TRN | RRC | Bank Name |
|---|---|---|---|---|---|---|
| 02/28/2014 | 009092707262 | 111012822 | Pay Bank | N | | BANK OF AMERICA, NA |
| 02/28/2014 | 1070913745 | 74909962 | Rtn Loc/BOFD | Y | | JPMORGAN CHASE BANK, |

```
Amount:        $600.00          Sequence Number: 8392311825
Account:       9505798506       Capture Date:    03/14/2014
Bank Number: 02120033           Check Number:    2150
```



```
Electronic Endorsements:
Date         Sequence        Bank #       Endrs Type    TRN    RRC    Bank Name
03/14/2014   5670782175      74909962     Rtn Loc/BOFD  Y             JPMORGAN CHASE BANK,
03/14/2014   008392311825    111012822    Pay Bank      N             BANK OF AMERICA, NA
```

# EXHIBIT C



THE STATE OF NEW JERSEY
DEPARTMENT OF LAW & PUBLIC SAFETY
OFFICE OF THE ATTORNEY GENERAL

Search

NJHome | Services A to Z | Departments/Agencies | FAQs

OAG Home | OAG Services from A - Z | Servicios en Español

OAG Contact | News Release

**For Immediate Release:**
August 2, 2017

**For Further Information:**
**Media Inquiries-**
Lisa Coryell
609-292-4791
**Citizen Inquiries-**
609-984-5828

**Office of The Attorney General**
- Christopher S. Porrino, *Attorney General*
**Office of the Insurance Fraud Prosecutor**
- Christopher Iu, *Acting Insurance Fraud Prosecutor*

‹ OAG Home
Gurbir S. Grewal
Attorney General
AG's Executive Leadership Team
AG's Message | Ask the AG
Contact OAG | About OAG
OAG News | OAG FAQs
OAG Library | Employment
OAG Grants | Proposed Rules
OAG History | Services A-Z
Statutes / Regulations / Rules
Agencies / Programs / Units
**Other News Pages**
Governor's Office
Otras Noticias en Español (OAG)
Civil Rights (Division on)
Consumer Affairs (Division of)
Criminal Justice (Division of)
Election Law Enforcement Comm.
Gaming Enforcement (Div. of)
Highway Traffic Safety (Division of)
Insurance Fraud Prosecutor (Office of)
Juvenile Justice Commission
State Police (Division of NJ)
Law (Division of)

## Bergen County Neurologist Charged with Paying Illegal Kickbacks to a Passaic County Chiropractor in Exchange for Patient Referrals to His Pain Management Facility



Dr. Terry Ramnanan

TRENTON – Attorney General Christopher S. Porrino and the Office of the Insurance Fraud Prosecutor announced that a Bergen County neurologist today was charged with third-degree conspiracy and commercial bribery for allegedly paying illegal kickbacks to a Totowa chiropractor in exchange for patient referrals to his pain management facility.

Dr. Terry Ramnanan, 64, who operates the Interventional Spine and Pain facility in Paramus, was also charged with third-degree running in an indictment handed up by a state Grand Jury in Trenton today.

Ramnanan, who lives in Upper Saddle River, is the latest doctor charged in connection with an ongoing investigation by the Attorney General's Commercial Bribery Task Force (CBTF), which was formed in January 2016 to target commercial bribery in the healthcare industry. The task force includes deputy attorneys general and detectives from the Division of Criminal Justice Financial & Computer Crimes Bureau and the Office of the Insurance Fraud Prosecutor.

The investigation has uncovered a statewide criminal enterprise in which doctors allegedly received hundreds of thousands of dollars in illegal kickbacks in return for providing patient referrals worth millions of dollars to other doctors and medical service providers.

"Our Commercial Bribery Task Force will continue to unravel this tangled web of corruption until we identify and bring to justice everyone involved in this shameless scheme that puts profit over patients," said Attorney General Porrino. "With each new defendant we charge, we're reinforcing our message that New Jersey patients are not for sale."

"Kickback schemes like this one undermine the entire medical profession and violate the doctor-patient relationship that serves as its sacred bedrock," said Acting Insurance Fraud Prosecutor Christopher Iu. "Patients must be able to trust that their healthcare treatments are based on sound medicine, not the greed and corruption of their doctors.
As this investigation shows, medical professionals who exploit that trust for personal gain will be held accountable."

"These bribery schemes involving medical professionals harm individual patients, who may be misdiagnosed or receive unnecessary treatments, and they raise costs for all healthcare consumers," said Director Elie Honig of the Division of Criminal Justice. "We urge anyone who suspects this type of corrupt activity in the healthcare industry to contact our task force confidentially at **866-TIPS-4CJ**."

