UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY
------------------------------------------------------------------------X

DR. TERRY RAMNANAN,

                      Plaintiff,

            -against-

COLIN KEIFFER, ESQ., Individually, DETECTIVE
WENDY BERG, Individually, DETECTIVE GRACE
PROETTA, Individually, DETECTIVE JOHN
CAMPANELLA, Individually, RONALD HAYEK, D.C.,
Individually, UNION WELLNESS CENTER P.A. LLC,
ADAM AWARI, D.C., Individually, and ADVANCED
CHIRO SPINE CENTER, P.C.,

                      Defendants.

------------------------------------------------------------------------X

Docket. No.:
20 Civ. 12747 (ZNQ) (LHG)

**SECOND AMENDED**
**COMPLAINT**

**JURY TRIAL DEMAND**

**ECF CASE**

      Plaintiff DR. TERRY RAMNANAN ("Plaintiff"), by his attorneys JON L. NORINSBERG, ESQ., PLLC, complaining of Defendants, respectfully alleges the following, based upon his own personal knowledge and/or upon information and belief:

## PRELIMINARY STATEMENT

      1.    This case arises from a manufactured and utterly baseless criminal prosecution that destroyed a prominent doctor's career, and left his practice and reputation in ruins. The Defendants here engaged in grossly improper and highly unethical conduct to attain their unlawful ends.  They manufactured evidence, altered documents and coerced witnesses to give false, misleading and dishonest testimony, for the purpose of generating a "high profile" case that could advance their careers and promote their own agendas.  As a result, Terry Ramnanan, M.D., a highly successful pain management doctor who had enjoyed a stellar career for 39 years, and who had an excellent reputation amongst his peers and patients, lost everything that he had worked his entire life to build.

      2.    Plaintiff now brings this action to seek redress for Defendants' grossly improper

conduct and their flagrant violations of his constitutional rights. Plaintiff seeks compensatory damages, punitive damages and attorney's fees pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1988 for violations of his civil rights, as said rights are secured by said statutes and the Constitutions of the State of New Jersey and the United States.

## JURISDICTION

3.      This action is brought pursuant 42 U.S.C. §1983 and the Fourth and Fourteenth Amendments to the United States Constitution. The Court has subject matter jurisdiction 28 U.S.C. §§ 1331.

4.      Supplemental jurisdiction over any state law claims asserted herein is founded upon 28 U.S.C. §§ 1367.

## VENUE

5.      Venue is properly laid in the District of New Jersey under 28 U.S.C. § 1391(b)(3), in that this is the District where the incident arose and where all Defendants are employed.

## JURY DEMAND

6.      Plaintiff respectfully demands a trial by jury of all issues in this matter pursuant to Fed. R. Civ. P. 38(b).

## PARTIES

7.      Plaintiff DR. TERRY RAMNANAN is a physician duly licensed to practice medicine in the State of New Jersey, and a resident of the State of New Jersey, residing presently in Upper Saddle River, New Jersey.

8.      At all times hereinafter mentioned, defendant COLIN KEIFFER, ESQ. ("KEIFFER") was a Deputy Attorney General in the Office of the Insurance Fraud Prosecutor of the State of New Jersey, located at 25 Market Street, in Trenton, New Jersey.

9.      At all times hereinafter mentioned, defendant DETECTIVE WENDY BERG ("DET. BERG") was a detective working in the New Jersey Office of the Attorney General, Division of Criminal Justice, Office of the Insurance Fraud Prosecutor located at 25 Market Street, in Trenton, New Jersey.

10.     At all times hereinafter mentioned, defendant DETECTIVE GRACE PROETTA ("DET. PROETTA") was a detective working at the Union County Prosecutor's Office, located at 32 Rahway Ave, Elizabeth, New Jersey.

11.     At all times hereinafter mentioned, defendant DETECTIVE JOHN CAMPANELLA ("DET. CAMPANELLA") was a detective working in the Office of the Insurance Fraud Prosecutor of the State of New Jersey, located at 25 Market Street, Trenton, New Jersey.

12.     At all times hereinafter mentioned, Defendants KEIFFER, BERG, PROETTA, CAMPANELLA (collectively, the "State Defendants"), were acting within the scope of their employment at the New Jersey Attorney General's Office, and in furtherance of their duties and responsibilities as employees of the New Jersey Attorney General's Office.

13.     At all times hereinafter mentioned, defendant RONALD HAYEK, D.C. ("HAYEK"), was a chiropractor and the owner of UNION WELLNESS CENTER P.A. LLC, located at 169 Union Blvd Ste. 2C, Totowa, New Jersey.

14.     At all times hereinafter mentioned, defendant the UNION WELLNESS CENTER P.A. LLC, was a chiropractic practice duly organized and existing under and by virtue of the laws of the State of New Jersey, with its principal place of business, 169 Union Blvd Ste. 2C, Totowa, New Jersey, and was owned, operated, maintained and controlled by defendant Ronald Hayek, D.C.

15.     At all times hereinafter mentioned, defendant ADAM AWARI, D.C. ("AWARI"), was a chiropractor, and the owner of Advanced Chiro Spine Center, located at 1555 Main Avenue,

Clifton, New Jersey.

16.    At all times hereinafter mentioned, defendant the ADVANCED CHIRO SPINE CENTER, P.C., was a chiropractic practice duly organized and existing under and by virtue of the laws of the State of New Jersey, with its principal place of business, 1555 Main Avenue, Clifton, New Jersey, and was owned, operated, maintained and controlled by defendant Adam Awari, D.C.

## **FACTS**

**Dr. Ramnanan's Stellar Career and Exemplary Reputation as a Physician.**

17.    Plaintiff, Dr. Terry Ramnanan, was and is a physician duly licensed to practice medicine in the State of New Jersey.

18.    Dr. Ramnanan is a double Board-Certified Physician who completed two Fellowships, one being at the prestigious and highly competitive University of California, San Francisco, where he was retained as an Assistant Clinical Professor in Pain Management.

19.    For over 38 years, Dr. Ramnanan was a highly respected medical doctor who operated his practice in Paramus, New Jersey.

20.    During his lengthy career, Dr. Ramnanan enjoyed a stellar reputation among the larger medical community and with his patients.

21.    After a very successful medical career in California, spanning over 15 years, including serving as a Department Chairman at a large hospital in California, Dr. Ramnanan was recruited in 2003 by Hackensack University Medical Center, in Hackensack New Jersey, to help initiate the Pain and Palliative Department.

22.    Dr. Ramnanan had never been sued for malpractice, and had never been the subject of any complaints by his patients.

23.    Dr. Ramnanan had built a strong and vibrant practice over the course of his career. Many of his patients came to him by word of mouth from other patients, or by referrals from other doctors.

**The State Defendants Engage in Willful and Intentional Misconduct, and Destroy Dr. Ramnanan's Career.**

24.    On August 2, 2017, Dr. Ramnanan was charged in a "kickback scheme" involving "illegally paying for patients."

25.    As set forth in detail below, the alleged "kickback scheme" was based on completely manufactured evidence by the State Defendants.

26.    There was no evidence that Dr. Ramnanan had engaged in any kickback scheme whatsoever. In fact, Dr. Ramnanan never paid for *any* referrals from any medical professional, at any time, *ever*.

27.    Unable to establish Dr. Ramnanan's guilt by **actual evidence**, the State Defendants resorted to lying, cheating and manufacturing evidence to fill in the gaps in their misguided and utterly baseless prosecution.

28.    On May 23, 2019, all criminal charges against Dr. Ramnanan were dismissed by the Honorable Robert Vinci.

29.    In dismissing the criminal charges, Judge Vinci concluded that, as a matter of law, Dr. Ramnanan had not engaged in any act of healthcare claims fraud. Specifically, Judge Vinci found as follows: "*As a matter of law, the State cannot establish the defendant made any false, fictitious, fraudulent, or misleading statement of fact in any document submitted for payment or reimbursement for health services…*" (Ex. A Transcript of Dismissal, dated May 23, 2019, ("**Order**"), at 21).

30.    Moreover, Judge Vinci concluded that the State Defendants, in their zeal to secure an indictment against Dr. Ramnanan, had crossed the ethical line and engaged in gross prosecutorial misconduct: "[T]his Court concludes that the State *intentionally subverted the grand jury process* resulting in a grand jury presentation that was *fundamentally unfair*." (Order at 32) (emphasis supplied).

31.    Notwithstanding the dismissal of all criminal charges, Dr. Ramnanan has suffered, and continues to suffer, severe, permanent, and irreparable harm to his professional and personal reputation.

32.    As a result of the State Defendants' manufactured claims against him, Dr. Ramnanan's entire career and medical practice have been destroyed, and all of his sources of income have been completely eviscerated.

**The Origins of this Manufactured Prosecution: the State Defendants Coerce Defendant Ronald Hayek, D.C. to "Name Names" in Order to Avoid a lengthy Prison Sentence.**

33.    The origins of this baseless prosecution can be traced back to early 2016, when the State Defendants first accused Defendant Hayek of engaging in a "kickback scheme" insurance fraud and commercial bribery.

34.    Desperate to avoid prison time and preserve his license, Hayek agreed to fully cooperate with the State Defendants in their "kickback scheme" investigation.

35.    In exchange for this cooperation, the State Defendants permitted Hayek to enter into a plea agreement which provided for the possibility of a probationary sentence with no jail sentence imposed, instead of facing a potential prison sentence of more than 20 years.

36.    Furthermore, the State Defendants agreed to write a letter to the Chiropractic Licensing Board advising the Board of the cooperation given by Hayek to the State as a possible means of keeping his chiropractic license to practice medicine.

37.     In short, the State Defendants induced Hayek to name as many doctors as possible in the "kickback scheme" -- whether supported by evidence or not -- by dangling the possibility of no jail sentence, and the opportunity to keep his license.

38.     With an offer he could not refuse, Hayek joined the State Defendants' prosecution team, and became fully invested in their shared goal of manufacturing a case against as many doctors as possible, so as to avoid prison time and preserve his license as a chiropractor.

39.     Thereafter, State Defendants held two proffer sessions with Defendant Hayek. The first proffer session was held on March 17, 2016 and the second one was held April 1, 2016.

**Hayek Does Not Mention Dr. Ramnanan in the First Proffer Session and Only Briefly Mentions Him at the End of the Second Proffer Session.**

40.     On March 17, 2016, as part of his cooperation agreement with the State, Hayek participated in a proffer session with members of the Office of the Insurance Fraud Prosecutor.

41.     During this proffer session, Hayek *never once* mentioned that he was involved in a referral relationship with Dr. Ramnanan at any time.

42.     In fact, during the entire proffer session, Hayek never even mentioned Dr. Ramnanan's name, even though he had the opportunity to do so multiple times.

43.     On April 1, 2016, Hayek participated in a second proffer session with members of the Office of the Insurance Prosecutor, including Defendant Keiffer.

44.     During the course of the lengthy interview, Hayek admitted to participating in multiple conspiracies, identifying many other medical providers and other professionals, but without mentioning Dr. Ramnanan.

45.     It was only at the end of this long proffer session, after being relentlessly pressured by the State Defendants to name other doctors –   Hayek would later testify that the State Defendants "kept pushing, pushing [me]", and that "I don't even remember what I told them" --

that Hayek finally made his false allegations against Dr. Ramnanan, claiming that Dr. Ramnanan had paid him for the referral of EMG patients.

**Hayek Subsequently Recants Many of His Proffer Allegations and/or Materially Alters His Prior Claims.**

46.     Hayek's claims regarding Dr. Ramnanan during the April 1, 2016 proffer session, limited as they were, were demonstrably false.   In fact, as the State defendants soon learned, there was not a *shred* of evidence that Dr. Ramnanan had ever paid Hayek for the referral of patients, ever.

47.   As Hayek would later admit, under oath, that he had *no records* of receiving a *single* referral payment from Dr. Ramnanan, despite the fact that Hayek a kept a binder in his office that contained the names and referral fees paid by all of the other doctors who had paid him.

