```
                              SUPERIOR COURT OF NEW JERSEY
                              LAW DIVISION, CRIMINAL PART
                              BERGEN COUNTY, NEW JERSEY
                              INDICTMENT NO. 18-05-00083-S
                              APP. DIV. NO.

STATE OF NEW JERSEY,       )
                           )          TRANSCRIPT
    vs.                    )              of
                           )
TERRY RAMNANAN,            )      MOTIONS DECISIONS
                           )
        Defendant.         )

                    Place: Bergen County Superior Court
                           Justice Center, 10 Main St.
                           Hackensack, N.J. 07601

                    Date:  May 23, 2019
BEFORE:

    HONORABLE ROBERT M. VINCI, J.S.C.

TRANSCRIPT ORDERED BY:

    WILLIAM S. WONG, ESQ. (Attorney at Law)


APPEARANCES:

    CRYSTAL CALLAHAN, ESQ. (Deputy Attorney General,
    Appearing for Robert Grady, Esq., Deputy Attorney
    General)
    Attorney for the State

    WILLIAM S. WONG, ESQ. (Attorney at Law)
    Attorney for the Defendant




                    Transcriber Dolores Hastings, AD/T 417
                    **APPEALING TRANSCRIPTS INC.**
                    8 Victoria Drive
                    Clark, New Jersey 07066
                    (732) 680-1610 / Fax (732) 680-1615
                    Dolores.hastings@appealingtrans.com
                    Digitally Recorded
                    Operator, Bernard Rodrigues
```

2

<u>I N D E X</u>

| | Page(s) |
|---|---|
| Colloquy | 3 |
| <u>THE COURT</u>: Decision | 4 |

3

```
 1              THE COURT:  On the record.  All right, State
 2   versus Terry Ramnanan, it's -- it's Indictment 18-05-
 3   83-S.
 4              Counsel, appearances please?
 5              MS. CALLAHAN:  Good afternoon, Your Honor,
 6   Deputy Attorney General Crystal Callahan appearing on
 7   behalf of Robert Grady on behalf of the State.
 8              THE COURT:  Good afternoon.
 9              MR. WONG:  Good afternoon, Your Honor,
10   William Wong on behalf of Dr. Terry Ramnanan who's
11   present.
12              THE COURT:  Good afternoon.
13              DR. RAMNANAN:  Good afternoon.
14              THE COURT:  Good to see you and I assume Mr.
15   Grady had a jury duty?
16              MS. CALLAHAN:  Jury duty.
17              THE COURT:  Okay.
18              MS. CALLAHAN:  That's correct.
19              THE COURT:  Okay.  Well, thanks for coming in
20   his place, so that we can --
21              MS. CALLAHAN:  Of course.
22              THE COURT:  -- we can do this.  Everybody can
23   have a seat.  Is any -- is there anything anybody wants
24   to talk to about before --
25              MS. CALLAHAN:  I think there's one
```

4

```
 1   outstanding --
 2              THE COURT:  -- before I give you my decision?
 3              MS. CALLAHAN:  -- discovery issue per detec -
 4   - D.A.G. Grady, and so this is the best efforts of my
 5   office to comply with the request from Mr. Wong, so I'm
 6   giving these over.  These are the transcripts and the
 7   recorded statements with respect to some of the other
 8   questions, at least as D.A.G. Grady has relayed them to
 9   me, the other items do not exist.
10              MR. WONG:  Well, the other item has --
11              THE COURT:  Let's -- let's -- we'll deal with
12   that after.
13              MS. CALLAHAN:  Okay.
14              THE COURT:  Let's deal with that after.
15              Okay.  So this is -- there are two motions
16   that I'm dealing with right here.  First is the
17   defendant's motion to dismiss.  We also have the
18   defendant's motion to sever.
19              I'm going to stick to the motion to dismiss
20   first.  The -- in terms of the procedural history, I
21   have the defendant's moving brief filed January 25,
22   2019, I have the State's opposition filed on February
23   11, 2019, defendant's reply briefs filed on February
24   19, 2019 and February 20, 2019, the State's re -- reply
25   to those briefs dated -- dated -- dated April 23, 2019,
```

5

 1    and the defendant's reply to that brief, which was
 2    filed on May 1, 2019.  I -- I heard oral argument on
 3    this case in connection with these motions on May 13,
 4    2019 and I -- and I asked you to come back -- asked the
 5    parties to come back today so I could give you a
 6    decision on the motion.
 7             The facts of the case -- around August 1,
 8    2017 defendant was initially indicted for conspiracy in
 9    the third degree, commercial bribery and breach of duty
10    to act disinterstly -- disinterestedly in the third
11    degree, and criminal use of runners in the third
12    degree.  All of these counts related only to the
13    defendant's allegedly kickback payments to chiropractor
14    Ronald Hayek.
15             On May 31, 2018 defendant was charged a
16    superseding indictment that included 10 counts and the
17    first -- the first six counts relating to chiropractor
18    Hayek, including conspiracy in the second degree,
19    misconduct by a corporate official in the second
20    degree, healthcare claims fraud in the second degree,
21    theft by deception in the second degree, commercial
22    bribery and breach of duty to act disinter --
23    disinterestedly in the third degree, and criminal
24    running in the third degree.  Then he was also indicted
25    with respect to alleged kickback payments to a second