According to the indictment, between January 2012 and April 2016, Ramnanan conspired with Totowa chiropractor Dr. Ronald Hayek in a kickback scheme in which Ramnanan paid Hayek for referring patients for treatment at his medical facility.

Hayek was among dozens of doctors charged in two prior medical fraud investigations that led to the formation of the Commercial Bribery Task Force:

- An investigation by the Division of Criminal Justice Financial & Computer Crimes Bureau that led to guilty pleas last year from Dr. Manoj Patharkar and his associate Mohammed Shamshair on charges that they hid and laundered approximately $3.6 million in income from the doctor's pain management clinics to evade taxes, and

- "Operation Rayscam," an investigation by the Office of the Insurance Fraud Prosecutor that led to guilty pleas in May 2015 from Rehan Zuberi, his wife and three other defendants in connection with commercial bribes that Zuberi paid to doctors in return for the referral of patients to his medical imaging centers.

In July 2016, Hayek pleaded guilty to two accusations. The first accusation, filed by the Division of Criminal Justice Financial & Computer Crimes Bureau, charged him with second-degree conspiracy, second-degree money laundering, six counts of commercial bribery, (four in the second degree, two in the third degree), and one count of third degree failure to pay taxes. The second accusation, filed by the Office of Insurance Fraud Prosecutor, charged him with one count of third-degree conspiracy.

In pleading guilty to the accusation filed by the Division of Criminal Justice, Hayek admitted he accepted tens of thousands of dollars in kickbacks from Shamshair, Patharkar, Ramnanan, and others, in exchange for referring patients to them and their related medical facilities. He also admitted paying commercial bribes to attorneys in exchange for the referral of clients to his practice. In pleading guilty to the accusation filed by the Office of Insurance Fraud Prosecutor, Hayek admitted to receiving kickbacks in exchange for referring patients to diagnostic imaging facilities owned or controlled by Rehan Zuberi.

The charges are merely accusations and the defendant is presumed innocent until proven guilty. Third-degree crimes carry a sentence of three to five years in state prison and a criminal fine of up to $15,000.

Deputy Attorney General Colin Keiffer, of the Office of Insurance Fraud Prosecutor, presented the case to the grand jury.

Commercial Bribery Task force members Lt. Lisa Shea, Lt. Anthony Butler, Detective John Campanella, Detective Wendy Berg, Detective Grace Rocca, Detective Kimberly Allen, Detective John Neggia, Analyst Bethany Schussler, and Analyst Rita Gillis, are conducting and coordinating the investigation for the Division of Criminal Justice Financial & Computer Crimes Bureau, under the supervision of Bureau Chief Michael Monahan and Deputy Bureau Chief Mark Kurzawa, and the Office of the Insurance Fraud Prosecutor. Additional assistance was provided by Supervising Criminal Forensic Auditor Debra Lewaine and Criminal Forensic Auditor Michael Birnie both of the Department of the Treasury's Office of Criminal Investigation, and the National Insurance Crime Bureau.

*Follow the New Jersey Attorney General's Office online at* Twitter*,* Facebook*,* Instagram *&* YouTube*. The social media links provided are for reference only. The New Jersey Attorney General's Office does not endorse any non-governmental websites, companies or applications.*

#### 

News Index Page | top

# EXHIBIT D

THE STATE OF NEW JERSEY
# DEPARTMENT OF LAW & PUBLIC SAFETY
## OFFICE OF THE ATTORNEY GENERAL

Search

NJHome | Services A to Z | Departments/Agencies | FAQs

| OAG Home | OAG Services from A - Z | Servicios en Español |
| OAG Contact | News Release | |

Gurbir S. Grewal
Attorney General

AG's Executive Leadership Team

| AG's Message | Ask the AG |
| Contact OAG | About OAG |
| OAG News | OAG FAQs |
| OAG Library | Employment |
| OAG Grants | Proposed Rules |
| OAG History | Services A-Z |

Statutes / Regulations / Rules

Agencies / Programs / Units

**Other News Pages**

Governor's Office

Otras Noticias en Español (OAG)

Civil Rights (Division on)

Consumer Affairs (Division of)

Criminal Justice (Division of)

Election Law Enforcement Comm.