48.     Further, in sworn deposition testimony June 6, 2018 – or just 7 seven days after the State filed a superseding indictment against Dr. Ramnanan (discussed infra.) -- Hayek recanted many of the allegations that he had made against Dr. Ramnanan and/or made material alterations to his prior claims against Dr. Ramnanan.

49.   Among other things, Hayek *directly contradicted* his prior claims about Dr. Ramnanan by, inter alia: i) changing the total amount of referral fees that he allegedly received from Dr. Ramnanan, from a total of $25,900.00 (according to Detective Campanella's fabricated Excel spreadsheet, discussed infra.), to a total of "maybe a couple of thousand" dollars; ii) changing the amount of rent that Dr. Ramnanan was paying him each month, from $3,000.00 per month to $300.00 per month; iii) changing the amount of money that Dr. Ramnanan paid him for referrals and reducing it by 25%, from $100.00 to $75.00 for upper EMG referrals, and $100.00 to $75.00 for lower EMG referrals; and iv) changing the year that Dr. Ramnanan had started paying him referral fees, from 2012 to 2010, when in fact, the two men had no association whatsoever in 2010

50.    In short, Hayek changed so many of his prior claims, and did so over such a short period of time, that he was patently incredible as a witness.

51.  Further, as the State Defendants well knew based on their own investigation, the *only* money that Dr. Ramnanan ever paid to Hayek was for renting space in his Totowa office, as detailed below.

**The Rental Arrangement Between Hayek and Dr. Ramnanan.**

52.    Toward the end of 2012, Dr. Ramnanan realized that for the convenience of some of his patients, especially while his then current North Haledon  office was in the process of being relocated to Paramus, New Jersey, it would be better if he could see some of his patients from nearby areas in Hayek's Totowa office.

53.    Thereafter, Dr. Ramnanan broached the topic with Hayek of using his Totowa office space. In response, Hayek said that, in order for Dr. Ramnanan to use the Totowa office, he would have to pay monthly rent to Hayek.

54.    Hayek initially wanted $1,200.00 per month in rent, which Dr. Ramnanan thought was too high, since the facility would only be used 2 to 3 times a month, and not more than 2 to 4 hours per session. At maximum, Dr. Ramnanan would be utilizing this office for 12 hours or less per month.

55.    Hayek eventually agreed to $600.00 per month, which, again, was *paid by check*. The checks were made out to Hayek's business entity – "Union Wellness Center" – and the memo section of the checks clearly stated that the payments were for "Union Office Totowa Rent." (Ex. B, Sample Checks).  The first such rent payment was made in January 2013.

56.    All payments made to Hayek, from 2012 to 2016, were solely for rent.  The amount paid to Hayek was exactly the same -- $600.00 -- every month, and never varied.   Rent later

decreased to $300.00 due to the reduced number of days/hours per month that the office was going to be utilized.  The checks and Dr. Ramnanan's records, reflected accordingly and was completely transparent.

57.    This agreement continued until March 2016, when Dr. Ramnanan learned that Hayek was under criminal investigation.

58.    Once Dr. Ramnanan learned that Hayek was under investigation, he did not want to have any type of involvement with Hayek whatsoever, and therefore, terminated the rental arrangement.

59.    These rent payments were the only payments ever made by Dr. Ramnanan to Hayek. Dr. Ramnanan never once -- *ever* -- paid Hayek for a "referral" of any patients whatsoever.

60.    The State Defendants were well aware that Dr. Ramnanan rented space from Hayek.  They were also aware that all rental payments had been made by check to Hayek, and that there was literally *no evidence* of any referral payments from Dr. Ramnanan to Hayek.

61.    In light of this fact, the State Defendants realized early in their investigation that there was no basis for pursuing criminal charges against Dr. Ramnanan. Nonetheless, the State Defendants believed that Dr. Ramnanan could still be very useful to them in their investigation of another doctor, Todd Koppel, M.D., whom they believed to be the leader of a multi-million-dollar insurance fraud scheme, as set forth below.

**Hayek Identifies Another Doctor, Dr. Todd Koppel, in His April 1, 2016 Proffer Session, and Dr. Koppel Soon becomes the Primary Target of the State Defendants' "Kickback Scheme" Investigation.**

62.    In the April 1, 2016 proffer session, one of the doctors identified by Hayek was a pain management doctor named Todd Koppel, M.D. ("Koppel"). Hayek told the State Defendants

that Koppel was paying him for the referral of patients to Koppel's treatment facility, known as the Garden State Pain Management office, located in Clifton, New Jersey.

63. According to Hayek, Koppel paid him in cash $2,000.00 every few months – Hayek would later change that number to $1,200.00 every single month, according to his June 6, 2018 testimony -- and that these payments would take place either at Koppel's office in Clifton or in Hayek's office.

64. Soon after the second proffer session, which was held on April 1, 2016, the State Defendants started to focus intensely on Koppel, whom they believed was running a massive insurance fraud scheme with other doctors and chiropractors in New Jersey.

65. The State Defendants made this very clear in their statements to Dr. Ramnanan. Specifically, on September 13, 2016, defendants Berg and Campanella approached Dr. Ramnanan and spoke to him regarding their investigation.

66. During this meeting, Campanella expressly told Dr. Ramnanan that the State Defendants were "focused on a doctor named Todd Koppel and his surgery center," and wanted to know more about him, and the doctors doing business with him. However, Dr. Ramnanan told the State Defendants -- as he would repeat many times throughout their investigation -- that he knew nothing about Dr. Koppel or the business relationships that Koppel had with other doctors.

67. By the Fall of 2016, Dr. Koppel had become the primary focus of the State Defendants' investigation. However, the State Defendants were having trouble finding evidence to corroborate their suspicions about Koppel.

68. By October 2016, the State Defendants' investigation into Dr. Koppel had essentially reached a standstill. While the State Defendants had developed circumstantial evidence to establish wrongdoing by Koppel, they still were missing *direct* evidence -- in the form

of the testimony from another medical doctor -- which would confirm the existence of the massive

insurance fraud scheme that they believed Koppel was running.

**The State Defendants Become Convinced that Dr. Ramnanan Has Valuable Information to Provide Regarding Dr. Koppel and the "Kickback Scheme"**

69.    Defendant Keiffer knew that further investigation would be necessary before he

would be able to bring charges against Koppel.  Towards that end, Keiffer became convinced that

Dr. Ramnanan -- one of several doctors whom Hayek had mentioned during his proffer session on

April 1, 2016 -- was the key to cracking the case and finding sufficient evidence to establish Dr.

Koppel's guilt.

70.    Thus, on November 1, 2016, Keiffer arranged for a proffer session with Dr.

Ramnanan,  in which Dr. Ramnanan would disclose to the State Defendants everything that he

knew about Dr. Koppel, as well as identify other medical doctors who were involved in Koppel's

insurance fraud scheme.

71.    At this November 1, 2016 meeting, Keiffer expressly told Dr. Ramnanan and his

counsel, Barry Cocoziello, Esq. that he "wanted Dr. Ramnanan's cooperation regarding Dr.

Koppel" – just as Defendants Campanella and Berg had told Dr. Ramnanan on September 13, 2016

-- and that he wanted to know *everything* that Dr. Ramnanan knew about Koppel and his

relationships with other doctors.

72.    In order to facilitate this disclosure, Keiffer proposed that Dr. Ramnanan could

"tell what he knows" by providing a hypothetical summary of all of potentially valuable

information that he would be willing to provide to the State Defendants.

73.    Further, Keiffer proposed that Dr. Ramnanan could identify, in hypothetical terms,

all of the doctors that he knew who were ordering unnecessary testing, and the approximate value

of such testing.

74.    Lastly, Keiffer also wanted Dr. Ramnanan to disclose, in hypothetical terms, everything that he knew about the Hayek kickback scheme, and to identify the two "sources" who had allegedly informed Dr. Ramnanan that Hayek was under investigation.

75.    Keiffer's beliefs about Dr. Ramnanan's knowledge were wildly off the mark.  In fact, Dr. Ramnanan did not have *any* knowledge about Koppel, or the insurance fraud scheme that he was purportedly running.  Nor, for that matter, did he know any other doctors who were ordering unnecessary testing, much less what they were getting paid for that testing.

76.    Simply put, Dr. Ramnanan had nothing to give the State Defendants that could help them build a case against Dr. Koppel -- whom they would eventually charge with running a $4.4 million dollar insurance fraud scheme -- or any other doctor in New Jersey.

**Dr. Ramnanan Emphatically Denies that He has Any Knowledge or Information Regarding Dr. Koppel, but the State Defendants Refuse to Listen**.

77.    Dr. Ramnanan's counsel at the time, Barry Cocoziello, Esq., repeatedly and emphatically told Keiffer that he simply did not have any information on Dr. Koppel, despite Keiffer's insistence to the contrary.

78.    While Dr. Ramnanan was willing to meet with Keiffer, it was not to assist him with his investigation into Koppel or other doctors.  Rather, it was only for the purpose of convincing him that Dr. Ramnanan had absolutely no involvement or knowledge of the insurance fraud scheme that the State Defendants were investigating. Mr. Cocoziello made this very clear in all his communications with Keiffer.

79.    Keiffer, however, did not believe that Dr. Ramnanan had no knowledge or information to provide.  To the contrary, Keiffer believed that Dr. Ramnanan was hiding evidence and covering up for Koppel and other New Jersey doctors. In fact, Keiffer was convinced that Dr. Ramnanan was the key to breaking open his investigation and providing him with the crucial

information that he needed to build a case against Dr. Koppel, and other medical doctors who were involved in this fraudulent "kickback" scheme.

80.     In order to convince Dr. Ramnanan to cooperate -- and disclose information about Dr. Koppel which, Keiffer believed, Dr. Ramnanan was hiding from the State Defendants -- Keiffer tried to convince Dr. Ramnanan that his investigation had *already* yielded a great deal of incriminating evidence against him, and that Dr. Ramnanan would be charged with very serious criminal offenses if he did not cooperate.

81.     The problem with Keiffer's strategy, however, is that there was literally *no* evidence that Dr. Ramnanan had actually paid Hayek for any patient referrals.  Despite a six-month investigation into Dr. Ramnanan following the April 1, 2016 proffer session with Hayek, there was literally not *one scintilla* of evidence that supported Hayek's patently incredible claims about Dr. Ramnanan.

82.      Desperate to build his case against Dr. Koppel, however, Keiffer resorted to engaging in highly improper and unlawful actions  to obtain his objectives.  Convinced that the end justified the means -- in this case, bringing down Dr. Koppel and other prominent doctors who were allegedly involved in the "kickback" scheme – Keiffer, with Hayek's assistance, created a completely false "smoking gun" document that, Keiffer believed, would force Dr. Ramnanan to reveal everything he knew about Dr. Koppel.

83.     Keiffer gave this document -- a "Kickback Spreadsheet" which purportedly showed all of the kickbacks that Dr. Ramnanan had paid to Hayek, based allegedly on Hayek's own records -- to Dr. Ramnanan's counsel, Barry Cocoziello, Esq. during the proffer meeting on November 1, 2016.

84.      This document also purportedly contained a schedule of the names of the patients,

dates of service, date of birth of patients who had allegedly been tested by Dr. Ramnanan at Dr. Hayek's office, as part of the kickback scheme.

85.    The list further purportedly showed whether the testing performed by Dr. Ramnanan consisted of an upper and lower EMG or a single EMG, and the amount of kickback that Dr. Ramnanan paid to Dr. Hayek for each such patient and test conducted.

86.    The problem with this "smoking gun" document, however, was that the allegedly incriminating information that it showed was completely fabricated.

87.     For example, there were many patients listed on this schedule who were, in fact, *never seen or tested by Dr. Ramnanan.*  To list just a few such patients:

- Patient "G.A." was never seen by Dr. Ramnanan

- Patient "A.A." was never seen by Dr. Ramnanan

- Patient "A.M." was never seen by Dr. Ramnanan

- Patient "J.D." was never seen by Dr. Ramnanan

- Patient "G.D." was never seen by Dr. Ramnanan

- Patient "U.H." was never seen by Dr. Ramnanan

- Patient "L.G." was never seen by Dr. Ramnanan

88.     Apart from listing patients who Dr. Ramnanan had never seen, there were many duplicate patient records on the schedule. For example, Box 138 and Box 193 were the same patient.  Likewise, Box 61 and Box 134.  There were many, many other instances of duplicate patient records on the schedule.