6

 1    chiropractor, Dr. Awari, and then -- then those counts
 2    included conspiracy in the second degree, healthcare
 3    claims fraud in the second degree, commercial bribery
 4    and breach of duty to act disinterestedly in the third
 5    degree, and commercial running in the third degree.
 6             As I said, Counts 1 and 3, 4, 6 -- 5, and 6
 7    relate to the alleged kickback payments to Arnold Hayek
 8    and Counts 7 through 10 relate to defendant's alleged
 9    kickback payments to Adam Awari.  The misconduct by a
10    corporate official charge, Count 2, is the only count
11    that arises out of the defendant's alleged kickback
12    payments to both Hayek and Awari.
13             The facts of the case - on May 31, 2018 the
14    State presented evidence to the State Grand Jury to
15    support the following allegations:  between January 1,
16    2012 and April 8, 2016 the defendant, a neurologist
17    using Interventional Spine and Pain Treatment Center, a
18    New Jersey corporation owned by defendant, submitted
19    insurance claims to at least 15 insurance companies
20    based on referrals from chiropractors Hayek and Awari.
21    The State alleges that the defendant paid kickback --
22    had kickback arrangements with Hayek and Awari under
23    which defendant paid the chiropractors cash bribes for
24    the referral of patients to the Spine and Pain
25    Treatment Center.

7

                    After providing the medical procedures, the
       spine -- the inter -- the Spine and Pain Treatment
       Center and/or defendant submitted standardized health
       insurance claim forms to the various insurance
       companies using a standard health insurance claim --
       claim form.
                    The procedures included patient
       consultations, needle E.M.G. and nerve conduction
       tests, and, importantly, the State concedes that the
       procedures were medically necessary and they were
       actually performed by qualified medical professionals
       on legitimate patients.  There were no fraudulent
       claims, there was no over-billing or overcharging.  All
       of the amounts paid by the insurers were for medical
       procedures needed by -- needed by and performed on
       their insureds, amounts that the insurance companies
       were obligated to pay pursuant to the terms of their
       respective insurance contracts.
                    The State alleges that the defendant paid Dr.
       Hayek a total of $25,900 for 196 patients and that
       defendant paid Dr. Awari approximately $3,000 in
       referral fees.  The State does not allege defendant
       made any false, fictitious, fraudulent, or misleading
       statements in the health insurance claims forms, nor
       does the State allege that the defendant omitted any

8

       information that was requested on those claim forms.
       The sole allegation is that defendant paid referral
       fees to Hayek and Awari and did -- did not disclose the
       alleged payments when he submitted the claim forms.
       Specifically, the State alleges -- alleged before the
       grand jury that defendant submitted the claim forms,
                 "to the different insurance companies,
       knowing that he or his staff was making
       misrepresentations or omissions on those forms by
       omitting to tell the insurance companies that he was
       breaking an implied certification that he, as a
       licensed doctor, was on -- or that as a licensed doctor
       was honoring his fiduciary duty to his patients to not
       be paying kickbacks to other referral -- referring
       medical practitioners, and by committing crimes and
       breaking regulatory rules in contravention of his
       medical license."
                    That's on the May 31, 2018 grand jury
       transcript, pages 5 to 6.
                    In exchange for a plea agreement providing
       the possibility of a non-custodial probationary
       sentence, Hayek agreed to cooperate with the State.  On
       April 1, 2016 Hayek participated in a proffer session
       with members of the Office of Insurance Prosecutors and
       during which he admitted that he had been receiving

9

```
 1   cash payments directly from defendant for patient
 2   referrals since 2012.  On April 8, 2016 Hayek was
 3   outfitted with a recording device while he attempted to
 4   discuss the kickback arrangements with defendant.
 5           In exchange for being diverted into Pretrial
 6   Intervention and avoiding jail -- a jail sentence,
 7   Awari also agreed to cooperate with the State.  On
 8   January 24, 2018 and February 7, 2018, as part of his
 9   cooperation, Awari participated in two proffer sessions
10   with members of the Insurance Fraud Prosecutor's
11   Office.  During these sessions Awari admitted that he
12   received between $2,000 and $3,000 in cash from the
13   defendant for patient referrals between two -- 2012 and
14   2015.
15           On May 31, 2018 Detective Berg (phonetic)
16   testified in front of the grand jury regarding both the
17   statements of Hayek and Awari, as well as the
18   recordings obtained in which defendant allegedly inculp
19   -- inculpated himself by discussing the kickback
20   schemes.
21           Defendant moved to dismiss Counts 2, 3, 4,
22   and 8.  As I explained at oral argument on May 13th,
23   because the motion to dismiss Count 2 implicitly and
24   necessarily includes a motion to dismiss the use of
25   criminal runners' charge -- runners' charges, because
```

10

```
 1   Count 2 is based, in part, on those charges, I'm also
 2   treating the motion to include a request for dismissal
 3   of Counts 6 and 10, which allege criminal use of
 4   runners.  Because that aspect of the motion was not
 5   expressly set forth, the Court allowed the State an
 6   opportunity to submit an additional brief on the issue
 7   of the criminal use of runners following oral argument.
 8   In response to that offer and opportunity, I received
 9   nothing from the State.  The State has not provided any
10   authority at all to support the charges of criminal use
11   of -- of runners that were included in the indictment.
12           A grand jury determines whether the State has
13   established a prima facie case that a crime has been
14   committed and that the accused committed it.  That's
15   State versus Francis, 191 N.J. 571 at 586 (2007).  In
16   seeking the indictment, the Prosecutor's sole
17   evidential obligation is to present a prima facie case
18   that the accused has committed a crime.  State versus
19   Hogan, 144 N.J. 216 at 236 (1996).  In order to
20   withstand the motion to dismiss, the State need only to
21   present some -- some evidence as to each element of the
22   charged offense.  State versus Vasky, 218 N.J. Super.
23   487 at 491, Appellate Division (1987).  The test of the
24   sufficiency of an indictment is whether it contains
25   elements of the offense intended to be charged and
```