Gaming Enforcement (Div. of)

Highway Traffic Safety (Division of)

Insurance Fraud Prosecutor (Office of)

Juvenile Justice Commission

State Police (Division of NJ)

Law (Division of)

**For Immediate Release:**
June 1, 2018

**Office of The Attorney General**
- Gurbir S. Grewal, *Attorney General*
**Office of the Insurance Fraud Prosecutor**
- Tracy M. Thompson,
*Acting Insurance Fraud Prosecutor*

**For Further Information:**
**Media Inquiries-**
Lisa Coryell
609-292-4791
**Citizen Inquiries-**
609-984-5828

## Bergen County Neurologist Faces New Charges in Superseding Indictment Alleging He Fraudulently Billed Insurance Companies for $682,000 in Statewide Medical Kickback Scheme

TRENTON – Attorney General Gurbir S. Grewal and the Office of the Insurance Fraud Prosecutor announced today that a Bergen County neurologist indicted last year on third-degree charges in connection with a statewide medical kickback scheme now faces additional charges of health care claims fraud, misconduct by a corporate official, and other second-degree offenses, as the result of a newly returned superseding indictment.

The superseding indictment alleges Dr. Terry Ramnanan, 65, who operates the Interventional Spine and Pain Treatment Center facility in Paramus, used his medical facility to fraudulently bill insurance carriers for more than 637 medical procedures totaling $682,000 related to patients involved in the kickback scheme. The 10-count superseding indictment was handed up to Superior Court Judge Peter E. Warshaw in Mercer County yesterday.

"The deeper our investigators dig, the more dirt they uncover on doctors who conspired to buy and sell patients for profit in this statewide kickback scheme," said Attorney General Grewal. "Upon further information and review, additional, upgraded charges against Dr. Ramnanan are appropriate, given his alleged role in this conspiracy to corrupt New Jersey's health care industry."

Ramnanan, who lives in Upper Saddle River, is one of dozens of health care practitioners charged in connection with an ongoing investigation by the Attorney General's Commercial Bribery Task Force (CBTF) that was formed in January 2016 to target commercial bribery in the health care industry. The task force includes deputy attorneys general and detectives from the Office of Insurance Fraud Prosecutor and the Division of Criminal Justice Financial & Computer Crimes Bureau.

The CBTF investigation has uncovered a statewide criminal enterprise in which doctors received hundreds of thousands of dollars in illegal kickbacks in return for providing patient referrals worth millions of dollars to other doctors and medical service providers.

In August 2017, Ramnanan was indicted on one charge each of third-degree conspiracy, commercial bribery, and criminal use of runners for allegedly paying Totowa chiropractor Ronald Hayek in exchange for patient referrals.

Ramnanan is now accused of bribing another health care professional, identified only by the initials A.A, for patient referrals and then fraudulently submitting insurance claims for medical treatment performed on those patients.

"Dr. Ramnanan's alleged crimes are greater in number and more serious in nature than we originally believed. The charges contained in the superseding indictment reflect the true nature of his involvement in this scheme," said Acting Insurance Fraud Prosecutor Tracy M. Thompson. "Our Commercial Bribery Task Force will continue to run down tips and follow leads to ensure that all those involved in this criminal enterprise are held fully accountable for their actions."

In addition to the previous charges against Ramnanan, the superseding indictment contains additional charges of:

- Misconduct by a Corporate Official (2nd degree)
- Health Care Claims Fraud (two counts, 2nd degree)
- Theft by  Deception (2nd degree)
- Commercial Bribery (3rd degree)
- Criminal Use of Runners (3rd degree)

It also upgrades the previous count of Conspiracy from 3rd degree to 2nd degree.

The charges are merely accusations and the defendant is presumed innocent until proven guilty. Second-degree crimes carry a sentence of five to 10 years in state prison and a fine of up to $150,000, while third-degree crimes carry a sentence of three to five years in state prison and a fine of up to $15,000.

According to the superseding indictment, between January 2012 and April 2016, Ramnanan conspired with both "A.A." and Hayek in a kickback scheme in which Ramnanan paid them for referring patients for treatment at his medical facility. Hayek was among dozens of doctors charged in two prior medical fraud investigations that led to the formation of the Commercial Bribery Task Force:

- An investigation by the Division of Criminal Justice Financial & Computer Crimes Bureau that led to guilty pleas in 2016 from Dr. Manoj Patharkar and his associate Mohammed Shamshair on charges that they hid and laundered approximately $3.6 million in income from the doctor's pain management clinics to evade taxes, and

- "Operation Rayscam," an investigation by the Office of the Insurance Fraud Prosecutor that led to guilty pleas in May 2015 from Rehan Zuberi, his wife, and three other defendants in connection with commercial bribes that Zuberi paid to doctors in return for the referral of patients to his medical imaging centers.