89.    The inclusion of such duplicate records was not accidental.  Rather, Keiffer did so intentionally -- for the purpose of artificially increasing the number of (non-existent) paid referrals that Dr. Ramnanan had allegedly received from Hayek – in order to convince Dr. Ramnanan that

the State Defendants had obtained an overwhelming amount of incriminating evidence against him, and that he needed to cooperate with them before it was too late.

90.    This "smoking gun" document contained many other blatantly false and misleading statements, such as: i) including dates of service that were impossible, as they allegedly took place  long after Dr. Ramnanan had terminated his relationship with Hayek;  ii) including procedures that had never actually been performed; iii) vastly overstating the number of EMG procedures that had actually been performed; and iv) repeatedly misrepresenting whether the patient's EMG consisted of one or two tests (upper and lower), to artificially increase the total number of EMGs that had taken place.

91.    In short, the "smoking gun" evidence presented by Keiffer -- which he claimed was supported by the records in Hayek's office -- was actually a complete sham.

92.    Keiffer had created this fictious "Kickback Spreadsheet" document with the active assistance of Hayek, who was desperate to avoid a lengthy prison sentence and wanted to convince the State Defendants that he had valuable information to give.

93.    Defendant Keiffer gave this document to Dr. Ramnanan's counsel in order to convince

Dr. Ramnanan to assist him in his investigation into Dr. Koppel, who Keiffer believed was the mastermind behind the insurance fraud scheme.   Keiffer's plan, however, failed.  Dr. Ramnanan remained steadfast in his assertions of innocence.

94.    Thereafter, on November 8, 2016, Mr. Cocozeillo formally told Keiffer, in no uncertain terms, that this alleged "smoking gun" -- the schedule allegedly showing the kickback from Dr. Ramnanan to Dr. Hayek -- contained blatantly fabricated evidence and gross inaccuracies, and would never hold up in a court of law.

95.     Further, Mr. Cocozeillo emphatically told Keiffer -- and as Dr. Ramnanan's subsequent counsel, William Wong, Esq. would tell Keiffer many times throughout the criminal proceedings -- Dr. Ramnanan had *no information* to disclose to the State Defendants, and could not assist them with their investigation in any manner whatsoever.  Simply put, Dr. Ramnanan knew nothing about Dr. Koppel and his alleged participation in a kickback scheme.  He knew nothing about any other doctors who were involved in this kickback scheme.

96.     In short, there was nothing that Dr. Ramnanan could provide to Keiffer that would help the State with their investigation. Nor, for that matter, had Dr. Ramnanan ever paid any referral fees to Hayek or participated in any manner in the alleged "Kickback Scheme." Therefore, Dr. Ramnanan would not, under any circumstances, agree to plea guilty and cooperate with the State Defendants.

97.     This emphatic message, however, fell on deaf ears.  Keiffer remained convinced that Dr. Ramnanan was hiding evidence, and that in fact, Dr. Ramnanan knew a lot more about Dr. Koppel than what he was letting on.

69. Desperate to nail Koppel -- whom Keiffer believed would break the case wide open, and equally important, provide him with a "high profile" case that would help make a name for himself and catapult his nascent career as a prosecutor -- Keiffer decided to up the ante and use an altered transcript, as set forth below, to convince Dr. Ramnanan to "play ball" and disclose everything he knew about Koppel.

**The State Defendants Deliberately Alter a Transcript to Force Dr. Ramnanan to Assist them with their Investigation into Dr. Koppel.**

98.     Since the State Defendants had no independent evidence to corroborate Dr. Ramnanan's involvement in any criminal enterprise, they were desperate to find some "evidence"

that would force Dr. Ramnanan to cooperate with them and disclose what, they erroneously believed, he knew about Koppel's involvement in an insurance fraud scheme.

99.    The State Defendants had originally attempted to create such evidence on April 8, 2016,

by having Hayek make a surreptitious recording of a conversation with Dr. Ramnanan. The State Defendants' goal was to record Dr. Ramnanan making self-incriminating statements that could be used against him as independent corroborating evidence to prove the existence of the charged conspiracy.

100.    Towards this end, on April 8, 2016, the State Defendants provided Hayek with a recording device and secreted it on Hayek's person under his clothing.

101.    The objective was to record a conversation between Dr. Ramnanan and Hayek in which, the State Defendants believed, the two would discuss aspects of the criminal conspiracy between them.

102.    Without independent evidence to corroborate Hayek's claims, the State Defendants knew that they would not be able to force Dr. Ramnanan to cooperate in their investigation into Dr. Koppel.

103.    Simply put, Dr. Hayek's statements, alone, would not be sufficient.    This was especially so because Hayek's credibility was suspect from the outset given his own criminal activities, and his highly incentivized plea deal.

104.    The conversation between Dr. Ramnanan and Hayek, however, did not go as the State Defendants had planned.

105.    Notwithstanding the State Defendants' plan to trap Dr. Ramnanan and have him make damning admissions during this conversation, Dr. Ramnanan did not, in fact, make *any* such incriminating statements during this conversation.

106.    The full, unredacted audio recording of this conversation confirms that Dr. Ramnanan did not make any incriminating statements whatsoever during this conversation.

107.    In the absence of any incriminating statements, the State Defendants attempted to create inculpatory evidence by materially altering the transcript of the actual conversation which took place between Dr. Ramnanan and Hayek.

108.    Upon information and belief, this altered transcript was created by Detective Grace Proetta in late 2016 or early 2017, when the State Defendants were still trying to build a case against Dr. Koppel and needed to Dr. Ramnanan's help to prove that Koppel had engaged in commercial bribery and health care fraud charges.

109.    The State Defendants' sleight of hand occurred by altering a critical portion of the transcript, where Hayek had asked Dr. Ramnanan whether he had spoken about their rental arrangement to anyone else.

110.    Specifically, when Hayek started to asked Dr. Ramnanan about whether he (Dr. Ramnanan) had mentioned to anyone their monthly rental arrangement -- which was documented by payments of monthly *checks*, was not hidden in any manner and was perfectly legal -- Dr. Ramnanan interrupted Hayek and answered "Nah, nah, nah, nah …" in mid-sentence, before Hayek could finish his question.

111.    Listening to the actual recording of the conversation makes it clear that Dr. Ramnanan's answer takes place *before* Hayek finishes his question, as the two are speaking over each other at the same time, with a loud television blaring in the background.

112.    However, in order to make the conversation sound incriminating -- and create the inculpatory "evidence" that was otherwise completely lacking on the actual recording -- the State Defendants, and in particular, Detective Grace Proetta, willfully, deliberately and knowingly altered the sequence of the questions and answers between Dr. Ramnanan and Hayek.

113.    Specifically, the State Defendants, and in particular, Defendant Proetta, created a transcript of the conversation which made it appear as if Hayek had *fully finished* his question first, and then Dr. Ramnanan had answered in response, as follows:

> RH:    You didn't tell, you didn't' tell anybody that you … that *you*
>        *pay me for doing EMG and NCV* and all of that.  Did you?
>        Did you mention that to anybody?
> TR:    Nah, nah, nah, nah, nah.
> RH:    No? Right, right?

114.    Thus, on the transcript created by the State Defendants, the questions and answers are presented as a single, fluid exchange.

115.    In other words, as a result of the State Defendants' deliberate and willful alteration of the transcripts, it appears as if Dr. Ramnanan is directly answering the question of whether or not he, Dr. Ramnanan, told anyone that he "pay[s]  [Hayek] for doing EMG and NCV" referrals.

116.    On the actual recording, however, Dr. Ramnanan, interrupts Hayek and starts saying "nah, nah, nah" *before*  Hayek completes his question, and *before* Hayek makes it clear that he is not asking about rent, but rather, about "EMG and NCV" procedures.

117.    Thus, the transcript that was created by the State Defendant was materially different than the actual audio recording between Hayek and Dr. Ramnanan.

**The State Defendants Attempt to Use the Altered Transcript to Force Dr. Ramnanan to Assist Them in their Investigation of Koppel.**

118.    The State Defendants were well aware of the fact that the transcript was false, misleading and inaccurate.   Nonetheless, Defendant Keiffer -- believing that the end justified the

means -- attempted to use this fabricated evidence as a means of coercing Dr. Ramnanan to cooperate and build a case against Koppel.

119.    Just as he had done with the fabricated "Kickback Spreadsheets," Keiffer attempted to use the altered transcript to convince Dr. Ramnanan that the State Defendants' case against Dr. Ramnanan was much stronger than it actually was.

120.    Defendant Keiffer knew that the audio recording was extremely poor in quality. Defendant Keiffer further knew that -- without being enhanced by an audio specialist, which was not done until much later in the case -- defense counsel would have great difficulty hearing what was actually said on the recording.

121.    Defendant Keiffer believed that Dr. Ramnanan's defense counsel, William Wong, Esq., who had taken over for Barry Cocozeillo, Esq., would be forced to rely on the falsified transcript, since the audio recording itself was largely inaudible and it was very difficult to discern, without audio amplification, what was actually being discussed between Hayek and Dr. Ramnanan.

122.    However, regardless of what the State Defendants claimed Dr. Ramnanan had said on the transcript, Dr. Ramnanan knew for certain that he was only discussing *rent* payments with Hayek, and not referral payments.  The fabricated transcript could not change this critical fact.

123.    If anything, the falsified transcript merely heightened Mr. Wong's suspicions about the misconduct of the State Defendants in their handling of this case.  It was clear to Mr. Wong, a former federal prosecutor with over 40 years of experience, that State Defendants' alteration of this transcript was willful, deliberate and intentional.

**The State Defendants Conceal the Truth About the Altered Transcript.**

124.    Mr. Wong's suspicion was confirmed by the fact that, when he made multiple inquiries about the creation of the transcript, the State Defendants deliberately tried to conceal the truth about who had created the transcript.

125.    Specifically, throughout the criminal proceedings, Mr. Wong repeatedly asked for the State Defendants to disclose the identity of the person who had created this transcript.

126.    Notwithstanding these repeated requests, however, the State Defendants repeatedly refused to disclose the identity of the person who had transcribed, and materially altered, the recording between Dr. Ramnanan and Hayek.

127.    In fact, Detective Wendy Berg -- when asked directly by Mr. Wong who had created the transcript -- affirmatively lied to him by stating that it was some "transcription company."

128.    When Mr. Wong asked Detective Berg to name the "transcription company," Detective Berg lied again and told him that she "didn't know" the name of the company that had created the transcript, when in fact, she knew full well that there was no transcription company at all involved with the creation of this transcript.

129.    Detective Berg deliberately lied to Mr. Wong in order to hide from the defense the fact that her own colleague, Detective Proetta, had in fact created this misleading and altered transcript.

**Unable to Get Dr. Ramnanan to Cooperate, Defendant Keiffer Seeks an Indictment Against Dr. Ramnanan.**

130.    After pressuring Dr. Ramnanan for months, falsifying evidence against him and threatening him with a lengthy jail term if he did not cooperate, Keiffer finally realized that Dr.

Ramnanan was not going to cooperate with the State Defendants – at least not until criminal charges were filed.

131.    With this in mind, Defendant Keiffer decided to move forward and seek an indictment against Dr. Ramnanan in late July 2017.

132.    On August 1, 2017, based entirely on the manufactured claims of Hayek, Dr. Ramnanan was indicted in a three-count indictment charging Conspiracy in the Third Degree (N.J.S.A. 2C:5-2; Count 1); Commercial Bribery in the Third Degree (N.J.S.A. 21-9; Count 2); and Criminal Running in the Third Degree (N.J.S.A. 2C:21-4.3a; Count 3).

133.    In this three-count indictment, the State Defendants accused Dr. Ramnanan of conspiring with Hayek, a licensed chiropractor, to engage in a medical fraud kickback scheme wherein it was alleged that Dr. Ramnanan paid Hayek $100.00 cash for conducting an EMG/NCV test in either the upper or lower extremity, or $200.00 in cash if both extremities were performed on patients referred by Hayek.