11

gives the accused reasonable notice of the act or acts he's called upon to defend. State versus M.I., 253 N.J. Super. 13, at Page 19, Appellate Division (1991). A defendant who challenges an indictment must demonstrate that evidence is clearly lacking to support the charges. State versus Graham, 248 N.J. Super. 413, 4 -- at 417, Appellate Division (1995). In reviewing a motion to dismiss, the Court must consider the facts in the light most favorable to the State. State versus Saavedra, 433 N.J. Super. 501 at 514, Appellate Division (2013). An -- an indictment cannot stand, however, if it fails to charge a viable offense. State versus Bennett, 194 N.J. Super. 231, Appellate Division (1984), certification denied, 101 N.J. 224 (1985) State -- and State versus Wein, 80 N.J. 491 at 497 (1979). The trial court's discretion to dismiss an indictment should be exer -- not be exercised except upon the clearest and plainest grounds and unless it's palpably defective. State versus N.J. Trade Waste Association, 96 N.J. at 8 -- at 18 and 19 (1984). Accordingly, a trial court may dismiss an indictment only upon a palpable showing of fundamental unfairness -- unfairness. State versus Wein, 80 N.J. 5 -- at 501, or where the Prosecutor's conduct amounted to an intentional subversion of the grand jury process.

12

State versus Murphy, 110 N.J. 20 at 35 (1988). Dismissal of indictment is appropriate if it is established that -- that the violations substantially influence the grand jury's decision to indict or if there's grave doubt that the determination ultimately reached was arrived at fairly and impartially. State versus Hogan, 336 N.J. Super. 319 at 340, Appellate Division (2001).

Turning to Counts 3 and 8, healthcare claim fraud, pur -- N.J.S.A. 2C:21-4.2 states that healthcare claims fraud means making or causing to be made a false, fictitious, fraudulent, or misleading statement of material fact in, or omitting a material fact from, or causing a material fact to be omitted from any record, bill, claim, or other document that a person submits for payment or reimbursement for healthcare services.

The statute targets false or fraudulent claims. The State concedes that the claims at issue in this case were legitimate claims for necessary services provided by qualified providers to insured patients. There are no allegations of over-billing, over-prescribing, or fraud, or any type of fraud, other than the alleged payment of the referral fees. The claim submissions in this case were accurate and they

13

```
 1    provided all of the information that was requested by
 2    the insurers on the universal health insurance claim
 3    form.  There were -- was no false -- there were no
 4    false or fraudulent statements, and no information that
 5    was requested or necessary to submit the claim was
 6    omitted.  There were no representations one way or the
 7    other regarding the payment of referral fees, because
 8    the insurers do not request that information on the
 9    health insurance claim form.  The insurers didn't ask
10    for a representation that referral fees were not paid
11    as part of the claim submission process and defendant
12    made no representations that could be construed to
13    represent otherwise.
14              As the State told the grand jury, the claim
15    against the defendant is premised on the notion that by
16    submitting a health insurance claim form he omitted to
17    tell the insurance companies that he was breaking an
18    implied certification that he -- he, as a licensed
19    doctor, was honoring his fiduciary duty to his patients
20    not -- to not be paying kickbacks to other referring
21    medical practitioners.
22              Where statutory language is clear and
23    unambiguous, the Court must enforce it as written.
24    Versus Moore, 358 N.J. Super. 241 at 247, Appellate
25    Division (2003).  Under the Rule of Lenity, however,
```

14

```
 1    any ambiguity in criminal laws must be resolved in
 2    defendant's favor in order to afford the defendant fair
 3    notice that certain behavior is criminal.  Individuals
 4    must receive fair warning that certain behavior is
 5    criminal.  State versus Riley, 412 N.J. Super. 162,
 6    Appellate Division (2009).
 7              In Riley, the court rejected the State's
 8    interpretation of a computer crime statute on the
 9    ground that it criminalized what amounted to a breach
10    of an employment contract.  Riley at 185.  The State
11    argued that criminal -- while incorporated by
12    reference, informal and unclear workplace policies, but
13    the Court found the State's interpretation did not
14    provide sufficient notice to satisfy due process.
15    Riley at 185 to 86.
16              Fair warning is fur -- is -- is -- is
17    furthered by the void for vagueness doctrine in the
18    United States versus Lanier, 520 U.S. 529 (1997).  The
19    void for vagueness doctrine requires that a penal
20    statute define the criminal offense with sufficient
21    definiteness that ordinary people can understand what
22    conduct is prohibited and in a manner that does not
23    encourage arbitrary and discriminatory enforcement,
24    Kolender versus Lawson, 461 U.S. 352 in 1983.  The
25    touchstone is whether the statute, either standing
```