In July 2016, Hayek pleaded guilty to two accusations. The first accusation, filed by the Division of Criminal Justice Financial & Computer Crimes Bureau, charged him with second-degree conspiracy, second-degree money laundering, six counts of commercial bribery, (four in the second degree, two in the third degree), and one count of third degree failure to pay taxes. The second accusation, filed by the Office of Insurance Fraud Prosecutor, charged him with one count of third-degree conspiracy. He is awaiting sentencing.

In pleading guilty to the accusation filed by the Division of Criminal Justice, Hayek admitted he accepted tens of thousands of dollars in kickbacks from Shamshair, Patharkar, Ramnanan, and others, in exchange for referring patients to them and their related medical facilities. He also admitted paying commercial bribes to attorneys in exchange for the referral of clients to his practice. In pleading guilty to the accusation filed by the Office of Insurance Fraud Prosecutor, Hayek admitted to receiving kickbacks in exchange for referring patients to diagnostic imaging facilities owned or

controlled by Rehan Zuberi.

Deputy Attorney General Colin Keiffer, of the Office of Insurance Fraud Prosecutor, presented the case to the grand jury.

Commercial Bribery Task force members Deputy Attorneys General Brian Faulk and Charles Wright, Deputy Chief Anthony Butler, Lt. Lisa Shea, Detective John Campanella, Detective Wendy Berg, Detective Grace Rocca, Detective Kimberly Allen, Detective John Neggia, Analyst Bethany Schussler, and Analyst Rita Gillis, are conducting and coordinating the investigation for the Division of Criminal Justice Financial & Computer Crimes Bureau, under the supervision of Deputy Bureau Chief Mark Kurzawa, and Bureau Chief Cheryl Maccaroni and Assistant Bureau Chief Jillian Carpenter for the Office of the Insurance Fraud Prosecutor. Additional assistance was provided by Supervising Criminal Forensic Auditor Debra Lewaine and Criminal Forensic Auditor Michael Birnie both of the Department of the Treasury's Office of Criminal Investigation, and the National Insurance Crime Bureau.

---

*Follow the New Jersey Attorney General's Office online at* Twitter*,* Facebook*,* Instagram*,* Flicker *&* YouTube*. The social media links provided are for reference only. The New Jersey Attorney General's Office does not endorse any non-governmental websites, companies or applications.*

#### 

---

News Index Page | top

# EXHIBIT E

Links to websites with negative press on Terry Ramnanan, M.D.

1. https://nj.gov/oag/newsreleases17/pr20170802a.html
2. https://www.nj.com/bergen/2017/08/neurologist_charged_with_paying_illegal_kickbacks_1.html
3. http://passaic280.rssing.com/browser.php?indx=52059994&item=3066
4. http://passaic280.rssing.com/chan-52059994/all_p154.html
5. http://benex.org/2017/08/n-j-crackdown-illegal-health-care-kickbacks-snares-neurologist/
6. https://myemail.constantcontact.com/ASIPP-Enews.html?soid=1101412233222&aid=CWnzrf3jjH8
7. https://www.doctornews.com/article/new-charges-neurologist-referral-kickback-scheme?mkt_tok=eyJpIjoiTlROa1ptVTBOR1EwWWpWbCIsInQiOiJmM3FyZ1JyMkJrdE5qblB0bno1aGM1QjBpXC9CQXZ1ZGhWTDh1RVIrUGF2T1IxQ3FBWTJqVm11ak83WUJ5UHlsN0JZWGlWK2FmXC92U1luS0ZMem8wTXYzTzlHcnFcL1JGQkRYdWRRkN0t4YlhcL2dXS3Z2UGF4MVhYanltbHlZTG5SSVAifQ==
8. https://www.northjersey.com/story/news/crime/2018/06/01/bergen-county-nj-neurologist-faces-additional-charges-kickback-scheme/665051002/
9. https://nj.gov/oag/newsreleases18/pr20180601c.html
10. https://www.tapinto.net/towns/paramus/sections/law-and-justice/articles/paramus-neurologist-charged-with-fraudulently-bil
11. https://www.nj.com/bergen/2018/06/nuerologist_illegal_doctors_new_jersey_bibes_kickb.html
12. https://dailyvoice.com/new-jersey/paramus/police-fire/new-charges-brought-against-paramus-neurologist-in-massive-kickback-scheme/738059/
13. https://www.wsj.com/articles/n-j-crackdown-on-illegal-health-care-kickbacks-snares-neurologist-1501713126
14. https://twitter.com/newjerseyoag/status/1002639966063734785?lang=en
15. https://www.facebook.com/NewJerseyOAG/photos/nj-attorney-general-grewal-and-the-new-jersey-office-of-the-insurance-fraud-pros/1851827761787542/
16. https://www.google.com/search?client=firefox-b-1-d&q=terry+ramnanan+md