134.    There was *no evidence* whatsoever to support these charges.

135.    Dr. Ramnanan never paid a single dollar to Hayek for patient referrals.  This claim was a complete and utter fabrication, invented by the State Defendants to build a case where none existed.

136.    As the State Defendants well knew, the only money that Dr. Ramnanan ever paid to Hayek was for monthly *rent,* as Dr. Ramnanan leased office space from Hayek to conduct EMG/NCV tests on patients who were referred to Dr. Ramnanan by multiple providers.  Thus, each and every month, Dr. Ramnanan would pay Hayek $600.00 in rent for use of his Totowa facilities.

137.    There was nothing illegal or improper about these rent payments.  To the contrary, the rent payments were paid by *check* -- which left a clear and transparent paper trail -- and there was nothing secretive or illicit whatsoever about this rental agreement.    (Ex B, sample monthly payment checks paid by Dr. Ramnanan to Hayek).

138.    Apart from Hayek's claims -- which were patently incredible on their face, and were fraught with blatant lies, material inconsistencies and gross exaggerations -- there was literally not one *scintilla* of evidence to support the State Defendants charges of an illegal kickback scheme between Plaintiff and Hayek.

139.    There were no witnesses to support any claims of any type of referral payments -- much less an "illegal kickback scheme" -- from Dr. Ramnanan to Hayek.

140.    There were no text messages between Dr. Ramnanan and Hayek.

141.    There were no emails between Dr. Ramnanan and Hayek.

142.    There were no letters between Dr. Ramnanan and Hayek.

143.    There were no faxes between Dr. Ramnanan and Hayek.

144.    There were no incriminating recorded conversations between Dr. Ramnanan and Hayek.

145.    In short, there was no evidence whatsoever, of any kind, to support the State Defendants' claims that there had been illegal payments from Dr. Ramnanan for referral of patients.

**After the First Indictment is Secured, Keiffer Continues to Pressure Dr. Ramnanan to Cooperate with the State Defendants in their Investigation into Koppel.**

146.    Keiffer's gambit to force Dr. Ramnanan to cooperate by indicting him had failed. While the first indictment was devastating to Dr. Ramnanan, it had not changed the fact that Dr. Ramnanan had nothing to offer the State Defendants.  Since Dr. Ramnanan had no knowledge of,

or involvement with, the "Kickback Scheme" that the State Defendants were investigating, he simply did not have any information regarding Koppel to give to the State Defendants.

147.    However, Keiffer simply refused to accept this reality.  No matter how many times Dr. Ramnanan and his counsel vehemently denied any knowledge or involvement in the "Kickback Scheme,"  Keiffer continued to believe that Ramnanan was somehow hiding evidence, and that he eventually would "come clean" and disclose everything that he knew about Koppel and the kickback scheme.

148.    With this in mind, in December 2017,  Keiffer set up another meeting in his office.

Mr. Wong and Mr. Wong's investigator, Steven Dupre, were present at this meeting.  Dr. Ramnanan did not attend, as Mr. Wong wanted to hear what Keiffer had to say before he allowed Dr. Ramnanan to be interviewed again.

149.    When Keiffer found out that Dr. Ramnanan was not there, he became extremely angry.  Keiffer started screaming and cursing at both Mr. Wong and Mr. Dupre.  Further, Keiffer started making grossly improper threats about what he was going to do to Dr. Ramnanan if he refused to cooperate on the Koppel investigation.

150.    Keiffer also threatened that the State Defendants were seeking to put Dr. Ramnanan in prison for a long time if he did not enter into a plea and cooperate. This was an outright fabrication.

151.    In fact, as DAG Robert Grady – a senior prosecutor who eventually replaced Keiffer -- would later admit in open court, the State Defendants never intended to seek jail time for Dr. Ramnanan.  Rather, as DAG Grady told the judge during a pre-trial appearance, the State would be seeking "probation," not prison time.

152.    Outside of court that day, Mr. Wong asked DAG tried to explain to why Keiffer had repeatedly threatened Dr. Ramnanan with a lengthy prison sentence if, in fact, the State Defendants never had any intention of seeking jail time.

153.    In response, DAG Grady told Mr. Wong, "off the record," that Keiffer was relatively new and inexperienced, that he was still a little "green" and that he sometimes was "a little trigger happy" in rushing to file charges and make threats that were not warranted.

154.    Notwithstanding Keiffer's vitriolic threats and explosive outburst in December 2017, Dr. Ramnanan refused to cooperate in the State Defendants' investigation, as there was simply nothing for him to discuss.

**The State Defendants Create Additional False Documents in a Further Attempt to Force Dr. Ramnanan to Cooperate in their Investigation.**

      i.    **The False and Misleading "Summary Chart" Prepared by Detective Campanella.**

155.    After realizing that Dr. Ramnanan *still* was unwilling to cooperate -- even after being indicted -- the State Defendants resorted to further acts of lying and cheating to force Dr. Ramnanan to cooperate in their investigation.

156.    Toward this end, the State Defendants, in the early winter of 2017, and working in concert with Hayek, created additional false and misleading "evidence" that would, they believed, finally force Dr. Ramnanan to cooperate with them and disclose everything that he knew about Koppel and the "Kickback Scheme."

157.    Specifically, the State Defendants, and in particular, Detective Campanella, created an Excel spreadsheet Summary Chart ("Summary Chart") – which was based upon, and greatly expanded, the original false and misleading "Kickback Spreadsheet" that had been created by the

State Defendants in November 2016 – which purportedly showed that Dr. Ramnanan had paid Hayek $25,900.00 in referral fees.  This document was patently false in every respect.

158.    First, as the State Defendants well knew from their investigation, Dr. Ramnanan had never paid any referral fees to Hayek.  The only payments Dr. Ramnanan ever paid to Hayek was for *rent*, which paid in the form of monthly checks.

159.    Second, Detective Campanella's claim that Dr. Ramnanan had paid $25,990.00 in referral fees was directly contradicted by Hayek himself, who testified on June 6, 2018, that Dr. Ramnanan had only paid him "maybe a couple of thousand" dollars in referral fees, that his dealings with Dr. Ramnanan were "very minimal" and that "Dr. Ramnanan wasn't very busy with me."

160.    In fact, Hayek later admitted that he had *no record* of any of the referral fees that Dr. Ramnanan had allegedly paid him, despite the fact that Hayek actually kept a binder in his office that contained the names and referral fees paid by all of the doctors who had paid him.

161.    The Summary Chart was false and misleading in several other material respects. For example, repeatedly and consistently included the names of patients who were allegedly referred by Hayek, when in fact, these patients were referred by *other* medical providers, and *not* by Hayek.

162.    An example of some of the patients who were referred by other doctors, and not Hayek, include but are not limited to the following individuals: i) patient "A.B." was referred by Joseph Salamone, D.C., *not* Ronald Hayek, D.C.; ii) patient "G.B."   was referred by Joseph Salamone, D.C., *not* Ronald Hayek, D.C.; iii) patient "S.P." was referred by Stuart Levin, D.C., not Ronald Hayek, D.C.; and iv) patient "M.M." was referred by Dr. Michael Loreti, *not* Ronald Hayek, D.C.

163.    The State Defendants willfully and deliberately included the names of the above patients, as well as many other, for the purpose of artificially increasing the total number of referrals from Hayek to Dr. Ramnanan.

164.    The State Defendants created this false and misleading "Summary Chart" in order to deceive Dr. Ramnanan and his counsel, William Wong, Esq., into believing that the State Defendants had a much stronger case than they actually had, and to convince them that if Dr. Ramnanan did not cooperate in their investigation, they would up the charges against him based on this "evidence."

165.    Defendant Keiffer explicitly made these threats during his conversations with William Wong, Esq., in the early winter of 2018, after having provided the defense with a copy of the Detective Campanella's fabricated Excel spreadsheet "Summary Chart."

### A.    Additional Falsehoods in the Summary Chart

166.    The Summary Chart was flawed and misleading in many other respects as well. For example, the Summary Chart repeatedly and consistently included erroneous information regarding the procedures performed on the various patients by Dr. Ramnanan.

167.    While the State Defendants claimed that Dr. Ramnanan had "paid Hayek for EMG/NCV tests," in fact, many of the services listed on the Summary Chart were for *different* procedures, and not for an EMG /NCV.

168.    The inclusion of these other procedures was not done by accident.  The State Defendants willfully, deliberately and knowingly included such other procedures in order to artificially inflate the number of procedures that Dr. Ramnanan had allegedly submitted to the insurance companies as part of the "Kickback Scheme."

169.    In fact, many of the patients who were referred by Hayek were referred for other medical procedures -- procedures which were *not* included in the alleged "Kickback Scheme" -- and therefore, were irrelevant and immaterial to the charges against Dr. Ramnanan.

170.    Worse still, the Summary Chart also contained certain patients listed who were not ever seen by Dr. Ramnanan, but instead, were seen by other providers.

171.    For example, patients "M.D.N," "T.B." and "M.R." -- to name just a few patients -- were seen by a Dr. "J.D.", *not* by Dr. Ramnanan.  The State Defendants deliberately included the names of patients seen by other providers, and not Dr. Ramnanan, to artificially inflate the amount of "fraudulent" bills that Dr. Ramnanan had allegedly submitted.

172.    The Summary Chart was further flawed in that it contained multiple entries relating to patients who were merely presenting to Dr. Ramnanan's office for a *follow-up* visit, not for an EMG/NCV procedure.  The State Defendants deliberately commingled and merged these visits -- and the bills arising from same -- so as to create a distorted and grossly inflated number as to the amount of bills submitted by Dr. Ramnanan to the various insurance companies.

**ii.    The False "Insurance Billing" Chart**

173.    Apart from the fabricated "Summary Chart," the State Defendants also created a deliberately false and misleading "Insurance Billing" Chart.

174.    As Defendant Keiffer well knew, the "evidence" that the State had adduced against Dr. Ramnanan – even if accepted as true, which it was not – was factually insufficient to meet the threshold amount of $75,000.00, which was mandatory to prove the charges against Dr. Ramnanan.

175.    More specifically, even if the State Defendants' "Kickback Scheme" calculations were accepted as valid -- which they were not -- the total sum of kickback "fees" would only equal $28,900.00, *not* $75,000.00.

176.    The State Defendants were well aware of this shortfall.  In fact, even if Detective Campanella's fabricated "Summary Chart" was true and accurate  -- which was not -- Defendant Hayek received only $25,900.00 in "kickbacks" from Dr. Ramnanan for performing EMG/NCV medical procedures, at the rate of $100.00 per test, on patients referred to Dr. Ramnanan by Hayek.

177.    Thus, even accepting the State Defendants' allegations as true, the *total* amount of "kickback" fees falls far short of establishing that Dr. Ramnanan derived a benefit of $75,000.00 or more.

178.    To make up the shortfall of $44,100.00, in the early winter of 2018, the State Defendants created this false and misleading "Insurance Billing" chart.

179.    This false chart purports to be a chart listing all of the insurance companies that Dr. Ramnanan billed for over 639 medical procedures in the amount of $682,000.00, for which the insurance companies actually paid him approximately $230,000.00 for the total amount billed.

180.    This "Insurance Billing" summary was false and misleading in every respect.  It was created for the purpose of overcoming a critical flaw in the State's theory of the case -- namely, that the amount of "kickbacks" fell far short of the mandatory $75,000.00 threshold --  by creating a grossly distorted, and wildly inflated, number as to the amount of bills submitted by Dr. Ramnanan to the various insurance companies.

181.    The State Defendants created this "Insurance Billing" chart for the purpose of deceiving Dr. Ramnanan and his counsel, William Wong, Esq., into believing that the State Defendants had a much stronger case than they actually had, and to convince them that if Dr.

Ramnanan did not cooperate with them in their investigation of Koppel, they would increase the charges against him based on this "evidence" and seek much more serious charges in a second indictment.