15

```
 1    alone or as -- or as construed, made it reasonably
 2    clear at the relevant time that defendant's conduct was
 3    criminal.  Lanier, 520 U.S. at 267.  Although the
 4    doctrine focuses both on the actual notice to citizens
 5    and arbitrary enforcement, the more important aspect of
 6    the vagueness doctrine is not actual notice, but the
 7    other principal element of the doctrine, that is the
 8    requirement that our Legislature establish minimum
 9    guidelines to govern law enforcement.  Smith versus
10    Goguen, 415 U.S. 560 -- 66 at 574 (1974).
11                In this case, the  -- the healthcare claims
12    fraud statute criminalizes making a false, fictitious,
13    fraudulent, or misleading statement of material fact
14    and/or omitting a material fact from or causing a
15    material fact to be omitted from any record, bill,
16    claim, or other document that a person submits for
17    payment or reimbursement for healthcare services.
18                As the State -- State explained to the grand
19    jury, the defendant submitted the claims at issue using
20    a universal health insurance claim form.  That form,
21    along with relevant patient records, were the only
22    documents submitted for payment or reimbursement for
23    health services.  Defendant did not make any false,
24    fictitious, fraudulent, or misleading statement of fact
25    in any of those documents, nor did defendant omit any
```

16

```
 1    fact, material or otherwise, from any of those
 2    documents.  Defendant provided all of the information
 3    requested by the insurers on the health insurance claim
 4    forms.  The State's attempting to shoehorn the use of
 5    referral fees into the statute by implicitly creating,
 6    from whole cloth, the requirement that providers
 7    include information regarding the payment of referral
 8    fees, a requirement that does not exist and a charge --
 9    and then charging the defendant with omitting that
10    information.  One cannot -- cannot omit information
11    from a claim form if that information is not sought in
12    the first instance.
13                The State's contention that the H.C.C.F.
14    statute extends to the defendant's alleged omission to
15    tell the insurance companies that he was breaking an
16    implied certification is a clear violation of the Rules
17    of Lenity and fair warning.  The Legislature did not
18    include the payment of referral fees as an active
19    healthcare claim fraud; of course, the Legislature
20    could have done so, but it didn't.  The State attempts
21    to stretch the reach of the statute to include the
22    payment of referral fees by contending that the failure
23    to report the payment of such fees was an omission, but
24    the insurers didn't ask for that information in the
25    claim submission process and there's no reason why a
```

```
 1      provider would be required to volunteer that
 2      information in the claim submission process.  It was
 3      not requested or required by any applicable statute or
 4      regulation.  The claim submission process focuses on
 5      the service provided and the patient who receives that
 6      service.  There's no reason why the provider would have
 7      been required to provide information regarding the
 8      operation of the provider's business when submitting a
 9      claim for reimbursement.
10              The inferences set forth in 2C:40 -- 21-
11      4.3(f)(1) and (2) provide context for the intended
12      breach of the statute.  Those inferences apply to
13      failure to perform an assessment necessary to determine
14      the appropriate course of treatment and in -- in other
15      words, an unnecessary procedure, and submission of
16      claims for more treatments or procedures than could
17      have been performed during the time period; in other
18      words, claims for services not actually provided.
19              There's no reason why information relating to
20      referral fees would be required, it has nothing to do
21      with the service provided to the patient for which the
22      payment or reimbursement is being sought and for which
23      the insurer is contractually obligated to pay or
24      reimburse.  At best, it's indirectly related to the
25      service provided, because it relates to the business
```

```
 1      practices of the pro -- provider.  Because the
 2      information is not directly relevant or necessary to
 3      the claim submission process and because it's not
 4      information requested by the insurers as part of the
 5      claims submission process, there's no way to know it
 6      would be an active healthcare claim fraud to not
 7      volunteer that information regarding the payment of --
 8      of referral fees in connection with the submission of
 9      the health insurance claim form.  Therefore, it would
10      violate the Rules of Lenity and fair warning to hold an
11      individual criminally -- criminally responsible for the
12      failure to volunteer information regarding referral --
13      referral fees in connection with the submission of the
14      health insurance claim form.
15              The Legislature also could have included in
16      the H.C.C.F. of this statute the type of implied
17      certification requirement that the State is attempting
18      to create.  In fact, the Legislature did include such a
19      provision in the New Jersey Insurance Fraud Prevention
20      Act, N.J.S.A. 17:33(a)(1) through -- to (30).  Under
21      the Insurance Fraud Prevention Act it is a violation of
22      the statute if a person,
23              "conceals or knowingly fails to disclose the
24      occurrence of an event which affects person's initial
25      or continued right or entitlement to any insurance
```

```
 1      benefit or payment".
 2              That's at 17:33(a)-4(a)(3).
 3              The leg -- Legislature did not include any
 4      similar provision in the Criminal Healthcare Claims
 5      Fraud statute, rather the H.C.C.F. statute is limited
 6      to making false, fictitious, fraudulent, or misleading
 7      statements of fact in or omitting facts from documents
 8      submitted for payment or reimbursement for health
 9      services.
10              Based on the language of the Insurance Fraud
11      Prevention Act, the Legislature knew how to include the
12      type of implied certification language the State seek -
13      - seeks to graft onto the H.C.C.F. statute, but have
14      elected not to do so.  The Legislature limited the
15      scope of the H.C.C.F. statute to actual
16      misrepresentations or omissions, it does not extend to
17      the type of implied certification alleged in this case.
18              The State's reliance on Universal Health
19      Services v. Escobar, 136 Supreme Court (1989), 2016
20      U.S. Lexus, 3920 2016 is misplaced.  First, Escobar is
21      a qui tam action under with the -- under the False
22      Claims Act seeking civil penalties.  It's not a
23      criminal case.
24              Second, and more importantly, the Supreme
25      Court did not adopt the extraordinarily broad implied
```