182.    Defendant Keiffer explicitly made such threats during his conversations with William Wong, Esq., in the early winter of 2018, after having provided the defense with a copy of this fabricated document.

183.    This Insurance Billing chart was further misleading because Dr. Ramnanan did *not* bill for 639 procedures on Hayek's patients, did *not* submit $682,000.00 in bills to insurance companies in connection with Hayek's patients, and did *not* receive $230,000.00 in fees from the insurance companies for work performed on Hayek's patients.

184.    Moreover, the Insurance Billing chart was materially misleading for another reason: it deliberately conveyed, falsely, the impression that Dr. Ramnanan had fraudulently overbilled the insurance companies for large amounts of money.  Nothing, however, could have been further from the truth.

185.    As Judge Vinci expressly found -- and as the State Defendants were eventually forced to concede -- "[t]here were *no fraudulent claims, there was no over-billing or overcharging*. All of the amounts paid by the insurers were for medical procedures needed by – needed by and performed on their insureds, amounts that the insurance companies were obligated to pay pursuant to their respective insurance contracts."  (Ex. A, Order at 7) (emphasis supplied).

186.    Indeed, as Judge Vinci further noted, "the State *concedes that the procedures were medically necessary, and they were actually performed by qualified medical professionals on legitimate patients*." (Id).  Thus, there was no evidence of fraudulent billing whatsoever.

     *i.*     ***The State Defendants Use False and Inaccurate Assumptions to Combine all Insurance Claims Together and Create a Grossly Inflated Total.***

187.    The State Defendants' Insurance Billing chart was false and deceptive for still another reason:  it relied upon the aggregation of insurance claims that could not, as a matter of law -- much less fundamental fairness --  be grouped together in such a manner.

188.    The State Defendants' aggregation of these claims was based on an erroneous and wildly inaccurate assumption, namely: that *all* insurance companies would  have concluded that the referral payments allegedly paid by Dr. Ramnanan -- which he never actually paid -- would have been considered "material" by each and every insurance company, for *all* claims submitted.

189.    However, as the State Defendants well knew, there was simply *no evidence* that Dr. Ramnanan's alleged failure to advise on the insurance forms that he submitted the existence of a referral fee was a "material" omission, so as to establish fraud within the definition of the Health Care claims fraud statue.

190.    Indeed, there is not a *shred* of evidence that exists -- not a single contemporaneous note, email, text, memorandum, and/or recording  --  to support the State Defendants' claims that *any* insurance companies actually believed that referral fees paid for EMG/NCV tests would be "material" information in reviewing a claim form submitted, much less that *all* such insurance companies would so.

191.    Notwithstanding the absence of any such evidence, the State Defendants improperly --  as Judge Vinci would later conclude -- "aggregated all of the insurance payments made to all of the alleged referral fee patients for purposes of establishing the second degree grading of the offense." (Ex. A, at 29).

192.    In sum, the State Defendants knowingly, intentionally and deliberately created the Insurance Billing chart to fill a major gap in their case, and to create the illusion of probable cause

-- where none otherwise existed -- in order to force Dr. Ramnanan to cooperate with them and assist in their investigation into Dr. Todd Koppel, who was the real target of their investigation.

**In a Final Desperate Attempt to Force Dr. Ramnanan to Cooperate, the State Defendants Secure a Second Indictment Against Him.**

193.    Having failed in their relentless efforts to "break" Dr. Ramnanan – by creating false and misleading "evidence," making repeated and explicit threats, and lying about their intention to seek a long-term prison sentence --  the State Defendants made one last desperate attempt to coerce Dr. Ramnanan to cooperate.

194.    Specifically, in the late spring 2018, the State Defendants sought a second indictment against Dr. Ramnanan.  However, as the State Defendants well *knew* -- and as Judge Vinci later confirmed in his scathing dismissal -- there was no legal or factual basis whatsoever for bringing any of these charges in the second indictment.

195.    In connection with this second indictment, the State Defendants grossly overcharged Dr. Ramnanan and charged him with offenses that were intended solely to "send a message" to him – cooperate with their investigation, or face dire consequences -- not to achieve justice.

196.    A superseding indictment was returned on May 31, 2018 against Dr. Ramnanan, charging him with multiple additional crimes, including: i) Conspiracy in the Second Degree (N.J.S.A. 2C:5-2; Count 1); ii) Misconduct by a Corporate Official-Second Degree (N.J.S.A. 21-9; Count 2); iii) Health Care Claims Fraud – Second Degree (N.J.S.A. 2C:21- 4.3a; Count 3); Theft by Deception – Second Degree (N.J.S.A. 2C:20-4; Count 4); v) Commercial Bribery and Breach of Duty to Act Disinterestedly – Third Degree (N.J.S.A. @C:21-10a(2) and 21-10c; Count 5);  vi) Criminal Running – Third Degree (N.J.S.A. 2C:21-22.1; Count 6); vii) Conspiracy – Second Degree (N.J.S.A. 2C:5-2, Count 7); viii) Health Care Claims Fraud – Second Degree

(N.J.S.A. 2C:21-4a, Count 8); ix) Commercial Bribery and Breach of Duty to Act Disinterestedly – Third Degree (N.J.S.A. 2C:21-10a(3) and 21-10c; Count 9); and Criminal Running – Third Degree (N.J.S.A. 2C:21-22.1; Count 10).

197.    In the superseding indictment, the charged conspiracy – which was the basis for charging Counts 1 through 6, was the same conspiracy charged in the original indictment and alleged to have been committed by Dr. Ramnanan and Ronald Hayek. Additionally, the superseding indictment added Counts 7 through 10, which were based on a second different conspiracy, alleged to have been committed by Dr. Ramnanan and Adam Awari, a licensed chiropractor.

**The Same  Fabricated Evidence that the State Defendants Created During the Investigative Phase is Used  Again in the Judicial Phase of the Proceedings.**

198.    As detailed above, the State Defendants manufactured evidence in multiple ways during their investigation into the "Kickback Scheme," including but not limited to: i) creating a false and misleading "Kickback Spreadsheet", which supposedly showed all of the referrals that Hayek had given Dr. Ramnanan in exchange for payment; ii) creating a false and misleading transcript of a recording a conversation between Dr. Ramnanan and Hayek, so as to materially alter the meaning of the actual words spoken between the two of them;  iii); creating a false and misleading Excel spreadsheet "Summary Chart" -- based  upon  the  original  "Kickback Spreadsheet," but significantly expanding it -- which improperly aggregated the insurance claims submitted by Dr. Ramnanan, thereby vastly increasing the alleged amount of "fraud" committed by him;  iv) commingling the referrals submitted by other medical practitioners to Dr. Ramnanan with those of Hayek, thereby vastly overstating the amount of patients that Hayek had actually referred to Dr. Ramnanan for EMG/NCV tests; and v) creating summary charts which improperly

aggregated *all* of the insurance payments made to *all* of the alleged referral fee patients, for purposes of establishing a completely fictitious sum of $682,000.00 in "fraudulent billing."

199.    All of the foregoing false evidence was created by the State Defendants in late 2016 and 2017, and was done so for the purpose of deceiving Dr. Ramnanan into believing that the State Defendants had a very strong case against him, and forcing him to cooperate in their investigation of Koppel.

200.    While the State Defendants created this false evidence during the investigative phase of the criminal proceedings, they in fact used this same false evidence during the judicial phase of the proceedings as well.

201.    As a direct result of this fabricated evidence, Dr. Ramnanan was forced to defend himself against baseless criminal charges for almost two years, and he suffered a significant deprivation of liberty as a result. Specifically, for almost 2 years, Dr. Ramnanan was required to make multiple and repeated  appearances in court, and he was subjected to significant restrictions on his freedom of movement and travel while the charges were pending against him. In addition, the State Defendants effectively seized Dr. Ramnanan's property by putting a freeze on all of his bank accounts for the duration of the criminal proceedings.

202.    Apart from falsifying evidence, the State Defendants engaged in many other acts of misconduct throughout the criminal proceedings.  To be clear, however, this action does *not* seek redress for the State Defendants' grossly improper conduct before the grand jury, as egregious as it may have been.  Nor, for that matter, does this action seek redress for the State Defendants' flagrant violations of their <u>Brady</u> and <u>Giglio</u> obligations, or any other misconduct that they engaged in following the second indictment and prior to Judge Vinci's dismissal.

203.    Rather, this action focuses solely on the State Defendants' fabrication of evidence during the investigative phase, while they were still attempting to build a case against Dr. Koppel -- whom they eventually charged with running a $4.4 million dollar medical billing scheme -- and were trying to force Dr. Ramnanan to assist them with their investigation into Koppel.

**The Fictitious "Kickback" Claims Regarding Adam Awari, D.C.**

204.    Apart from their creation of falsified documentary evidence, as discussed above, the State Defendants -- in furtherance of their improper scheme to manufacture evidence against Dr. Ramnanan and coerce him to cooperate -- attempted to bolster their (non-existent) case against him by claiming, falsely, that Dr. Ramnanan had *also* paid Awari for referrals.

205.    On March 9, 2018, Awari had entered into a plea agreement with the State Defendants.  Pursuant to this agreement, Awari was able to avoid the potential criminal charges that the State Defendants had threatened to bring against him, including but not limited to: i) Health Care Claims Fraud (N.J.S.A 2C:21-4.2); ii) Commercial Bribery and Breach of Duty to Act Disinterestedly (N.J.S.A. 2C: 20-10c); iii) Criminal Running (N.J.S.A. 2C:21-4.2); and iv) Conspiracy (N.J.S.A. 2C:5-2).

206.    In return for accepting the terms and conditions of sentence that the State Defendants had proposed, Awari agreed to cooperate with the State Defendants in their investigation and provide them with the names of doctors who had paid him referral fees, in order to avoid jail time and preserve his license.

207.    After much prodding, Awari claimed that Dr. Ramnanan had paid him for patient referrals.

208.    This claim, however, was another complete and outright fabrication.

209.    Dr. Ramnanan had never paid any referral fees to Awari, period.  Not once, *ever*.

210.    To the contrary, over the years, Dr. Ramnanan had referred many of his own patients to Awari for chiropractic treatment.

211.    Awari, in turn, had referred many patients to Dr. Ramnanan for pain management.

212.    Awari referred patients to Dr. Ramnanan because he thought that Dr. Ramnanan was an excellent pain management physician.

213.    In fact, Awari thought so highly of Dr. Ramnanan that he actually sought treatment from Dr. Ramnanan for his own back pain on two separate occasions.

214.    There was nothing illegal, unethical or improper about the referral arrangement between Dr. Ramnanan and Awari.

215.    In fact, referrals of this nature are expressly permitted under New Jersey law.

216.    In fact, Dr. Ramnanan had a similar referral relationship with many other doctors and chiropractors. These relationships were mutually beneficial, completely above board, and in all respects lawful and proper.

**The Complete Absence of Any Evidence of "Kickbacks" Between Dr. Ramnanan and Adam Awari, D.C.**

217.    The State Defendants' claim of a "kickback scheme" between Dr. Ramnanan and Awari was literally made up out of whole cloth.

218.    There was no evidence whatsoever to corroborate any of the State Defendants' claims regarding Awari.

219.    There was no documentary evidence to support this claim.

220.    There were no checks ever paid by Dr. Ramnanan to Awari.

221.    There was no cash ever paid by Dr. Ramnanan to Awari.

222.    There were no emails between Dr. Ramnanan and Awari.

223.    There were no text messages between Dr. Ramnanan and Awari.

224. There were no faxes between Dr. Ramnanan and Awari.

225. There were no phone records to show contact between Dr. Ramnanan and Awari.

226. There were no recordings of any conversations between Dr. Ramnanan and Awari.

227. There were no witnesses to support any claims of any type of referral payments -- much less an "illegal kickback scheme" -- from Dr. Ramnanan to Awari.

228. In short, there was no evidence whatsoever, of any kind, to support the State Defendants' claims that there had been illegal payments from Dr. Ramnanan for referrals.

**The State Defendants Literally Put Words into Awari's Mouth to Manufacture Another "Kickback" Claim against Dr. Ramnanan.**

229. In the absence of actual evidence, the State Defendants literally made-up evidence in order to intimidate Dr. Ramnanan and force him to cooperate.