20

```
 1      certification argument the State advances in this case,
 2      rather, the Court held the implied certification theory
 3      can be a basis of liability at least where two
 4      conditions are satisfied.  First, that the claim does
 5      not merely request payment, but also makes specific
 6      representations about the goods or services provided
 7      and, second, that the defendant's failure to disclose
 8      noncompli -- or the defendant's failure to disclose
 9      noncompliance with a material statutory, regulatory, or
10      con -- or contractual requirements makes those
11      representations of a -- representations mis --
12      misleading half truths.  That's Escobar at 136 Supreme
13      at 2000.  This would include, for example, using
14      billing codes that in -- that indicated services were
15      provided by qualified providers when those services
16      were actually provided by unlicensed, uncreden --
17      uncredentialed or unqualified staff.  The Court
18      expressly -- the Supreme Court expressly did not
19      resolve whether all claims for payment implicitly
20      represent that a billing party is legally entitled to
21      payment.  Escobar at 136, Supreme Court at 2001.
22              In this case, the State can't point to any
23      representations made in any health insurance claim form
24      that is rendered misleading -- a misleading half truth
25      by the failure to disclose the payment of referral
```

21

fees.  Therefore, even if the implied certification theory adopted in Escobar applied to this criminal prosecution, which it does not, the State cannot satisfy the Escobar standard under the facts of this case.  Based on the clear and unambiguous language of the H.  -- H.C.C.F. statute, defendant did not commit an act of healthcare claim fraud.  As a matter of law, the State cannot establish the defendant made any false, fictitious, fraudulent, or misleading statement of fact in any document submitted for payment or reimbursement for health services or that defendant admitted any fact, material or otherwise, from any such documents.  Defendant, therefore, has met its burden to demonstrate the evidence is clearly lacking support in the charges.  See State versus Graham, 248 N.J. Super. at 417.  Even if the State could establish an omission as contemplated by the H.C.C.F. statute, which it cannot, the State cannot establish that the omission was material.

In State versus Goodwin, 224 N.J. 102 (2016) the Supreme Court held that statement -- a statement of fact is material if it could have reasonably affected the decision by an insurance company to provide insurance coverage to a claimant, or the decision to provide any benefit pursuant to an insurance policy, or

22

the decision to provide reimbursement, or the decision to pay a claim.

The State's effort to establish materiality before the grand jury was based on vague and ambiguous hearsay testimony.  On this -- and this is at the -- in the grand jury transcript at Pages 71 and 72.  The testimony included things such as the insurers -- the insurer said "some of them said a kickback scheme would definitely affect their investigation and payment of claims."  Also, some were not willing to commit and say it definitely would and many of the insurer -- insurance companies considered the existence of a kick -- kickback scheme between providers to be material and the failure to disclose that scheme when billing is considered material to them, as well.

And the State didn't identify which of the insurers considered the payment of referral fees to be material or -- or what any of the insurers would have done if they knew about the payments.  The best the State could do on materiality, therefore, was to tell the grand jury that some or many of the insurers would consider the existence of kickback schemes in their investigation of payment and payment of a claim.

The State needed to concede that some of the insurers would not even say -- they would not even say

```
 1      the payment of re -- referral fees would be material to
 2      the investigation of payment of a -- on the payment of
 3      the claims, and the State didn't offer any testimony to
 4      support the claim that any of the insurers would have
 5      denied an otherwise legitimate and -- an insured claim
 6      based on the payment of a referral fee.  It's not
 7      surprising, based on the facts of this case.  Again,
 8      the medical procedures in this case were legitimate and
 9      necessary procedures performed by qualified
10      professionals on insured patients.  The insurers were
11      obligated to pay the claims pursuant to the terms and
12      conditions of the respective insurance policies with
13      their insureds.
14              The State then took it one step further and
15      told the grand jurors,
16              "Actually, there's substantial case law in
17      civil context upon which many insurance companies re --
18      reply",  I believe that's supposed to be rely, "wherein
19      the Supreme Court has held that there is an implied
20      certification whenever they are sending in these
21      healthcare claim forms that medical providers have to
22      comply with all significant statutes, such as the
23      regulation in their -- in -- in their licenses".
24              This is, at best, a gross overstatement of
25      the Supreme Court's decision in Escobar.  In fact, as a
```

```
 1      -- as I already discussed, Escobar says nothing of that
 2      sort.  And, in fact, expressly does not adopt the legal
 3      analysis suggested by the State to the grand jurors
 4      here.  It was extremely misleading to tell the grand
 5      jury that the United State Supreme Court issued a
 6      decision supporting the State's legal theory when that
 7      simply is not true.
 8              At best, the evidence presented to the grand
 9      jury supports a finding that some of the insurers may
10      have considered the payment of referral fees in their
11      investigation in payment of claims.  As the Supreme
12      Court held in Escobar, it's not sufficient for a
13      finding of materiality if the government would have had
14      the option to decline to pay if it knew of the
15      defendant's noncompliance.  Escobar, 136 Supreme Court
16      at 2003.
17              In the absence of evidence that the insurers
18      or even some of the insurers would have actually
19      declined coverage if they were aware of the referral
20      payments, the State cannot establish the alleged
21      omissions in the claim process were material.
22              Finally, the defendant provided evidence
23      establishing that the insurers paid every claim
24      submitted and continued to pay the claims without
25      objection after the State obtained the superseding
```