230. The State Defendants knew that there were never any payments made by Dr. Ramnanan to Awari. However, blinded by their "ends justifies the means" approach -- and still convinced that they could force Dr. Ramnanan to cooperate with them -- they attempted to bolster their (non-existent) case against Dr. Ramnanan by inducing a second witness to make claims against him.

231. Specifically, during their proffer session with Awari, which took place on February 6, 2018, the State Defendants repeatedly and deliberately put words in his mouth regarding the alleged "kickback" scheme between him and Dr. Ramnanan.

232. During their proffer session with Awari, the State Defendants were the first ones to mention "Dr. Ramnanan" by name. Awari never mentioned Dr. Ramnanan on his own.

233. During their proffer session with Awari, the State Defendants were the first ones to suggest that the amount of referral fees that Dr. Ramnanan had paid was actually "$3,000.00." Awari never mentioned this specific sum on his own.

234.    During their proffer session with Awari the State Defendants were the first ones to suggest that the amount paid Dr. Ramnanan for each referral was "$500.00."  Awari never mentioned this sum on his own.

235.    During their proffer session with Awari, the State Defendants invented the "fact" that the cash payments were delivered by Dr. Ramnanan in "envelopes."  Awari never mentioned this "fact" on his own.

236.    As the State Defendants well knew, there were no cash payments, period.  Further, Dr. Ramnanan never delivered *anything* to Awari in an envelope.

237.    There was no evidence that Dr. Ramnanan ever made any "cash payments", or any payments whatsoever, to Awari.

**The State Defendants Recognize that Awari is a Patently Incredible Witness.**

238.    During the proffer session, it soon became clear that Awari was completely worthless as a witness.

239.    When interviewed by the State Defendants, Awari gave long, rambling and incoherent responses, often contradicting himself and providing materially inconsistent answers.

240.    Awari also had frequent memory lapses and could not recall critical events, such as when the meetings took place, where the meetings took place, how the meetings were arranged, how much money was paid, when the money was paid, how the alleged kickback scheme ended.

241.    It was obvious from the outset that Awari had massive credibility problems, and could not possibly be trusted to provide even the most basic information, much less to serve as a foundation for any criminal charges against Dr. Ramnanan.

242.    Unable to get the answers that they wanted from Awari the State Defendants instead chose to give him the answers that they wanted.

243.    In particular, Defendant Keiffer took over the questioning and started asking a series of grossly improper leading questions, essentially testifying as an unsworn witness.

244.    Rather than seeking to elicit evidence from Awari, Keiffer spoon fed the answers to Awari so that he would know what to say.   The other State Defendants likewise continuously provided him with the "right" answers to their questions.

245.    The reason why the State Defendants had to continuously feed the answers to Awari, D.C. was because they *knew* that he was a patently incredible witness.

246.    Desperate to avoid prison time and keep his license, Awari was literally willing to say *anything* that the State Defendants wanted him to say, a fact which the State Defendants knew and exploited in every way possible.

247.    As a result, the only "evidence" of a referral scheme between Awari and Dr. Ramnanan came from the State Defendants themselves, in the form of leading, coercive and improperly suggestive questions to Awari.

248.    With addition of the false charges relating to Awari, the State Defendants' specious criminal prosecution had now ballooned up to ten separate criminal charges. The State Defendants believed that the addition of these new charges would finally force Dr. Ramnanan, at long last, to seek a plea deal and assist them in their investigation into Dr. Koppel.

**Judge Vinci Issues a Scathing Decision Against the State Defendants and Dismisses all Charges Against Dr. Ramnanan.**

249.    No matter how many false charges the State Defendants added to the original indictment, in the end, it did not matter.  Once Judge Vinci had an opportunity to carefully review the evidence presented to the grand jury, the State Defendants' manufactured case came to a crashing halt.

250. Specifically, after forcing Dr. Ramnanan to defend himself against fabricated charges for nearly two years -- and completely destroying his reputation and career in the process -- the State Defendants' sham case finally ended on May 23, 2019, when the Honorable Robert M. Vinci dismissed the entire ten count superseding indictment against Dr. Ramnanan.

251. In doing so, Judge Vinci left no doubt that the State Defendants had engaged in grave misconduct in presenting their case to the grand jury. Specifically, in his dismissal decision, Judge Vinci described the State Defendants' deceptive conduct before the grand jury as, inter alia: "improper[]," "intentional[]," "extremely misleading," "flat-out wrong," "incorrect[] and misleading[]," and "patently false." See generally Ex. A.

252. In short, "the State [had] *intentionally subverted the grand jury process* resulting in a grand jury presentation that was *fundamentally unfair*." (Id. at 32) (emphasis supplied)

253. By engaging in such misconduct, "[t]he State *lost sight of its obligation to do justice* and instead sought to indict the defendant on the most serious charges it could present. Had the State not *misled the grand jurors regarding the law applicable* to the charges and had the State not *charged [the] defendant improperly*...and had the State not and misled the grand jury...the Court is not convinced the grand jury would have indicted the defendant." (Id. at 36) (emphasis supplied).

254. In short, Judge Vinci found that the State Defendants completely "deceived" the grand jury, which resulted in an unlawful and impermissible criminal indictment against Dr. Ramnanan. (Id. at 33-34) (emphasis supplied).

255. In dismissing all charges, Judge Vinci made it clear that Dr. Ramnanan did not commit *any* healthcare claim fraud whatsoever: "*As a matter of law, the State cannot establish the defendant made any false, fictitious, fraudulent, or misleading statement of fact in any*

*document submitted for payment or reimbursement for health services*… Defendant, therefore, has met its burden to demonstrate the evidence is clearly lacking support in the charges…"

256.    Even viewing "the facts in the light most favorable to the State", the indictment had to be dismissed because it was "palpably defective."  (Id. at 11).

257.    In reaching this conclusion, the Court expressly rejected the State Defendants' theory of the case, i.e., that Dr. Ramnanan had violated a criminal statute by omitting information on claim forms submitted to insurance carriers as to whether he was paying referral fees to other referring medical practitioners.

258.    The Court reasoned that the forms did not actually *ask* for this information, and that therefore, a doctor "cannot omit information from a claim form, if that information is not sought in the first instance. (Id. at 16).

259.    Since the forms never sought referral information from Dr. Ramnanan, the State Defendants had failed to identify any representation made in any claim form that was rendered misleading by the failure to disclose the payment of referral fees. Accordingly, the evidence presented by the State Defendants was "clearly lacking support in the charges." (Id. at 20-21).

260.    The Court further found that the State Defendants had failed to satisfy the required element of materiality. The Court stated that the "State's effort to establish materiality before the Grand Jury was based on vague and ambiguous hearsay testimony" (Id. at 22-23).

261.    The Court further criticized the State for telling the Grand Jurors that there was substantial case law in the civil context upon which many insurers rely, in which the United States Supreme Court held that there is an implied certification contained in claim forms that the medical provider has complied with all significant statutory requirements.

262.    The Court stated that this was "at best, a *gross overstatement* of the Supreme Court's decision" and that it "was *extremely misleading* to tell the Grand Jury that the United States Supreme Court issued a decision supporting the State's legal theory when that simply is not true. (Id. at 23-24) (emphasis supplied).

263.    After reviewing the entire grand jury transcript, Judge Vinci concluded that "the State [had] intentionally subverted the Grand jury process resulting in a Grand Jury presentation that was fundamentally unfair …." (Id. at 32-33).

264.    In particular, "it was improper to suggest to the grand Jurors that …. they should consider some ambiguously described body of law, including the alleged Supreme Court decision that allegedly supported the State's request for an indictment on the charges. This left the Grand Jurors … with the [false] impression … that the State's legal position was supported by substantial case law and Supreme Court law." (Id. at 32-33).

265.    "By incorrectly and misleadingly … advising the Grand Jury regarding the applicable law, the State left the Grand Jurors with the *patently false impression* that the law was in its favor. In fact, the State should have told the Grand Jury that there's absolutely no law that supported … these charges. The State *deceived* the Grand Jury when it told them otherwise." (Id. at 33-34).

266.    The Court further found that the "runner" charges against Dr. Ramnanan failed as a matter of law. As Judge Vinci explained, "the statute specifically provides that a runner shall *not* include a person who refers patients to a provider as otherwise authorized by law." (Id. at 30) (emphasis supplied). Thus, "as chiropractors, Hayek and Awari were *authorized by law* to refer patients to the Defendant. (Id. at 31). "Because Hayek and Awari cannot qualify as 'runners' under

the Statue, Counts 6 and 10 of the superseding indictment fail to charge a viable offense and must

also must be dismissed." (Id. at 32).

267.    In sum, based on his review of the entire grand jury proceedings, Judge Vinci had

"*grave doubts that the determination ultimately reached was arrived at fairly and impartially*."

(Id.  37) (emphasis supplied).   Accordingly, Judge Vinci dismissed all 10 charges of the

superseding indictment.

**Despite Having All Charges Dismissed, Dr. Ramnanan's Career is Permanently Destroyed as a Result of the State Defendants' False, Inflammatory and Prejudicial Press Releases.**

268.    While Dr. Ramnanan felt vindicated by Judge Vinci's dismissal of the criminal

charges, it had come too late: Dr. Ramnanan's entire career had been destroyed.

269.    Everything that Dr. Ramnanan had worked for so hard for 39 years had been

eviscerated.   His reputation, both personally and professionally, was in tatters.   His medical

practice, which he had spent his lifetime building up, was in complete ruins, his patients having

abandoned him in droves and new patients unwilling to be treated by such a "corrupt" doctor.

270.    The reason why Dr. Ramnanan's career was thoroughly destroyed was not, simply

because of the sham indictments, but rather, because of the State Defendants' shameless attempt

to *publicize* these indictments for their own political agenda by issuing false, defamatory and

highly sensationalized press releases regarding Dr. Ramnanan.

271.    There was no legal justification for issuing the press releases. Simply put,

publicizing indictments is *not* part of the Prosecutors' duties in the New Jersey Attorney General's

Office.

272.    However, the State Defendants saw an opportunity to promote and publicize the

work of the Commercial Bribery Task Force ("CBTF") -- which was still relatively new, having

just been created in 2016 -- so they deliberately and knowingly attempted to sensationalize the

criminal charges against Dr. Ramnanan, so as to enhance the prestige and stature of the CBTF, and make it appear as this unit was highly successful in exposing massive fraud in the medical industry.

273.    The first press release, issued by the New Jersey Office of Attorney General on August 2, 2017, stated, in bold initial caps, as follows: "**Bergen County Neurologist Charged with Paying Kickbacks to a Passaic County Chiropractor in Exchange for Patient Referrals to his Pain Management Facility**." (Ex. C).

274.    The press release went on to state that "Kickback schemes like this one undermine the entire medical profession and violate the doctor-patient relationship that serves as its sacred bedrock," quoting Acting Insurance Fraud Prosecutor Christopher Iu. "Patients must be able to trust their healthcare treatments are based on sound medicine, not the *greed and corruption* of their doctors." (Id.) (emphasis supplied).

275.    The press release continued: "As this investigation shows, medical professionals who *exploit that trust for personal gain* will be held accountable." (Id.) (emphasis supplied).

276.    Thus, according to the State Defendants' press release, Dr. Ramnanan was a doctor who allowed his "greed and corruption" to trump the doctor-patient relationship and who "exploit[ed] his patients for personal gain."

277.    Even more damaging, the press release suggested that, as result of this bribery scheme, Dr. Ramnanan's patients may have been "*misdiagnosed patients or receive[d] unnecessary treatments.*" (Id.).

278.    This press release was false and defamatory in every respect, as the State Defendants well knew based on their own investigation. Dr. Ramnanan had not engaged in *any* of the acts of misconduct alleged in the press release. These claims were outright lies, and were based on the fabricated and manufactured claims that the State Defendants had created when they

were trying to force Dr. Ramnanan to enter into a plea and cooperate with their investigation of Koppel.