25

1  indictment in this case.  The State doesn't contest
2  defendant's claims and has not provided evi -- any
3  evidence to contradict it.  The fact that the insurers
4  continued to pay these claims after the superseding
5  indictment was -- was -- was issued further undermines
6  the State's claim of materiality.
7           As the Supreme Court noted in Escobar, if the
8  government pays a particular claim in full, despite its
9  actual knowledge that certain requirements were
10 violated, that's very strong evidence that those
11 requirements are not material.  Escobar, 136 Supreme
12 Court at 230 -- 2003 to 2004.
13          The insurers in this case continued to pay
14 the very claims at issue after the defendant was
15 indicted.  This is strong evidence that the insurers
16 did not view the payment of referral fees as material
17 to their decisions to pay legitimate claims for medical
18 services provided to their insureds.
19          In the end, defendant has demonstrated that -
20 - that evidence is clearly lacking to support the
21 charge of healthcare claim fraud alleged in Counts 3
22 and 8 of the superseding indictment.  Because Counts 3
23 and 8 of the superseding indictment fail to charge a
24 viable offense, they must be dismissed.
25          Now I'll move to the theft by deception --

26

1  theft by -- pursuant to 2C:20, and this is Count 4.
2  Pursuant to 2C:20-4 a person is guilty of theft if he
3  purposely obtains property of another by deception.  A
4  person deceives if he purposely a) creates or
5  reinforces a false impression including false
6  impressions as to law, value, intention, or other -- or
7  other state of mind, b) prevent -- prevents another
8  from acquiring information which would affect his
9  judgment of a transaction, or, three -- or -- or c)
10 fails to correct the false impression which the
11 deceiver previously created or reinforced.
12          First, defendant did not obtain property of
13 another as contemplated by 2C:20-4.  The insurers paid
14 and/or reimbursed amounts they were obligated to pay
15 under the terms and conditions of their insurance
16 policies with their insureds.  Payments were made for
17 legitimate claims for necessary medical services
18 actually provided to their insureds.
19          The State claims -- the State's claim that
20 the defendant committed theft because the insurers
21 would have denied the claims if then insurers knew
22 about the referral payments fails miserably.  As
23 discussed previously, the State did not provide any
24 evidence that any of the insurance companies denied the
25 claims on that basis.  The best the insurer -- the

```
 1        State could do was offer evidence that some of the
 2   insurance companies may have taken that fact into
 3   account in their investigation or payment of claims.
 4   Even if this -- this evidence established materiality
 5   for purposes of the Health Claims Fraud statute, which
 6   it does not, it would not support a claim of theft by
 7   deception.
 8        Second, the State's implicit certification
 9   argument doesn't even come to close to establishing
10   deception as contemplated by the theft by deception
11   statute.  In fact, the premises of the State's implicit
12   certification argument is that the defendant did not
13   make any false or misleading statements or omit any
14   information requested by the insurers.
15        To prove theft by deception, the State must
16   prove that defendant purposely created or reinforced a
17   false impression or purposely prevented another from
18   acquire -- acquiring information which would affect his
19   or her judgment of a transaction or purposely failed to
20   correct a false impression which the deceiver
21   previously created or reinforced.
22        In this case, the State contends the
23   defendant omitted information from the health insurance
24   claim form that was not even sought by the insurers on
25   the form.  There's no evidence support a claim that
```

```
 1   defendant purposely created or reinforced a false
 2   impression, purposely prevented the insurers from
 3   require -- from obtaining required information, or
 4   purposely failed to correct the false impression that
 5   defendant previously created or reinforced.
 6        Third, the claim against the defendant
 7   arising out of his alleged taking of property from the
 8   insurer sounds in contract, not criminality.  Distilled
 9   to its essence, the State contends that the insurers
10   would have denied reimbursement for the claims because
11   defendant violated the -- his various agreements with
12   the insurers.  Even if any of the insurers would
13   actually have denied the claims, a claim that appears
14   to be con -- contradicted by the fact that they did pay
15   the claims, even after the defendant was indicted, the
16   insurers would have based the denial on defendant's
17   failure to comply with their agreements with the
18   defendant.  This type of breach of contract action has
19   consistently been rejected as a basis for criminal
20   charges.  See State versus Bennett, 194 N.J. Super.
21   231, Appellate Division (1984) and State versus Riley,
22   412 N.J. Super. 162, that was Law Division (2009).
23   Defendant's alleged breach -- defendant's alleged
24   violations of his agreements with the various insurers
25   is not a proper basis for a criminal charge of theft by
```