279.    Further, the press release contained "facts" which were completely wrong.  For example, Dr. Ramnanan was *not* a "neurologist" -- which Hayek had erroneously told the State Defendants, and which the State Defendants had simply accepted as true, rather than take a moment to simply verify -- but rather, he was a pain management specialist whose background and training was markedly different than that of a neurologist.

280.    The State Defendants were directly involved in the creation of this false and misleading press release.  Specifically, the first press release was drafted, edited, reviewed and/or approved by each of the State Defendants and/or was based upon the same lies -- and the same manufactured evidence -- that the State Defendants had used to support their specious claim that Dr. Ramnanan was engaged in a "Kickback Scheme."

281.    The story was picked up by many news outlets, and was repeated on social media including government social media accounts, and all over the Internet.   The news was picked up locally, nationally and internationally throughout the world.

282.    The story caused great damage to Dr. Ramnanan. He lost many patients as a result, and it caused him severe humiliation and embarrassment amongst his friends, family and professional colleagues.

283.    Nonetheless, despite the damage caused by the first press release, Dr. Ramnanan was still able to maintain some resemblance of his patient base and his medical practice.   However, this all came to an abrupt end with the second press release.

284.    On June 1, 2018, the State Defendants issued another press release regarding Dr. Ramnanan.  (Ex.  D). This press release, which contained new, highly sensationalized and truly

scandalous information -- which was demonstrably false in every respect -- was far more damaging than the original press release.

285.    This second press release contained, in bold lettering, the following headline: *"Bergen County Neurologist Faces New Charges in Superseding Indictment Alleging He Fraudulently Billed Insurance Companies for $682,000 in Statewide Medical Kickback scheme."*

286.    Thus, the press release repeated the same lies -- and relied upon the same false evidence -- that the State Defendants had manufactured during their investigation in order to support their specious claim that Dr. Ramnanan had "fraudulently billed insurance companies for $682,000."

287.    The State Defendants were directly involved in the creation of this false and misleading press release.  Specifically, the second press release was drafted, edited, reviewed and/or approved by each of the State Defendants and/or was based upon the same lies -- and the same manufactured evidence -- that the State Defendants had used to support their specious claim that Dr. Ramnanan was engaged in a "Kickback Scheme."

288.    This "fraudulent billing" claim was patently false in every respect. As Judge Vinci later concluded,  the State Defendants had arrived at this number by improperly "aggregate[ing] all of the insurance payments made to all of the alleged referral fee patients for purposes of establishing the second degree grading of the offense." (Ex. A, Order at 29).

289.    The press release went on to allege that "Dr. Terry Ramnanan, 65, who operates the Interventional Spine and Pain Treatment Center facility in Paramus, used his medical facility to *fraudulently bill insurance carriers for more than 637 medical procedures totaling $682,000* related to patients involved in the kickback scheme."

290.    Thus, this press release suggested, falsely, that Dr. Ramnanan had: i) fraudulently billed insurance carriers;  ii) fraudulently submitted claims for over 637 procedures; and iii) fraudulently billed the insurance companies for a total of $682,000.00.  Each one of these claims was categorically false.

291.    In fact, as Judge Vinci later found -- and as the State Defendants were eventually forced to concede -- "[t]here were *no fraudulent claims, there was no over-billing or overcharging*. All of the amounts paid by the insurers were for medical procedures needed by – needed by and performed on their insureds, amounts that the insurance companies were obligated to pay pursuant to their respective insurance contracts.  (Ex. A at 7) (emphasis supplied).

292.    In fact, as Judge Vinci noted, "the State *concedes that the procedures were medically necessary, and they were actually performed by qualified medical professionals on legitimate patients*." (Id).  Thus, there was no evidence of fraudulent billing whatsoever.   The press release's suggestion to the contrary was a stunningly false statement, made complete and utter disregard for the truth.   Simply put, there was no legal or factual basis whatsoever for making such a claim.

293.    While the press release suggested that there was false billing in the amount of $682,000.00 in actuality, this "fraud" amount was also shockingly overstated and patently false, as discussed above.

294.    The press release continued: "The deeper our investigators dig, the more dirt they uncover on the doctors who conspired to *buy and sell patients for profit* in this statewide kickback scheme," said Attorney General Grewal. (Ex. D) (emphasis supplied).

295.    Thus, the press release conveyed the (completely false) impression that the State Defendants Investigators had dug "deeper"  and  had now, as a result,  uncovered "more dirt" on

Dr. Ramnanan, confirming that he was indeed one of the doctors who "buy and sell patients for profit."

296.    The press release continued: "Upon further information and review, additional, *upgraded charges against Dr. Ramnanan are appropriate*, give his alleged role in this conspiracy to corrupt New Jersey's health care industry."

297.    Specifically, "Dr. Ramnanan's alleged crimes are *greater in number* and *more serious* in nature than we originally believed.  The charges contained in the superseding indictment reflect the true nature of his involvement in this scheme," said Acting Insurance Fraud Prosecutor Tracy M. Thompson.

298.    As a result of the State Defendants' attempt to publicize the second indictment of Dr. Ramnanan, the story was picked up by many news outlets, and was repeated on social media, including government social media accounts, and all over the Internet.   The news was picked up locally, nationally and internationally throughout the world.

299.    Moreover, Dr. Ramnanan's photograph was posted in multiple news outlets, and even on Attorney General Gurbir Grewal's Twitter page, where Grewal boasted as follows: "Dr. Terry Ramnanan, a Bergen County neurologist, faces new charges in a superseding indictment alleging he fraudulently billed insurance companies for $682,000.00 in a statewide kickback scheme."   (Ex. E). This Twitter post resulted in even further damage and humiliation to Dr. Ramnanan and his family.

300.    Attorney General Grewal further attempted to publicize the false charges against Dr. Ramnanan by making similar postings about his "fraudulently billing insurance companies for 682,000" on  Facebook, Instagram and other forms of social media.  These stories were picked up

by other news outlets and caused further substantial harm to Dr. Ramnanan's reputation and practice.

301.    While the first press release was damaging to Dr. Ramnanan, the second press release -- when combined with Grewal's boastful postings on Twitter, Facebook and Instagram -- proved to be a devastating blow to Dr. Ramnanan, the *coup de grace* that effectively destroyed Dr. Ramnanan's practice for good.

302.    Following the second press release, Dr. Ramnanan started losing his patients in droves, and new patients were impossible to bring in.   The damage to his reputation was severe and irreparable, and continues to this date.

303.    The negative press has fundamentally destroyed Dr. Ramnanan's medical practice. It is extremely difficult for him to attract both new, and retain existing, patients when there is only negative press about him out in the public forum.

304.    To this day, anyone who looks up Dr. Ramnanan will find page after page of stories on the Internet talking about his alleged "fraudulent billing" of insurance companies for "$682,000," and his status as a doctor who "buy and sell patients for profit."  (Ex. E, Sample Negative Internet Stories).

305.    There is not *one* article on the Internet, or anywhere else for that matter, that mentions the fact that all charges against Dr. Ramnanan were dismissed by Judge Vinci.

306.    In sum, Dr. Ramnanan's pristine reputation as a medical doctor for over 38 years, and his leadership of a previously very successful medical practice, has been thoroughly destroyed by the State Defendants' false accusations and manufactured evidence, which they shamelessly publicized to promote their own political agenda.

## COUNT I
### Violation of Civil Rights Pursuant to 42 U.S.C. § 1983
### Fabrication of Evidence (State Defendants)

307.    Dr. Ramnanan hereby incorporates all of the preceding allegations and makes them part of this Count as if fully set forth herein.

308.    The State Defendants at all times acted under color of state law.

309.    As described above, the State Defendants, in their individual capacities, acting alone and in concert with Defendants Hayek and Awari, agreed to engage in and engaged in the fabrication of evidence in violation of Dr. Ramnanan's rights under the Fourth, Fifth and Fourteenth Amendments to the United States Constitution.

310.    As described above, Dr. Ramnanan was charged in two separate indictments based on completely fabricated evidence.

311.    The State Defendants manufactured such fabricated evidence knowingly, intentionally, willfully during the course of their investigation, and did so for the improper purpose of manufacturing probable cause to charge Dr. Ramnanan -- knowing full well that probable cause did not exist – so as to coerce him into cooperating with them.

312.    The fabricated evidence that was manufactured by the State Defendants included, but was not limited to,  the following evidence: i) the false and misleading "Kickback Spreadsheet", which supposedly showed all of the referrals that Hayek had given Dr. Ramnanan in exchange for payment; ii) the doctored transcript of the conversation between Dr. Ramnanan and Hayek, which materially altered the  sequence and meaning of the words spoken by Dr. Ramnanan;  iii) a completely false Excel spreadsheet "Summary Chart" of Dr. Ramnanan's Records, which vastly overstated the amount of the (non-existent) referral fees paid by Dr. Ramnanan, and improperly included the names of patients who were allegedly referred by Hayek,

when in fact, these patients were referred by *other* medical providers, and *not* by Hayek; iv) the false and misleading "Insurance Billing" chart, which improperly and unlawfully aggregated *all* insurance claims submitted to *all* insurance companies, even though there was no evidence of same – in order to arrive at an utterly fictitious sum of "$682,000.00" from "fraudulent billing"; and v) the completely fabricated "corroborating" statement from Awari, D.C., in which the State Defendants literally *put words in his mouth* regarding: the amount of referral payments ("$3,000.00"), the amount of each payment ("$500.00"), the means of each payment ("cash"), the manner of referral ("envelopes"), and other false statements, as set forth in detail above.

313.    Dr. Ramnanan suffered a deprivation of liberty as a result the State Defendants' fabricated evidence. Based on such false evidence, he was arrested and booked, and thereafter he was required to make multiple court appearances to defend himself against the baseless charges brought by defendants.

314.    Dr. Ramnanan would not have been charged with any criminal offenses had the State Defendants not fabricated evidence against him in the first instance. In fact, Dr. Ramnanan could not have been charged with *any* crimes without the above described fabricated evidence.

315.    As a direct result of the State Defendants' fabrication of evidence, Dr. Ramnanan has suffered loss of liberty, damage to his personal and professional reputation, mental anguish, severe emotional distress, embarrassment, humiliation, loss of his career, past lost earnings and future lost earnings, as well as loss of his retirement funds and loss of his investments.

316.    Since the State Defendants acted maliciously, willfully, and want only in violating Dr. Ramnanan's federally protected rights, the imposition of punitive damages is warranted.

## COUNT II

### Violation of Civil Rights Pursuant to 42 U.S.C. § 1983
### Malicious Prosecution – Defendants Berg, Proetta and Campanella

317.    Dr. Ramnanan hereby incorporates all of the preceding allegations and make them part of this Count as if fully set forth herein

318.    The State Defendants, in their individual initiated capacities, criminal proceedings against Dr. Ramnanan, intentionally engaged in conduct that influenced the initiation of criminal proceedings against Dr. Ramnanan, and intentionally engaged and agreed to engage in conduct that gave rise to the continuation of criminal proceedings against Dr. Ramnanan.

319.    The State Defendants, in their individual capacities, acting alone and in concert with Defendants Hayek and Awari, agreed to engage in and be engaged in misconduct in initiating a malicious prosecution depriving Dr. Ramnanan of his rights as a citizen of the United States under the Fourth and Fourteenth Amendments to the Constitution of the United States.

320.    The State Defendants knowingly and intentionally  created fabricated evidence against Dr. Ramnanan during their investigation into the "Kickback Scheme," and then used such false evidence to initiate  baseless criminal charges against Dr. Ramnanan.

321.    The criminal proceedings against Dr. Ramnanan terminated in Dr. Ramnanan's favor on May 23, 2019, when the Honorable Robert Vinci dismissed all charges against Dr. Ramnanan.

322.    The State Defendants acted maliciously and for purpose other than bringing Dr. Ramnanan to justice.

323.    As a result of the State Defendants' misconduct, Dr. Ramnanan suffered a deprivation of his liberty, in that he was detained against his will and was required to defend himself against baseless and fabricated charges for almost two years, before all charges were

dismissed.