29

```
 1   deception.
 2              Finally, despite the fact that some identify
 3   -- some identified subset of the insurers would not
 4   even represent to the State that they would consider
 5   the payment of referral fees to be material
 6   information, much less that they would actually deny
 7   any -- any claims, the State aggregated all of the
 8   insurance payments made to all of the alleged re --
 9   referral fee patients for purposes of establishing the
10   second degree grading of the offense.  There's no way
11   for the grand jurors to determine the amount of the
12   payments made by the insurers who refused to say they -
13   - they would even consider the payments to be -- to be
14   material to the decision to pay.  It was improper for
15   the State to present the aggregate amount of the
16   insurance payments without reducing the amount for the
17   insurers who would not even say that they might have
18   declined the claims.  The State knew that it could not
19   establish that all of the insurers would have denied
20   the claims, because all -- some of the insurers would
21   not even tell them that they would consider this -- the
22   -- the -- the fact in their -- in their investigation
23   in payment of the claims, yet the State went ahead and
24   told the grand jurors that all -- in effect, all of the
25   insurers would have denied all of the claims when it
```

30

```
 1   aggregated -- aggregated all of the amounts paid to
 2   Hayek and Awari in -- in -- in its presentation to the
 3   grand jury.
 4              Again, the defendant has demonstrated that
 5   the evidence is clearly lacking to support the charge
 6   of second degree theft by deception alleged in Count 4
 7   of the superseding indictment.  Because Count 4 of the
 8   superseding indictment fails to charge a viable
 9   offense, it also must be dismissed.
10              Now with respect to criminal use of runners.
11   This is 2C:21-22.1(b).  A person is guilty of a crime
12   if that person knowingly uses, solicits, hires, or
13   employs another to act as a runner.
14              2C:21-22.1(c) provides that a runner means a
15   person who, for pecuniary benefit, procures or attempts
16   to procure a patient at the direction of, request, or -
17   - or in cooperation with a provider with the purpose --
18   or in cooperation with a provider was -- whose purpose
19   is to seek to obtain benefits under a contract of
20   insurance.
21              The statute specifically provides runner
22   shall not include a person who refers patients to a pro
23   -- provider as otherwise authorized by law.  In this
24   case, the State concedes that but for the alleged
25   payment of referral fees, Hayek and Awari were
```

```
 1    authorized by law to refer patients to the defendant.
 2    In other words, as chiropractors, Hayek and Awari were
 3    authorized by law to refer patients to the defendant.
 4    The Legislature expressly excludes such persons,
 5    persons such as chiropractors, who are authorized by
 6    law to refer patients, but -- but to do so -- but who
 7    do so for a fee in violation of the applicable
 8    regulations and licensure requirements.  For example,
 9    from the use of -- from the definition of runners, for
10    purposes of the criminal use of runners statute.  The
11    State has not provided any authority to support its
12    decision to charge the defendant under this statute and
13    the Court's research doesn't reveal any.  Again, I gave
14    the State an opportunity to provide me anything that
15    would support charging the defendant under this statute
16    and the defen -- and the State provided me absolutely
17    nothing, not a single piece of paper, not a single
18    citation to anything that could possibly support
19    charging the defendant under this statute, which by its
20    plain -- plain reading he did not violate.  In the
21    absence of any authority that could possibly explain or
22    justify the State's decision to charge the defendant
23    with a violation of this statute, the State -- the
24    State con -- this Court concludes that the State did so
25    improperly based on a plain reading of the statute.
```

```
 1    Because Hayek and Awari cannot qualify as runners under
 2    the statute, Counts 6 and 10 of the superseding
 3    indictment fail to charge a viable offense and also
 4    must be dismissed.
 5              Count 2 of the superseding indictment alleges
 6    misconduct by a corporate official, contrary to 2C:21-
 7    9.  Count 2 alleges that defendant used, controlled, or
 8    operated Interventional Spine Pain for the fur --
 9    furtherance or promotion of 1) theft by deception, 2)
10    healthcare claims fraud, and 3) criminal use of
11    runners.  Because all the offenses on which Count 2 is
12    based have been dismissed, Count 2 also must be
13    dismissed.
14              Finally, as I went through all of -- all of
15    this analysis and I -- and I became more familiar with
16    the -- with the legal concepts and -- and -- and fine -
17    - and finer points of exactly what was charged and what
18    was -- what was represented to the grand jury, this
19    Court concludes that the State intentionally subverted
20    the grand jury process resulting in a grand jury
21    presentation that was fundamentally unfair. First, the
22    State suggested to the grand jury that it should rely
23    on or at least assuaged by the fact that there exists,
24              "substantial case law and civil context upon
25    which many insurance companies rely, wherein the
```

```
 1      Supreme Court has held that there is an implied
 2      certification whenever -- whenever they are sending in
 3      these healthcare claims forms, that medical providers
 4      have to comply with all significant statutes, such as
 5      the regulation in their licenses".
 6              This was improper for two reasons.  It was
 7      improper to suggest to the grand jurors that the --
 8      that they should consider some ambiguously described
 9      body of law, including the alleged Supreme Court
10      decision that allegedly supported the State's request
11      for an indictment on the charges.  This left the grand
12      jurors not only with the impression that the legal
13      instructions provided at the conclusion of the
14      presentation should be considered in conjunction with
15      some other vaguely defined body of law, but also that
16      the State's legal position was supported by substantial
17      case law and Supreme Court law.
18              In addition, the State's claim was misleading
19      at best.  In fact, the State should have told the grand
20      jury that there is absolutely no law supporting the
21      charges of healthcare claim fraud, use of criminal
22      runners, or theft by deception.  The State deceived the
23      grand jury when it told them otherwise.  Not a single
24      one of the cases cited by the State is a criminal case
25      and not a single one of those cases relates to the --
```