324.    As a direct result of the State Defendants' violation of Dr. Ramnanan's constitutional rights, acting in concert with Defendants Hayek and Awari, Dr. Ramnanan has suffered loss of liberty, damage to his personal and professional reputation, mental anguish, emotional distress, embarrassment, humiliation, the destruction of his medical practice, past lost earnings and future lost earnings.

325.    The State Defendants, acting in concert with Hayek and Awari, acted maliciously, willfully, and wantonly in violating Dr. Ramnanan's federally protected rights, thereby warranting the imposition of punitive damages.

## COUNT III
## Conspiracy To Violate Plaintiff's Civil Rights Under 42 U.S.C. § 1983 – The State Defendants

326.    Dr. Ramnanan hereby incorporates all of the preceding allegations and makes them a part of this Count as if fully set forth herein.

327.    The State Defendants, acting in concert with Defendants Hayek and Awari, conspired and agreed to engage in conduct that deprived Dr. Ramnanan of his rights under the Fourth, Fifth, Sixth, and Fourteenth Amendments. The State Defendants each engaged in a series of actions and omissions in furtherance of this conspiracy and agreement.

328.    The State Defendants, acting in concert with Defendants Hayek and Awari, falsified evidence and manipulated the truth during their pre-trial investigation, suborned perjury, protected witnesses who they knew, with absolutely certainty, were providing false testimony, and denied Dr. Ramnanan his constitutional rights.

329.    Throughout the period of the conspiracy, the Defendants pursued their objectives with actual malice toward plaintiff, with utter and deliberate indifference to and disregard for plaintiff's

rights under the Constitution and laws of the United States, without probable or reasonable cause to believe plaintiff was guilty of any crime.

330.    Pursuant to the conspiracy, the conspirators, and their employees, agents and servants, intentionally, recklessly, negligently, and/or with complete indifference to the rights of Dr. Ramnanan: (a) manufactured false evidence; (b) pressured, intimidated, threatened, coerced and induced witnesses to give untruthful, erroneous, incomplete and/or misleading statements and testimony; and (c) failed to correct such false statements and testimony.

331.    The aforesaid conduct of defendants operated to deprive Dr. Ramnanan of important and well-established rights under the Constitution and the laws of the United States including, but not limited to, his rights:

(a)    Not to be deprived of his liberty or to be arrested, detained or imprisoned except upon probable cause to believe him guilty of a crime, under the Fourth, Fifth and Fourteenth Amendments to the United States Constitution;

(b)    Not to be deprived of his liberty or to be arrested, indicted, prosecuted or imprisoned based upon evidence fabricated by a government official;

(c)    Not to be deprived of his liberty or to be arrested, indicted, prosecuted or imprisoned based upon the testimony of witnesses who had been illegally bribed or influenced for their testimony; and

332.    As a result of the foregoing, Dr. Ramnanan was deprived of his liberty, was denied fundamental constitutional rights, was publicly embarrassed and humiliated, was caused to suffer severe emotional distress, was forced to incur substantial legal expenses, had his personal and professional reputation destroyed, lost his livelihood as a medical doctor and has incurred substantial lost earnings.

## PENDENT STATE LAW CLAIMS

333.    Dr. Ramnanan hereby incorporates all of the preceding allegations and makes them a part of this Count as if fully set forth herein.

334.    In addition to the claims set forth above under federal law, pursuant to 42 U.S.C. § 1983, plaintiff also alleges multiple claims under New Jersey State law and the New Jersey Constitution in this action, as set forth below.

### COUNT IV
**Violation of Civil Rights Pursuant to N.J.S.A. § 10:6-1 *et seq.*
Fabrication of Evidence – The State
Defendants,   Hayek and Awari**

335.    Dr. Ramnanan hereby incorporates all of the preceding allegations and makes them a part of this Count as if fully set forth herein.

336.    The State Defendants at all times acted under color of state law.

337.    As described above, The State Defendants, in their individual capacities, acting alone and in concert, agreed to engage in and engaged in the fabrication of evidence in violation of Dr. Ramnanan's rights and due process afforded under the New Jersey Constitution.

338.    As described above, Dr. Ramnanan was charged with two separate indictments, and was forced to defend himself for almost two years, based on completely fabricated evidence.

339.    Dr. Ramnanan would never have been charged with first indictment, much less the second one, had the State Defendants not fabricated evidence during their investigation and then presented such evidence to the grand jury.

340.    Dr. Ramnanan's rights under the New Jersey Constitution were clearly established such that any reasonable person would be aware of them. It was not reasonable for the State Defendants to believe that their unlawful actions did not violate Dr. Ramnanan's rights under the New Jersey Constitution.

341.    As a direct result of the State Defendants' violation of Dr. Ramnanan's

constitutional rights, Dr. Ramnanan has suffered loss of liberty, damage to his personal and professional reputation, loss of his career, mental anguish, emotional distress, embarrassment, humiliation and substantial financial losses, and is entitled to relief under N.J.S.A. § 10:6-2.

## COUNT V
### Violation of Civil Rights Pursuant to N.J.S.A. § 10:6-1 *et seq.*
### Malicious Prosecution – All Defendants

342.    Dr. Ramnanan hereby incorporates all of the preceding allegations and makes them a part of this Count as if fully set forth herein.

343.    The State Defendants at all times acted under color of state law.

344.    The State Defendants, in their individual capacities, and acting in concert with Defendants Hayek and Awari, initiated criminal proceedings against Dr. Ramnanan, intentionally engaged and agreed to engage in conduct that influenced the initiation and continuation of baseless criminal proceedings against Dr. Ramnanan, and intentionally engaged and agreed to engage in conduct that gave rise to the initiation and continuation of criminal proceedings.

345.    The State Defendants, in their individual capacities, acting alone and in concert, agreed to engage in and engaged in misconduct amounting to a malicious prosecution depriving Dr. Ramnanan of his rights under the New Jersey Constitution, including but not limited to Article I.

346.    The State Defendants created false, misleading and dishonest "evidence" during the investigative phase, manipulated the truth, suborned perjury, protected witnesses who were providing false testimony, and denied Dr. Ramnanan his civil rights under the New Jersey State Constitution.

347.    The State Defendants knowingly and intentionally presented false and fabricated evidence to investigators, and conspired with the other State Defendants to do so.

348.    The State Defendants acted maliciously, willfully, and wantonly in violating Dr. Ramnanan's rights.

349.     The criminal proceedings against Dr. Ramnanan terminated in Dr. Ramnanan's favor on May 23, 2019, when all charges against him were dismissed.

350.     The State Defendants acted maliciously and for purposes other than bringing Dr. Ramnanan to justice.

351.     As a result of the State Defendants' misconduct, Dr. Ramnanan suffered a significant deprivation of liberty.

352.     Dr. Ramnanan's rights under the New Jersey Constitution were clearly established such that any reasonable person would be aware of them. It was not reasonable for the State Defendants to believe that their actions did not violate Dr. Ramnanan's rights under the New Jersey Constitution, including but not limited to Article I.

353.     As a direct result of the State Defendants' violation of Dr. Ramnanan's rights, Dr. Ramnanan has suffered loss of liberty, damage to his reputation, mental anguish, emotional distress, embarrassment, humiliation and financial loss and is entitled to relief under N.J.S.A. § 10:6-2.

## COUNT VI

### Violation of Civil Rights Pursuant to N.J.S.A. § 10:6-1 *et seq.*
### Deprivation of Substantive Due Process – The State Defendants

354.     Dr. Ramnanan hereby incorporates all of the preceding allegations and makes them a part of this Count as if fully set forth herein.

355.     The State Defendants at all times acted under color of state law.

356.     The State Defendants, in their individual capacities, acting alone and in concert, agreed to engage in and engaged in conduct that shocks the conscience and deprived Dr. Ramnanan of fundamental interests protected by the New Jersey Constitution, including: his rights to intrastate and interstate travel, his right to pursue a career and profession of his choosing, his right to be free from involuntary confinement, resulting in the violation of Dr. Ramnanan's rights to substantive due process.

357.    The State Defendants knowingly disregarded a substantial and real risk of serious injury, resulting in the deprivation of Dr. Ramnanan's life, liberty, and property interests.

358.    The State Defendants manipulated the truth during the pre-trial investigation, suborn perjury, protect witnesses providing false testimony, further the conspiracy, and denied Dr. Ramnanan his constitutional rights. By furthering the conspiracy through their administrative role, they were not engaged in law enforcement and are not entitled to sovereign immunity.

359.    Dr. Ramnanan's right to substantive due process under the New Jersey Constitution was clearly established such that any reasonable person would be aware of them. It was not reasonable for the State Defendants to believe that their actions and omissions did not violate Dr. Ramnanan's right to substantive due process under the New Jersey Constitution.

360.    As a direct result of the State Defendants' violation of Dr. Ramnanan's rights, Dr. Ramnanan has suffered numerous losses, including but not limited to loss of liberty, damage to his reputation, permanent negative stigma, mental anguish, emotional distress, embarrassment, loss of his ability to work in his chosen field, loss of his ability to travel, humiliation and substantial financial losses and is entitled to relief under N.J.S.A. § 10:6-2.

## COUNT VII

### Violation of Civil Rights Pursuant to N.J.S.A. § 10:6-1 *et seq.*
### Conspiracy – All Defendants

361.    Dr. Ramnanan hereby incorporates all of the preceding allegations and makes them a part of this Count as if fully set forth herein.

362.    The State Defendants at all times acted under color of state law.

363.    The State Defendants conspired and agreed to engage in conduct that deprived Dr. Ramnanan of his rights under the New Jersey Constitution. The State Defendants each engaged in a series of actions and omissions in furtherance of this conspiracy and agreement.

364.    The State Defendants manipulated the truth during the pre-trial investigation,

suborned perjury, protected witnesses who were providing false testimony, and violated Dr. Ramnanan's constitutional rights.

365.    As a direct result of the State Defendants' violation of Dr. Ramnanan's rights, Dr. Ramnanan suffered loss of liberty, damage to his personal and professional reputation, loss of his career, mental anguish, emotional distress, embarrassment, humiliation and substantial financial losses, and is entitled to relief under N.J.S.A. § 10:6-2.

## COUNT VIII
### Intentional Infliction of Emotional Distress – All Defendants

366.    Dr. Ramnanan hereby incorporates all of the preceding allegations and makes them a part of this Count as if fully set forth herein.

367.    The Defendants acted intentionally or recklessly at all times.

368.    The Defendants manipulated the truth during the pre-trial investigation, suborned perjury, protected witnesses providing false testimony, and flagrantly violated Dr. Ramnanan's constitutional rights.

369.    The conduct of the Defendants was extreme and outrageous.

370.    The extreme and outrageous conduct of the State Defendants caused Dr. Ramnanan to suffer severe emotional distress.

371.    The emotional distress incurred by Dr. Ramnanan was so severe that no reasonable person could be expected to endure it.

372.    The emotional distress incurred by Dr. Ramnanan was so severe that it resulted in serious psychological sequelae. It also caused his family to suffer severe emotional distress, which Dr. Ramnanan saw with his own eyes every day, and which greatly compounded his own suffering.

373.    As a direct result of the conduct of the Defendants, Dr. Ramnanan suffered loss of liberty, damage to his reputation, loss of his career, mental anguish, severe emotional distress, embarrassment, humiliation and substantial financial losses and is entitled to relief under New Jersey

common law.

## DEMAND FOR RELIEF

**WHEREFORE**, Plaintiff Terry Ramnanan, M.D., demands judgment against all defendants:

(1)     On all causes of action, compensatory damages in the amount of $50,000,000.00;

(2)     On all causes of action, punitive damages in the amount of $50,000,000.00; and

(3)     Costs and disbursements of this action, including attorney's fees, and for such other and further relief as to this Court may deem just and proper.

Dated: New York, New York
       September 13, 2021

       **JON L. NORINSBERG, ESQ., PLLC**

       Diego O. Barros, Esq.
       *Attorney for Plaintiff*
       110 East 59th Street, Suite 3200
       New York, New York 10022
       Telephone No.: (212) 791-5396
       Facsimile No.:  (212) 406-6890