34

```
 1      to the H.C.C.F. statute.  Moreover, the State's
 2      apparent reference to the Supreme Court's decision in
 3      Escobar is flat out wrong.  In addition to the fact
 4      that Escobar was a civil qui tam action, not a criminal
 5      case, the Supreme Court simply did not adopt the
 6      position represented by the State, instead, it adopted
 7      a test the State can't meet in this case.  By
 8      incorrectly and misleadingly advisingly [sic] the grand
 9      -- advising the grand jury regarding the applicable
10      law, the State left the grand jurors with the patently
11      false impression that the law was in its favor.  In
12      fact, the State should have told the grand jury that
13      there's absolutely no law that supported -- supported
14      these charges.  The State deceived the grand jury when
15      it told them otherwise.
16              Second, the State charged the defendant with
17      a violation of criminal use of runner statute even
18      though it knew the claim failed as a matter of law.  As
19      explained previously, the Legislature expressly
20      exempted from the definition of runner a person who
21      refers patients to a provider as otherwise authorized
22      by law.
23              As chiropractors, Hayek and Awari were
24      authorized by law to refer patients to the defendant.
25      The State was well aware that the Legislature expressly
```

```
 1      excluded cases such as this from the reach of the
 2      criminal runner statute and the State cannot come with
 3      any -- come up with any authority to support its
 4      decision to charge the defendant in the face of the
 5      place language of the statute.  In order to secure an
 6      indictment on this charge, the State failed to advise
 7      the grand jurors that -- what it plainly knew, that
 8      Hayek and Awari were authorized to refer patients to
 9      the defendant and could not qualify as runners.
10      Instead, the State selectively -- selectively advised
11      the grand jurors at the outset of the presentation that
12      it would be prof -- professional misconduct for a
13      chiropractor to receive referral -- a referral fee, and
14      that's the transcript at Page 7.  Yet it neglected to
15      tell the grand jurors that they were authorized to
16      refer patients to the defendant.  By hiding the ball
17      from the grand jurors and not advising them of the fact
18      -- of a fact that was critical to the grand jurors'
19      evaluation of the criminal runner statute, the State
20      intentionally subverted the grand jury process.
21              In this case, in addition, as I -- as I
22      mentioned earlier, despite knowing that the -- some --
23      at least some of the insurers, and we -- we have no
24      idea how many of the insurers, told the State that they
25      would not tell -- they would not consider the use of
```

36

```
 1      runners as part of the investigation and -- and claim
 2      payment process, the State went ahead and aggregated
 3      all of the payments to -- with respect to all of the
 4      patients to all of the insurers in presenting the case
 5      to the grand jury, and -- and -- and as I said earlier,
 6      implicitly represented to the grand jury that all of
 7      those claims would have been denied; the State knew
 8      that was not true.  The State absolutely knew that at
 9      least some of the insurers told them that they wouldn't
10      even commit to considering it as part of the process,
11      yet the State went ahead and -- and implicitly told the
12      grand jurors that every single one of those claims
13      would have been denied.  That was clearly improper and
14      it's simp -- simply cannot -- cannot be tolerated in
15      the context of a presentation of charges like this to a
16      grand jury.
17              In this case, the State lost sight of its
18      obligation to do justice and instead sought to indict
19      the defendant on the most serious charges it could
20      present.  Had the State not misled the grand jurors
21      regarding the law applicable to the charges and had the
22      State not charged defendant improperly with the use of
23      criminal runners, and had the State not over --
24      overstated the materiality and misled the grand jury
25      with respect to how -- how many, if any, of the
```

```
                                                              37
 1    insurers would have actually denied the -- these
 2    claims, the Court is not convinced the grand jury would
 3    have indicted the defendant.  In short, this Court has
 4    grave doubts that the determination ultimately re -- re
 5    -- reached was arrived at fairly and impartially.
 6              Accordingly, Counts 2, 3, 4, 6, 8, and 10 of
 7    the superseding indictment are dismissed with
 8    prejudice.  Counts 1, 5, 7, and 9 of the superseding
 9    indictment are dismissed without prejudice and, of
10    course, the State is free to represent those charges to
11    the grand jury in a fair and -- and appropriate manner,
12    if it chooses to do so.
13              Okay.  Thanks everybody.
14              MS. CALLAHAN:  Thank you.
15              MR. WONG:  Your Honor, is there a chance I
16    can get a copy of that?
17              THE COURT:  No.  You can order a transcript.
18              MR. WONG:  Oh, a transcript from your clerk?
19              THE COURT:  Yes.
20              MR. WONG:  Okay.
21              THE COURT:  Oh, we can go off the record.
22
23                    (END OF PROCEEDINGS)
24
25
```

```
                                                              38

                         CERTIFICATION

     I, DOLORES S. HASTINGS, the assigned transcriber,
do hereby certify the foregoing transcript of
proceedings of May 23, 2019, digitally recorded, index
number from 1:43:11 to 2:21:56, is prepared to the best
of my ability and in full compliance with the current
Transcript Format for Judicial Proceedings and is a
true and accurate compressed transcript of the
proceedings as recorded.



**/s/ Dolores S. Hastings**              May 30, 2019
Dolores S. Hastings AD/T 417
APPEALING TRANSCRIPTS, INC.
CLARK, NEW JERSEY
```